UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PHOENIX ANCIENT ART, S.A., PETRARCH LLC a/k/a ELECTRUM, and REGULUS INTERNATIONAL CAPITAL CORP. <br><br> Plaintiffs, <br><br> VS. <br><br> J. PAUL GETTY TRUST, J. PAUL GETTY MUSEUM, TIMOTHY POTTS, LIVIO RUSSO, and ARTURO RUSSO <br><br> Defendants. | CASE NO. _____1:17-cv-241_____ <br><br><br> PLAINTIFFS' ORIGINAL COMPLAINT <br><br><br> DEMAND FOR JURY TRIAL |

Plaintiffs file suit against the J. Paul Getty Trust (the "TRUST"), J. Paul Getty Museum (the "GETTY MUSEUM"), Timothy Potts ("POTTS"), Livio Russo ("LIVIO"), and Arturo Russo ("ARTURO") (collectively, "DEFENDANTS") for their misappropriation, fraud, and breach of and interference with a contract, interference with prospective business relationships, and conversion. Plaintiffs, through years of hard work, professional judgment, and extensive knowledge regarding antiquities, created exclusive relationships with the Torlonia family and Italian officials designed to create a plan to transfer, sell, display and commercialize a Torlonia family extensive art collection. These plans were the trade secrets and proprietary plans of Plaintiffs.

The Torlonia collections at issue in this case is a collection of Greek and Roman sculptures valued in the billions of dollars. Knowing the TRUST and GETTY MUSEUM's history of dubious acquisitions and trouble with Italian authorities, Plaintiffs protected their plans, proprietary information, and trade secrets through a Non-Circumvention

Agreement. DEFENDANTS, however, stole the value of years of work and relationships cultivated by Plaintiffs in violation of their contractual and legal duties. PLAINTIFFS further allege as follows:

JURISDICTION AND VENUE

1.      Federal question jurisdiction exists under 28 U.S.C. § 1331 as this action arises under 18 U.S.C. § 1836. Additionally, this Court has jurisdiction pursuant to 28 U.S.C. § 1332 over this civil action in which the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, between citizens of different states, and citizens of a state and citizens or subjects of a foreign state.

2.      As further explained below, this Court has personal jurisdiction over DEFENDANTS at least because DEFENDANTS are present within or have ongoing systematic contacts with the United States, the State of New York, and the Southern District of New York. DEFENDANTS have purposefully and regularly availed themselves of the privileges of conducting business in the State of New York and in the Southern District of New York. As also explained below, Plaintiffs' causes of action arise directly from DEFENDANTS' activities in the State of New York and in the Southern District of New York.

3.      Venue is proper in this Court under 28 U.S.C. §§ 1391(b), (c), and (d) because, as explained below, a substantial part of the events or omissions giving rise to the claims occurred in this District.

THE PARTIES

A.      **The PLAINTIFFS.**

4.      Phoenix Ancient Art, S.A. ("PHOENIX") is a world-leading dealer in rare and exquisite antiquities. Phoenix Ancient Art, S.A. is managed by brothers Ali and Hicham

Aboutaam and was founded in the mid-1960s. Phoenix Ancient Art, S.A.'s principal place of business is at 6, rue Verdaine, P.O. Box 3516, 1211 Geneva 3, Switzerland.

5.      PHOENIX maintains galleries in Geneva and New York. Its offerings include antiquities of the highest quality from a broad geographic range covering the Mediterranean and western and central Asia. PHOENIX exhibits objects from the Greek, Roman, and Byzantine worlds and cultures in Mesopotamia, the Near East, Egypt, Europe, the Balkans, Eurasia, and the Steppes.

6.      PHOENIX's works of art have been purchased for public display by many of the world's preeminent museums. PHOENIX expends significant effort to establish the authenticity and provenance of its offered works of art. This extends from scholarly historical and stylistic analysis to scientific reports based on thermo-luminescence, carbon-14, metallurgic, and other testing. These analyses ensure that each artifact is authentic regarding its description and date.

7.      Petrarch LLC a/k/a Electrum ("ELECTRUM") is the exclusive U.S. agent for PHOENIX and is a New York limited liability company with a principal place of business at 47 East 66th Street, New York, New York 10065.

8.      Regulus International Capital Corp. ("REGULUS") is a Delaware Corporation with a principal place of business at 67 Holly Hill Lane, Greenwich, Connecticut, 06830. REGULUS and ELECTRUM agreed to participate in a cooperative venture to assist in the sale or transfer of art owned by the Torlonia family.

9.      PHOENIX, ELECTRUM, and REGULUS are collectively referred to herein as PLAINTIFFS.

### B.   The DEFENDANTS.

10.   The GETTY MUSEUM is the richest museum in the world and has an endowment that exceeds $4 billion.

11.   In its bylaws, the TRUST claims to be formerly known as The J. Paul Getty Museum and claims a principal office at 1200 Getty Center Drive, Los Angeles, California 90049. The TRUST bylaws explicitly provide that contracts executed by TRUST officers are valid and binding on the TRUST. The TRUST and the GETTY MUSEUM will hereinafter be referred to as the GETTY.

12.   The GETTY MUSEUM and TRUST may be served through James Cuno at 1200 Getty Center Drive, Los Angeles, California, 90049.

13.   POTTS is a director of the GETTY who has repeatedly travelled to New York, New York regarding the acts and omissions complained of herein. POTTS orally agreed to the contractual obligations discussed herein while in New York, personally executed the contract at issue and sent it to New York, personally made the representations and omissions at issue, many of which occurred in New York, and personally participated in misappropriation of PLAINTIFFS' trade secrets and proprietary business information, which were maintained in New York. POTTS can be served with process at 1200 Getty Center Drive, Los Angeles, CA 90049.

14.   LIVIO and ARTURO (herein referred to collectively as "the RUSSOS") conduct substantial business in this District, including a significant convention on an annual basis in which they conduct millions of dollars in sales of antiquities, and this District is the locus of their sales in the United States. The RUSSOS can be personally served in New York or

- 4 -

served pursuant to the Hague Convention at 3rd Floor Genavco House, 17 Waterloo Place, London SW1Y 4AR, UK or Corso Magenta, 2, 20123 Milano MI Italy.

**FACTUAL BACKGROUND**

**A.  The GETTY.**

15.     The GETTY   MUSEUM and the TRUST are creations of their namesake, J. Paul Getty. J. Paul Getty earned billions of dollars after striking oil in the Neutral Zone between Saudi Arabia and Kuwait. In 1957, J. Paul Getty was declared the richest man in the United States.

16.     J. Paul Getty's family life, however, was tragic. One of his sons committed suicide, a daughter-in-law suffered a fatal heroin overdose, and a grandson was kidnapped and mutilated when J. Paul Getty refused to pay nearly $17 million in ransom. When J. Paul Getty died in 1976, he left behind three living children but willed the bulk of his estate to the GETTY MUSEUM.

17.     After inheriting $1.2 billion from J. Paul Getty, The GETTY MUSEUM became the richest museum in the world, a status that continues to this date.

18.     The GETTY has a history of legal troubles for allegedly dubious acquisitions.

19.     For example, the Italian government initiated both civil and criminal actions against former GETTY antiquities curator, Marion True, who served in that position from 1986 to 2005.

20.     The Italian government claimed that 46 ancient artworks were looted and smuggled out of the country prior to being purchased by the GETTY. Maurizio Fiorilli was a government lawyer who represented Italy in these charges.

21.     Fiorilli stated that those charges resulted in a "cultural embargo" between Italy and the GETTY during which Italian authorities ignored several requests by the GETTY to borrow Italian art.

22.     The Italian government actually refused multiple requests by the GETTY to borrow or exhibit Italian art.

23.     The Attorney General of the State of California launched a civil investigation of the TRUST in 2006. After conducting that investigation, the Attorney General found that the Trustees of the TRUST "improperly allowed the expenditure of charitable funds when they permitted the Trust to pay the travel expenses of [the Trust's president's] wife," "improperly allowed the use of charitable funds to make gifts of more than token value to retiring Trust officials," "improperly used Trust resources for private benefit when [the president] directed employees to run personal errands," and paid improper consulting funds to a graduate art student. But finding that the TRUST's president agreed pursuant to a settlement to pay the TRUST $250,000 cash and to forfeit more than $2 million in benefits, the Attorney General declined to take any legal action because "the Trust ha[d] been compensated for the losses as a result of the settlement."

24.      In 2007, the GETTY agreed to return 40 of 46 challenged artworks to Italy. The Italian government, in turn, dropped its civil charges against Ms. True.

25.     The GETTY, however, refused to return a bronze sculpture known as the "Victorious Youth" to the Italian Government. This particular bronze sculpture dates from around 300-100 B.C. In 2010, a court in Italy ordered that the GETTY hand over the sculpture. But the GETTY appealed and continues to appeal that ruling, and ultimately had

the case remanded back to a regional Italian court. The GETTY has still not returned the "Victorious Youth" to Italy.

26.     In 2010, the GETTY again faced a lawsuit for alleged improper antiquity acquisition. The Armenian Orthodox Church sued the GETTY for allegedly harboring stolen illuminated medieval manuscripts, failing to verify the ownership of those manuscripts, and violating ethical duties.

27.     The GETTY ultimately settled those claims, issued a recognition that the Armenian Orthodox Church owned the disputed artwork, and agreed to pay the Church's legal expenses.

28.     POTTS publicly admitted there were "lots of gray areas and facts [the GETTY didn't] know" relating to the chain of title of the manuscript pages they acquired.

29.     The GETTY's questionable acquisition tactics have spurred scholastic discussion. In 2012, the International Foundation for Art Research published an article regarding the Getty's questionable acquisition tactics.[1] That article reviewed *Chasing Aphrodite: The Hunt for Looted Antiquities at the World's Richest Museum* and its allegations that the GETTY "ignored" issues regarding looting of antiquities.

30.     According to *Chasing Aphrodite*, while J. Paul Getty's death in 1976 left the museum well-funded, it was also unencumbered by ethical, moral, or financial constraints on spending.

31.     To catch up with the more-established antiquities museums of the world, the Getty launched an ambitious acquisition program that was less strict regarding the provenance of the objects it acquired than competitor museums.

---

[1] *The Fall and Rise of Marion True and the Getty Museum*, IFAR Journal, Vol. 13, No. 3 (2012)

32.     The authors of *Chasing Aphrodite* obtained leaked internal documents and expanded their work into a narrative of avarice and arrogance throughout the Museum.

33.     Those authors confirm that the aforementioned Ms. True was ultimately replaced by POTTS.

34.     The GETTY hired POTTS because of his appetite for risk in acquiring extraordinary works of art.

35.     POTTS's appetite for risk in acquiring works of art led him to engage in the unethical and illegal acquisition tactics alleged herein.

**B.  The Torlonia Family.**

36.     Originally emigrants from France who arrived to make uniforms for the occupying Napoleonic army, the Torlonia family began to acquire great wealth in the 18th and 19th centuries through their administration of Vatican finances.

37.     Giovanni Torlonia established the family bank that worked for the Vatican and was ultimately named the Duke of Bracciano, Count of Pisciarelli, Marquess of Romavecchia e Turrita, and First Prince of Civitella Cesi. The latter title was bestowed by Pope Pius VI.

38.     Giovanni's successors lived as nobility, enjoyed high-profile positions, and included senators and a Mayor of Rome. One of Giovanni's great-great-grandchildren married into the Spanish Royal Family.

39.     In the 1920s, the Torlonia family rented one of their expansive villas to Mussolini and his family, where the Mussolini's resided for almost ten years. After the end of World War II, the Torlonia family shrank from public view, likely because of the political backlash of harboring one of history's most vilified despots.

40.     The Torlonia family's villa fell into disrepair until it was claimed by Italy in 1977 who opened it to the public. Mussolini's bunkers on the property were only recently opened to public view.

41.     As discussed below, the Torlonia family experienced significant governmental pressure regarding its vast art collections during this period.

42.     The current Prince, Prince Alessandro Torlonia, is responsible for the assets of the Torlonia family. Various members of his family participated in the acts complained of herein, including his grandson, also named Alessandro Torlonia.

C.     **The Torlonia Collections.**

43.     The Torlonia Collections are known as one of the world's most significant collections of classical sculptures and the world's most important private collections of classical art.

44.     The Torlonia Collections were started by Giovanni Torlonia in the 1800s and consist of works that were unearthed on the family's estates, works that were used as security for defaulted loans, and purchases from other collectors.

45.     Since the 1960s, the Torlonia Collections were maintained out-of-view in some of the Torlonia family's several palaces in Rome. During the 1960s, the Torlonia family converted the exhibition hall holding the collections into apartments and moved the collections to various basements out of public view. This caused an outcry among experts who called for the collection to be confiscated by the Italian state.

46.     The family, however, long resisted government attempts to return the artwork to the public and kept the collection out of public view.

**D.    ELECTRUM is hired to catalogue the TORLONIA SCULPTURES.**

47.    The RUSSOS are world-renowned numismatists and engage in multiple high-dollar coin auctions on a yearly basis. For example, the RUSSOS participate annually in the New York International Numismatic Convention held in the Waldorf-Astoria Hotel in January of each year. Over the years, they have sold millions of dollars of historical coins in New York. The RUSSOS are currently expected to exhibit in stall S18 of the 45th New York International Numismatic Convention from Thursday, January 12, 2017 through Sunday, January 15, 2017.

48.    The Aboutaam family also collects ancient coins. Through this mutual interest, Ali Aboutaam was contacted by the RUSSOS and told about the portions of the Torlonia Collections that were available for sale.

49.    The Torlonia Collections include approximately 620 Greek and Roman Sculptures that were described in an 1885 catalogue entitled the *I monumenti del Museo Torlonia riprodotti con la fototipia*. Those 620 sculptures are hereinafter referred to as the TORLONIA SCULPTURES.

50.    The RUSSOS informed ELECTRUM of their belief that only ELECTRUM could find a buyer for the TORLONIA SCULPTURES.

51.    The RUSSOS provided Ali with the 1885 catalogue of the TORLONIA SCULPTURES which was provided by the Torlonia family to the RUSSOS. That catalogue was over 130 years old, included low-resolution black-and-white pictures and abbreviated descriptions only, and did not provide sufficient details regarding current status, condition, market value, restoration, or attributions regarding chain of title for the works of art.

52.     On January 21, 2010, Hicham Aboutaam flew to Rome to meet with LIVIO. LIVIO met him at the airport and they proceeded directly to meet the Prince and to view the collection. ELECTRUM's work began immediately thereafter.

53.     Beginning in the summer of 2010, ELECTRUM utilized its professional judgment and extensive knowledge regarding antiquities to painstakingly catalogue the TORLONIA SCULPTURES, took thousands of new pictures, and translated supporting documents from Italian to English to support the provenance of the collection.

54.     The purpose of ELECTRUM's efforts in cataloguing the TORLONIA SCULPTURES was to ready the collection for sale. At all times, PLAINTIFFS kept the contents of their catalogue and research under reasonable security measures to maintain the independent economic value of that catalogue and research as it related to the sale or transfer of the TORLONIA SCULPTURES.

55.     Over the next several years, ELECTRUM continued its efforts in evaluating the TORLONIA SCULPTURES, developing its trade secrets, cultivating its relationships with Italian authorities, and attempting to find a buyer.

56.     In the Spring of 2013, ELECTRUM representatives invited POTTS to visit their New York gallery.

57.     When POTTS and ELECTRUM representatives met in New York in the Spring of 2013, ELECTRUM disclosed that it was cataloguing a significant collection that could be of interest to the GETTY. ELECTRUM also discussed the substantial work undertaken by ELECTRUM in preparing that collection for sale or transfer. At that time, however, ELECTRUM did not specifically name or describe the TORLONIA SCULPTURES or provide any of its trade-secret information.

- 11 -

58.     POTTS was excited about the collection and ELECTRUM's trade secrets and expressed that the GETTY would be very interested in a deal through which the GETTY could acquire an interest in that collection.

59.     ELECTRUM explained to POTTS that it had developed proprietary means and relationships with Italian authorities necessary to bring the collection to public view.

60.     After POTTS orally agreed to keep the opportunity in the strictest confidence, ELECTRUM shared that the collection was the TORLONIA SCULPTURES and provided the Torlonia family's history. POTTS agreed to later formally document the oral confidentiality agreement in writing after consulting with the GETTY's attorneys.

61.     After this oral agreement, ELECTRUM showed POTTS the thousands of photographs taken by ELECTRUM of the TORLONIA SCULPTURES. POTTS also requested that ELECTRUM send him a large selection of the photographs to his private residence for further review.

        E.      The NON-CIRCUMVENTION AGREEMENT.

62.     On July 12, 2013, POTTS signed a Non-Disclosure and Non-Circumvention Agreement ("NON-CIRCUMVENTION AGREEMENT") with ELECTRUM and PHOENIX relating to access to the Torlonia Family, relationships with Italian officials, knowledge, trade secrets, and access relating to the TORLONIA SCULPTURES, and knowledge regarding appropriate deal structures to bring the TORLONIA SCULPTURES to the public.

63.     POTTS executed the NON-CIRCUMVENTION AGREEMENT on behalf of the GETTY as well as "all affiliates, officers, directors, employees, and agents thereof."

64.     POTTS and the GETTY agreed to "receive disclosure of confidential and proprietary information from Electrum pursuant to the terms of [that] agreement for the

purpose of evaluating a possible transaction" and "agreed to maintain the confidentiality of the disclosed information."

65.     POTTS and the GETTY agreed to "take all reasonable measures to protect the secrecy of and avoid disclosure or use of the Confidential Information" and to "take at least those measures that [the GETTY] takes to protect its own most highly confidential information."

66.     Simply put, confidential information could not be used by POTTS or the GETTY "in any way except for the purpose of evaluating the possible transaction."

67.     Additionally, "[a]s an express prior condition to its receipt of information" regarding the TORLONIA SCULPTURES, POTTS and the GETTY agreed that they would "not contact either directly or indirectly" the Torlonia Family or any party representing or related to the Torlonia family regarding the TORLONIA SCULPTURES, except exclusively through ELECTRUM and PHOENIX.

68.     The GETTY further undertook the obligation to return to ELECTRUM and PHOENIX "all originals and copies of Confidential Information upon request."

**F.    The GETTY's Continued Interest in the TORLONIA SCULPTURES.**

69.     In the fall of 2013, POTTS and the GETTY requested the catalogue prepared by PLAINTIFFS. Relying on POTTS and the GETTY's representations relating to the NON-CIRCUMVENTION AGREEMENT, PLAINTIFFS sent POTTS and the GETTY the detailed catalogue

70.     POTTS, on behalf of the GETTY, again visited New York and ELECTRUM to discuss the acquisition of the TORLONIA SCULPTURES. On November 8, 2013, ELECTRUM, REGULUS, and POTTS met at the Rouge Tomate Restaurant in Manhattan. PLAINTIFFS

- 13 -

explained that REGULUS could provide important guidance regarding its trade-secret deal structures for the TORLONIA SCULPTURES that would allow foreigners to purchase rights to important cultural collections in Italy.

71.     After that meeting, on November 15, 2013, POTTS and the GETTY requested PLAINTIFFS' thousands of photographs of the TORLONIA SCULPTURES. Again, in reliance on DEFENDANTS' representations, PLAINTIFFS forwarded the requested information. This package of detailed photographs and information weighed over 12 pounds and includes PLAINTIFFS' trade secrets. DEFENDANTS still have possession of this package and have refused PLAINTIFFS' request to return it, in breach of the NON-CIRCUMVENTION AGREEMENT.

72.     By January of 2014, the GETTY and POTTS had identified a list of sculptures from the TORLONIA SCULPTURES that the GETTY was interested in acquiring or controlling.

73.     POTTS and the GETTY planned on visiting Rome in early 2014 to review those sculptures from the TORLONIA SCULPTURES regarding which the GETTY had interest.

74.     POTTS thus sent PLAINTIFFS on January 13, 2014 a list of 119 sculptures he would like to see from the TORLONIA SCULPTURES for his visit to Rome.

75.     Also on January 13, 2014, POTTS, knowing that only PLAINTIFFS had an exclusive understanding of the proper channels and means with which to communicate with the Prince, requested that ELECTRUM draft a letter for POTTS to send to Prince Alessandro Torlonia. In that letter, POTTS stated he planned to visit Rome with Mr. Hicham Aboutaam to inspect the renowned TORLONIA SCULPTURES.

76.     POTTS allowed two days to inspect the sculptures and determine in more detail which ones may be of interest to the GETTY.

77.     POTTS recognized the TORLONIA SCULPTURES is a famous collection filled with masterpieces with importance to the history of collecting antiquities in Italy and to the understanding of ancient Roman art.

78.     POTTS and the GETTY relied on Mr. Aboutaam to draft and send the letter to the Prince, as the Prince had particular requirements regarding formal protocols, did not maintain an address, and preferred to have correspondence sent to his agents who would then print and hand deliver such correspondence to the Prince. Those agents were the RUSSOS.

79.     The RUSSOS submitted POTTS and GETTY's letter to the Prince and circulated a response from the Prince.

80.     Prince Alessandro Torlonia expressed sincere appreciation for the GETTY's interest in the TORLONIA SCULPTURES but also expressed concern regarding late notice and noted that the individual pieces in the collection were not for sale.

81.     On January 16, 2014, POTTS visited Rome with PLAINTIFFS and met with the grandson of the Prince, LIVIO, and an attorney for the Prince. At that meeting, POTTS expressed interest in the TORLONIA SCULPTURES and stated an intent to reschedule a visit soon.

82.     On January 17, 2014, PLAINTIFFS, through their connections in Italy, arranged for POTTS to visit the Vatican. Demonstrating PLAINTIFFS' broad access to items of importance to Italian art, PLAINTIFFS arranged for POTTS to view the Pope's private

chapel, which is attached to the Sistine Chapel, and allowed for a visit of the living quarters for the Pope and senior Vatican officials.

83.     No later than April 17, 2014, ELECTRUM emailed the RUSSOS a copy of the NON-CIRCUMVENTION AGREEMENT, which the RUSSOS delivered to the Torlonia family. Prior to April 17, 2014, however, the RUSSOS and the Torlonia family were verbally informed of the NON-CIRCUMVENTION AGREEMENT.

84.     Through PLAINTIFFS, POTTS and representatives of the GETTY again attempted to meet with Prince Alessandro Torlonia regarding the TORLONIA SCULPTURES during meetings in Rome on April 18, 2014 and April 19, 2014.

85.     In a letter to the Prince, the GETTY and POTTS confirmed the TORLONIA SCULPTURES was potentially of great interest to the GETTY.

86.     As was required by practice and the NON-CIRCUMVENTION AGREEMENT, the GETTY and POTTS forwarded this letter to PLAINTIFFS to transmit to the Prince through the RUSSOS.

87.     POTTS, on behalf of the GETTY, again met with ELECTRUM, the Prince and representatives of the Torlonia Family in Rome on April 18, 2014.

88.     POTTS again sent PLAINTIFFS a letter for the Prince in which he confirmed that he had been offered an opportunity to see a group of Roman marble sculptures of possible interest for acquisition by the GETTY. He also agreed to treat the owner's name and the information related to the sculptures as confidential.

89.     Like the others, this letter was drafted by PLAINTIFFS and approved by POTTS and the GETTY for transmission by PLAINTIFFS to the RUSSOS who in turn sent it to the Prince.

90.     After PLAINTIFFS had already submitted the GETTY's agreement to keep information related to the sculptures confidential to the RUSSOS, the GETTY requested that PLAINTIFFS stop transmission so that the GETTY's legal department could review that "NDA."

91.     By April 29, 2014, GETTY had revised the letter. In the revised letter, POTTS confirmed he saw the group of Roman marble sculptures of possible interest for acquisition by the J. Paul Getty Museum on April 18, 2014 but also requested that the Prince keep confidential the GETTY's interest in those objects.

**G.      PLAINTIFFS continue to assist the GETTY in its efforts to obtain the TORLONIA SCULPTURES.**

92.     On June 27, 2014, POTTS and the GETTY requested that PLAINTIFFS send the original and dated versions of the catalogue of the TORLONIA SCULPTURES to POTTS and the GETTY. Again relying on Defendants' oral representations and those in the NON-CIRCUMVENTION AGREEMENT, PLAINTIFFS did as requested.

93.     After receiving the catalogues, however, the GETTY and POTTS suddenly stopped communicating with PLAINTIFFS regarding the GETTY's intent for the TORLONIA SCULPTURES.

94.     By February 19, 2015, the Prince became anxious because he hadn't heard from the GETTY or been visited again by the GETTY. The Prince stated he considered gifting the collection to the Italian authorities in lieu of taxes absent a commitment from the GETTY.

95.     When PLAINTIFFS conveyed the Prince's concerns to POTTS and the GETTY, the GETTY represented it had decided to decline the opportunity to pursue this important collection.

96.     The GETTY agreed it would be wonderful for the TORLONIA SCULPTURES to be available to the public, but claimed applicable Italian law made the GETTY's involvement unappealing.

97.     The GETTY's concern with Italian law was borne out of its multiple conflicts with the Italian government regarding art purchased by the GETTY without proper authentication of source. For example, the GETTY had ongoing litigation with the Italian government regarding the Victorious Youth, had previously funded the defense of its prior curator, Marion True, and had previously been forced to return 40 statues to Italy that had been purchased by the GETTY after being looted.

98.     The GETTY was also concerned regarding whether the Italian government would allow temporary exportation of the TORLONIA SCULPTURES, or parts thereof, particularly given the collection's value to the Italian public.

99.     Only through PLAINTIFFS' extensive knowledge regarding antiquities, professional judgment, and exclusive relationships with the Italian government and officials and the Torlonia family could DEFENDANTS overcome these difficulties.

100.    Additionally, PLAINTIFFS developed a trade-secret deal structure that would allow for the GETTY to hold ownership of the TORLONIA SCULPTURES in a manner that was consistent with Italian law and permit temporary export of the collection or the pieces of the collection of interest to the GETTY.

101.    PLAINTIFFS also assembled a unique insurance plan to limit the GETTY's exposure to political risk regarding acquiring ownership or control of the TORLONIA SCULPTURES.

102.    Continuing in their attempt to bring the Torlonia Family, Italian authorities, and the GETTY together to allow for the public display of the TORLONIA SCULPTURES, PLAINTIFFS expressed to the GETTY on March 5, 2015 that they, along with the Prince's advisors, believed the potential sales price for the TORLONIA SCULPTURES had decreased.

103.    PLAINTIFFS estimated the cost of the TORLONIA SCULPTURES was between $350 million and $550 million, net of commission. To facilitate the deal, PLAINTIFFS agreed to change the deal structure and agreed to a commission of 22% of the price paid to the Prince.

104.    Mr. Stephen Clark, general counsel for the GETTY, expressed interest in that proposal and agreed to further discuss.

105.    By March 24, 2015, the GETTY feigned a lack of interest in the TORLONIA SCULPTURES and claimed the proposal did not make sense for the GETTY regarding "this superb collection" of "important art."

106.    In May of 2015, LIVIO contacted PLAINTIFFS to inquire whether he might directly contact the GETTY regarding the TORLONIA SCULPTURES. PLAINTIFFS responded in writing that to do so would be a violation of the NON-CIRCUMVENTION AGREEMENT, reminded LIVIO that he had a copy of that agreement, and that any communication must go through PLAINTIFFS. Through at least this communication and the prior transmission of the NON-CIRCUMVENTION AGREEMENT, the RUSSOS had knowledge of the NON-

CIRCUMVENTION AGREEMENT and PLAINTIFFS' rights and the GETTY's obligations arising out of that agreement.

107.    In June of 2015, the Italian press reported on the TORLONIA SCULPTURES. Describing the collection as the "largest still in private hands," the Italian press expressed concern that it was for sale to "U.S. businessmen." Citing the Italian Minister of Culture, the press confirmed that a sale was immediately pending and requested that the state intervene in the purchase.

108.    On June 19, 2015, PLAINTIFFS proposed a new trade secret deal structure to the GETTY regarding the TORLONIA SCULPTURES to avoid political risk.

109.    Meanwhile, PLAINTIFFS worked with the Italian government to ensure that the government would not intervene in a sale or transfer of the TORLONIA SCULPTURES on the grounds that the collection was in disrepair. PLAINTIFFS were in the best position to do so given their substantial involvement in cataloguing and describing the TORLONIA SCULPTURES.

110.    In July of 2015, ELECTRUM and POTTS met at the GETTY MUSEUM.

111.    As a follow-up to that meeting and at the GETTY's request, PLAINTIFFS forwarded to the GETTY additional details regarding the Ministry of Culture in Italy, the ministry's assurance to the Prince that the Italian government was supportive of the sale of the TORLONIA SCULPTURES and would provide a building in Rome to exhibit the works, and that the Prince was willing to further reduce his price for the sale of the TORLONIA SCULPTURES.

112.    Also in July of 2015, the Roman press reported on meetings between the Ministry of Culture and the Torlonia family. Because of PLAINTIFFS' significant work in

cataloguing the collection, the Ministry reported on the well-being of the TORLONIA SCULPTURES and expressed an interest in "ways to initiate a project that makes was has been defined as the most important private collection of ancient art in the world fully accessible."

113.    Shortly after the GETTY met with PLAINTIFFS and requested and received additional information from PLAINTIFFS, the GETTY met with LIVIO, the Prince's grandson, and POTTS in Los Angeles in late July or early August of 2015.

114.    The Prince and his family were anxious to set up this meeting; less than a day after setting an appointment with POTTS and the GETTY, the Prince's family flew from Rome via London to Los Angeles to discuss a deal and to review the GETTY's exhibition of Greek Bronzes.

115.    Demonstrating how far PLAINTIFFS had developed the relationship between the GETTY and the Italians, the Prince's grandson visited the GETTY during a period when the GETTY was featuring an exhibition entitled *Power and Pathos: Bronze Sculpture of the Hellenistic World.* That exhibition included the controversial and contested Victorious Youth.

116.    While the parties to that meeting discussed the sale and/or transfer of the TORLONIA SCULPTURES, PLAINTIFFS did not learn of this meeting until well after it had occurred.

**H.    DEFENDANTS cut PLAINTIFFS out of the deal.**

117.    In the fall of 2015, DEFENDANTS and the Prince ceased discussing the sale of the TORLONIA COLLECITON with PLAINTIFFS.

118.   While the DEFENDANTS were thereafter silent regarding their intent to purchase the TORLONIA SCULPTURES with PLAINTIFFS, they were working without PLAINTIFFS to effectuate a sale or transfer of the TORLONIA SCULPTURES.

119.   Through the remainder of 2015 and first half of 2016, DEFENDANTS conspired without PLAINTIFFS' knowledge or involvement regarding the ultimate sale or transfer of the TORLONIA SCULPTURES to the GETTY.

120.   During this period, DEFENDANTS met, corresponded, conducted telephone calls, and otherwise communicated in violation of the NON-CIRCUMVENTION AGREEMENT in an attempt to cut PLAINTIFFS out of the deal so they would not have to pay PLAINTIFFS any commission on the sale, investment in, or acquisition of control of the vast TORLONIA SCULPTURES.

121.   DEFENDANTS also violated PLAINTIFFS' confidentiality and trade secret rights by utilizing ELECTRUM's private catalogue of the TORLONIA COLLECTION, PLAINTIFFS' exclusive relationships, and PLAINTIFFS' trade secret deal structures to effectuate a sale or transfer.

122.   On March 15, 2016, to PLAINTIFFS surprise, the New York Times reported on the sale or transfer of the TORLONIA SCULPTURES.

123.   In or about March of 2016, representatives of the Culture Ministry signed an accord with the Torlonia Foundation to display the TORLONIA SCULPTURES, starting with a display of approximately 60 sculptures in Rome. The TORLONIA SCULPTURES were then to travel elsewhere in Europe and to the United States with the intent of finding a new permanent home for the collection.

124.    Salvatore Settis, a long-term former employee of the GETTY, was selected to be the historian and curator to curate the exhibition of the TORLONIA SCULPTURES. Mr. Settis described cataloguing the TORLONIA SCULPTURES as a "monumental work." In this manner, DEFENDANTS usurpation of trade secret rights and breach of confidentiality in ELECTRUM's catalogue of the TORLONIA SCULPTURES was made plain.

125.    The Culture Minister claimed the agreement to transfer the TORLONIA SCULPTURES was historic and noted that agreement was finally reached because "there was a new approach on the part of the ministry to a potential partnership between the public and private" that "could become a model for other similar cases." This "new approach" was PLAINTIFFS' trade-secret and confidential deal structure proposed under constraints of secrecy to only the GETTY, the Torlonia family, and the RUSSOS and was possible only by virtue of PLAINTIFFS' years of hard work and relationship-building.

126.    Alessandro Poma Murialdo of the Torlonia family stated that one of the principles of the agreement was that the exhibition would be shown abroad.

127.    Surprised by these recent developments, PLAINTIFFS attempted to schedule a call with the GETTY. In response to that request, Mr. Clark of the GETTY confirmed that on March 18, 2016, Mr. Settis and POTTS were "actively discussing the possibility of exhibiting some of these wonderful works of art at the Getty."

128.    That direct communication, as admitted by the GETTY, is a violation of the NON-CIRCUMVENTION AGREEMENT.

129.    The GETTY's involvement in the TORLONIA SCULPTURES transaction was confirmed by Salvatore Morando of the Italian Ministry of Culture. Mr. Morando confirmed that PLAINTIFFS were in contact with Prince Torlonia's family and their attorneys as early

as May of 2012. He confirmed that PLAINTIFFS contacted GETTY and put in place legal plans to return the TORLONIA SCULPTURES to public view.

130.    Mr. Morando recounted PLAINTIFFS' two years of legal efforts, contacts with museums, contacts with Italian officials, scientific studies, verifications, restoration studies, searches for exhibit spaces and other collateral activities to accomplish the public display of the TORLONIA SCULPTURES. The result of that research and efforts was entitled the "MUSEUM" project. The MUSEUM project was proposed to the General Director for Archeology at the Ministry for Cultural Assets, Mr. Gino Famiglietti, in May of 2015.

131.    Mr. Morando expressed surprise that in March 2016, the office of the Ministry for Cultural Assets announced an agreement to publicize the TORLONIA SCULPTURES that greatly mirrored the MUSEUM project but was instead called the EXHIBIT project. The curator designated for that project was "Prof. Salvatore Settis, well-known Professor of Archeology" who was "the Director of the Getty Center for the History of Art and the Humanities in Los Angeles from 1994 to 1999."

132.    Mr. Morando confirmed PLAINTIFFS' suspicions that this new project is "based on an agreement with two large foreign museums" including the GETTY. "Obviously, in order to arrange such transactions, it would have been necessary to have had direct contacts with the managers of the two foreign venues and that such contacts were made between the end of 2014 and the start of 2015." These contacts were in violation of the NON-CIRCUMVENTION AGREEMENT.

133.    Mr. Morando confirmed "it appears evident that [PLAINTIFFS'] 'MUSEUM' project, with which [he is] very familiar, was literally plagiarized, copied, and renamed 'EXHIBIT.'"

- 24 -

134.    PLAINTIFFS also established a friendly relationship between the GETTY and

Maurizio Fiorilli, an Italian State lawyer whose previous experience with the GETTY

included the aforementioned lawsuit in which the GETTY agreed to repatriate 40 looted art

pieces. Through PLAINTIFFS, the GETTY was able to work with Fiorilli and other Italian

authorities to effectuate a transaction regarding the TORLONIA SCULPTURES.

135.    PLAINTIFFS commissioned Fiorilli's legal opinion regarding the transaction

structure necessary to allow a temporary export of the TORLONIA SCULPTURES.

PLAINTIFFS expended significant capital obtaining this legal opinion; that legal opinion

was PLAINTIFFS' intellectual property and was shared with DEFENDANTS only as a result

of PLAINTIFFS' reliance on DEFENDANTS' representations relating to the NON-

CIRCUMVENTION AGREEMENT.

136.    Fiorilli thus had direct involvement in the GETTY's interest in and activities

regarding the TORLONIA SCULPTURES. Fiorilli has confirmed that the GETTY violated the

NON-CIRCUMVENTION AGREEMENT, that representatives of the GETTY communicated

repeatedly with the Prince's representatives without PLAINTIFFS' involvement, and that

the project disclosed by the press is "identical" to that ultimately proposed by PLAINTIFFS

to the GETTY and the Prince in order to bring the TORLONIA SCULPTURES into public

view.

137.    On May 27, 2016, ARTURO met with PLAINTIFFS and informed PLAINTIFFS

that they should "forget about" any compensation regarding the TORLONIA SCULPTURES

because the GETTY and the Torlonia family were then in direct contact. When PLAINTIFFS

expressed their concerns that their years of hard work, confidential and proprietary and

trade secret information, and contractual and legal rights were being violated and misappropriated, ARTURO challenged PLAINTIFFS to file suit.

138.   PLAINTIFFS have never been compensated, by DEFENDANTS or otherwise, for their investment of years of time, research, development, and efforts that directly resulted in the GETTY's ability to bring the TORLONIA SCULPTURES to the United States.

139.   Despite PLAINTIFFS' attempts to resolve this matter, the GETTY has denied that PLAINTIFFS are entitled to any relief and has refused to share any communications between DEFENDANTS and the Torlonia family or its representatives relating to the TORLONIA SCULPTURES and has refused to return PLAINTIFFS' trade secrets and confidential information.

<u>COUNT 1 – Breach of Contract (GETTY)</u>

140.   PLAINTIFFS incorporate herein the allegations in paragraphs 4-139.

141.   ELECTRUM, PHOENIX, and the GETTY entered into the NON-CIRCUMVENTION AGREEMENT.

142.   ELECTRUM and PHOENIX provided something of value to the GETTY pursuant to the NON-CIRCUMVENTION AGREEMENT. For example, ELECTRUM and PHOENIX exchanged knowledge regarding the TORLONIA SCULPTURES, the Torlonia family, relevant relationships, and Italian law for the GETTY's promises that it would keep all such information as Confidential and not circumvent ELECTRUM and PHOENIX in violation of ELECTRUM and PHOENIX's rights to commissions on the sale or other transaction relating to the TORLONIA SCULPTURES.

143.   ELECTRUM and PHOENIX performed all of their obligations pursuant to the NON-CIRCUMVENTION AGREEMENT and satisfied all preconditions to suit. For example,

ELECTRUM and PHOENIX provided the called-for knowledge regarding the TORLONIA

SCULPTURES and the Torlonia family and provided the necessary introductions to

members of Torlonia family and had discussions with members of the Italian government

necessary to effectuate a sale or transfer of the TORLONIA SCULPTURES.

144.    The GETTY, however, breached its obligations under the NON-

CIRCUMVENTION AGREEMENT. For example, the GETTY failed to keep information

received from PLAINTIFFS pursuant to the NON-CIRCUMVENTION AGREEMENT as

Confidential. As a further example, the GETTY directly circumvented PLAINTIFFS and

entered into an agreement with the Torlonia family to obtain rights to or to exhibit the

TORLONIA SCULPTURES. As a further example, the GETTY refused to return ELECTRUM

and PHOENIX's confidential information relating to its communications with the Torlonia

family.

145.    PLAINTIFFS are entitled to recovery, including but not limited to

commissions, as the GETTY has secured rights to or to exhibit the TORLONIA SCULPTURES

as a direct result of PLAINTIFFS' performance under the NON-CIRCUMVENTION

AGREEMENT, and PLAINTIFFS' efforts were instrumental in bringing about the benefits

secured by the GETTY.

146.    As a result of GETTY's breaches, ELECTRUM and PHOENIX have been

damaged in an amount to be proven at trial.

### COUNT 2 – Breach of Third-Party Beneficiary Contract (GETTY)

147.    PLAINTIFFS incorporate herein the allegations in paragraphs 4-139.

148.    ELECTRUM, PHOENIX, and the GETTY entered into the NON-

CIRCUMVENTION AGREEMENT.

149.    The NON-CIRCUMVENTION AGREEMENT was intended for REGULUS's benefit and the GETTY was fully aware that the parties intended the NON-CIRCUMVENTION AGREEMENT was for REGULUS's benefit. ELECTRUM and PHOENIX intended to give REGULUS some of the benefits of the GETTY's promised performance under the NON-CIRCUMVENTION AGREEMENT.

150.    REGULUS provided something of value to the GETTY pursuant to the NON-CIRCUMVENTION AGREEMENT. For example, REGULUS provided important guidance and instruction regarding deal structures that would allow the GETTY to consummate a transaction with the Torlonia family and/or bring the TORLONIA SCULPTURES into public view. The GETTY further represented to REGULUS that it would treat information received from REGULUS under the NON-CIRCUMVENTION AGREEMENT as confidential and not circumvent REGULUS.

151.    The benefits of the NON-CIRCUMVENTION AGREEMENT to REGULUS were sufficiently immediate to indicate the assumption by the immediate parties to the NON-CIRCUMVENTION AGREEMENT of a duty to compensate REGULUS if the benefits were lost.

152.    The GETTY, however, breached its obligations under the NON-CIRCUMVENTION AGREEMENT. For example, the GETTY failed to keep information received from PLAINTIFFS pursuant to the NON-CIRCUMVENTION AGREEMENT as Confidential. As a further example, the GETTY directly circumvented PLAINTIFFS and entered into an agreement with the Torlonia family to obtain rights to or to exhibit the TORLONIA SCULPTURES.

153.    REGULUS is entitled to recovery, including but not limited to commissions, as the GETTY has secured rights to or to exhibit the TORLONIA SCULPTURES as a direct result

of REGULUS's performance under the NON-CIRCUMVENTION AGREEMENT, and REGULUS's efforts were instrumental in bringing about the benefits secured by the GETTY.

154.    As a result of GETTY's breaches, REGULUS has been damaged in an amount to be proven at trial.

### COUNT 3 – Breach of the Implied Covenant of Good Faith and Fair Dealing (GETTY)

155.    PLAINTIFFS incorporate herein the allegations in paragraphs 4-139.

156.    ELECTRUM, PHOENIX, and the GETTY entered into the NON-CIRCUMVENTION AGREEMENT. The NON-CIRCUMVENTION AGREEMENT is valid, binding, certain, and agreed-to by the parties.

157.    ELECTRUM, PHOENIX, and the GETTY intended for REGULUS to be a beneficiary of the NON-CIRCUMVENTION AGREEMENT.

158.    PLAINTIFFS performed all conditions precedent to enforcing the NON-CIRCUMVENTION AGREEMENT, and performed according to both the letter and the intent of the NON-CIRCUMVENTION AGREEMENT. For example, PLAINTIFFS provided the called-for knowledge regarding the TORLONIA SCULPTURES and the Torlonia family and provided the necessary introductions to members of Torlonia family and members of the Italian government necessary to effectuate a sale or transfer of the TORLONIA SCULPTURES.

159.    Pleading in the alternative, the GETTY acted in a manner that, although not expressly forbidden by any contractual provision of the NON-CIRCUMVENTION AGREEMENT, acted to deprive PLAINTIFFS' rights to receive the benefits of the NON-CIRCUMVENTION AGREEMENT. The purpose of the NON-CIRCUMVENTION AGREEMENT

was for PLAINTIFFS to be compensated, including through commissions, for procuring the GETTY's rights to or to exhibit the TORLONIA SCULPTURES.

160.    Further pleading in the alternative, the implied promise to pay a commission to PLAINTIFFS for a sale or transfer of the TORLONIA SCULPTURES is not contrary to any express provision of the NON-CIRCUMVENTION AGREEMENT and is in fact one of the primary purposes of the NON-CIRCUMVENTION AGREEMENT.

161.    PLAINTIFFS have been damaged by the GETTY's breach of the implied covenant of good faith and fair dealing. PLAINTIFFS are entitled to recovery, including but not limited to commissions, as the GETTY has secured rights to or to exhibit the TORLONIA SCULPTURES as a direct result of PLAINTIFFS' performance under the NON-CIRCUMVENTION AGREEMENT, and PLAINTIFFS' efforts were instrumental in bringing about the benefits secured by the GETTY.

162.    PLAINTIFFS, however, were unable to obtain agreed-to commissions on the sale or transfer of rights to or to exhibit the TORLONIA SCULPTURES. PLAINTIFFS are thus entitled to, at least, their lost profits relating to the TORLONIA SCULPTURES.

## COUNT 4 – Tortious Interference with Contract
### (POTTS, LIVIO, and ARTURO)

163.    PLAINTIFFS incorporate herein the allegations in paragraphs 4-139.

164.    ELECTRUM and PHOENIX entered into the NON-CIRCUMVENTION AGREEMENT with the GETTY.

165.    ELECTRUM, PHOENIX, and the GETTY intended for REGULUS to be a beneficiary of the NON-CIRCUMVENTION AGREEMENT.

166.    POTTS, LIVIO, and ARTURO were aware of the NON-CIRCUMVENTION AGREEMENT.

167.    POTTS, LIVIO, and ARTURO, without justification, intentionally procured the GETTY's breach of the NON-CIRCUMVENTION AGREEMENT or rendered performance under the NON-CIRCUMVENTION AGREEMENT impossible.

168.    POTTS, LIVIO, and ARTURO intended to harm PLAINTIFFS when inducing the GETTY to breach the NON-CIRCUMVENTION AGREEMENT, including through the misrepresentations and omissions discussed herein, and intentionally sought to utilize PLAINTIFFS' confidential, proprietary, and trade secret information without compensation by the GETTY or otherwise.

169.    PLAINTIFFS were thus harmed by Defendants POTTS, LIVIO, and ARTURO's actions and POTTS, LIVIO, and ARTURO's conduct was a substantial factor in causing PLAINTIFFS' harm.

170.    As a result, PLAINTIFFS seek recovery of damages from POTTS, LIVIO, and ARTURO.

### COUNT 5 – Intentional Interference with an Advantageous Business Relationship (All DEFENDANTS)

171.    PLAINTIFFS incorporate herein the allegations in paragraphs 4-139.

172.    PLAINTIFFS and the Torlonia family were in a business relationship that would have probably resulted in economic benefit to PLAINTIFFS.

173.    DEFENDANTS were aware of the relationship between PLAINTIFFS and the Torlonia family and were either introduced through PLAINTIFFS or had knowledge of that relationship through involvement with the GETTY.

174.    DEFENDANTS, however, intentionally and with malice cut PLAINTIFFS out of the continued relationship with the Torlonia family. By engaging in that conduct and by using improper or illegal means, DEFENDANTS intended to disrupt the relationship between the Torlonia family and PLAINTIFFS or knew that disruption of that relationship was certain or substantially certain to occur.

175.    As a result of DEFENDANTS' conduct, PLAINTIFFS' relationship with the Torlonia family was disrupted and PLAINTIFFS were harmed.

176.    DEFENDANTS' conduct was a substantial factor in harming the relationship between the Torlonia family and PLAINTIFFS.

177.    As a result, PLAINTIFFS seek recovery of damages from DEFENDANTS.

<u>COUNT 6 – Fraud (all DEFENDANTS)</u>

178.    PLAINTIFFS incorporate herein the allegations in paragraphs 4-139.

179.    The GETTY and POTTS repeatedly misrepresented material facts to PLAINTIFFS, including that they would, *inter alia*: (i) keep PLAINTIFFS' information confidential; (ii) not circumvent PLAINTIFFS in a deal with the Torlonia family; (iii) not contact or communicate with the Prince or his family without PLAINTIFFS' participation and consent; (iv) compensate PLAINTIFFS for facilitating a deal with the Torlonia family; and (v) that the GETTY did not have interest in a deal with the Torlonia family.

180.    LIVIO and ARTURO repeatedly misrepresented material facts to PLAINTIFFS including that, *inter alia*: (i) they would respect the NON-CIRCUMVENTION AGREEMENT between PLAINTIFFS and the GETTY; and (ii) that they would not use any information regarding ELECTRUM's catalogue or PLAINTIFFS' proposed deal structure without PLAINTIFFS' consent.

181.    The DEFENDANTS knew that these representations were false when made or made those representations recklessly and without regard for their truth.

182.    The DEFENDANTS intended that PLAINTIFFS rely on their misrepresentations and PLAINTIFFS did actually reasonably rely on the DEFENDANTS' representations.

183.    PLAINTIFFS were harmed by the DEFENDANTS' misrepresentations and those misrepresentations were a substantial factor in causing PLAINTIFFS' harm.

184.    The GETTY further made promises to PLAINTIFFS in the NON-CIRCUMVENTION AGREEMENT but did not intend to perform those promises when they were made.

185.    PLAINTIFFS reasonably relied on the GETTY's promises, but the GETTY did not perform the promised acts. As a result, PLAINTIFFS were harmed.

<u>COUNT 7 – Unjust Enrichment (All DEFENDANTS)</u>

186.    PLAINTIFFS incorporate herein the allegations in paragraphs 4-139.

187.    DEFENDANTS received benefits from PLAINTIFFS and were unjustly enriched by DEFENDANTS' misappropriation of PLAINTIFFS' knowledge of the TORLONIA SCULPTURES, relationships with the GETTY and/or the Torlonia family, and knowledge of the politics and application of Italian law.

188.    As a result of their misappropriation, DEFENDANTS received a benefit by virtue of the transaction relating to the TORLONIA SCULPTURES for which PLAINTIFFS hereby sue.

189.    DEFENDANTS should not be entitled to retain the benefits they received from PLAINTIFFS without compensating PLAINTIFFS for the value of the benefits which

DEFENDANTS received from PLAINTIFFS. Equity and good conscience require DEFENDANTS to compensate PLAINTIFFS for the value of the benefits DEFENDANTS received from PLAINTIFFS.

<u>COUNT 8 – Unfair Competition (All DEFENDANTS)</u>

190.    PLAINTIFFS incorporate herein the allegations in paragraphs 4-139.

191.    PLAINTIFFS were the owners of trade secrets and confidential and proprietary information. Specifically, PLAINTIFFS owned trade secrets and confidential and proprietary information in the deal structure necessary to bring the TORLONIA SCULPTURES overseas for exhibition and ELECTRUM owned trade secrets and confidential and proprietary information in its catalogue of the TORLONIA SCULPTURES. PLAINTIFFS further owned trade secrets and confidential and proprietary information in the knowledge and application of Italian law and the relationships necessary to bring about a sale or transfer of the TORLONIA SCULPTURES. Those trade secrets and confidential and proprietary information are used in PLAINTIFFS' business and give them an opportunity to obtain an advantage over competitors who do not know or use it.

192.    DEFENDANTS further improperly acquired, used, and disclosed PLAINTIFFS' trade secrets and confidential and proprietary information, including but not limited to the misrepresentations and breaches alleged herein, and in violation of the NON-CIRCUMVENTION AGREEMENT. DEFENDANTS thus misappropriated the above-referenced trade secrets and confidential and proprietary information for their own benefit and for the benefit of others.

193.    PLAINTIFFS' trade secrets and confidential and proprietary information had actual or potential independent economic value because they were secret.

194.    PLAINTIFFS made reasonable efforts to protect their trade secrets, including but not limited to the NON-CIRCUMVENTION AGREEMENT.

195.    DEFENDANTS' misappropriation caused PLAINTIFFS to be harmed or caused DEFENDANTS to be unjustly enriched.

196.    By reason of the foregoing, DEFENDANTS have engaged in unfair competition with PLAINTIFFS.

<u>COUNT 9 – Conversion (All DEFENDANTS)</u>

197.    PLAINTIFFS incorporate herein the allegations in paragraphs 4-139.

198.    PLAINTIFFS have a current and possessory right and interest in their confidential and proprietary information and trade secrets, including but not limited to the catalogue PLAINTIFFS prepared of the TORLONIA SCULPTURES.

199.    DEFENDANTS' wrongful possession and use of PLAINTIFFS' confidential and proprietary information and trade secrets is in derogation of PLAINTIFFS' rights.

200.    DEFENDANTS' actions as fully set forth above in obtaining and improperly using PLAINTIFFS' confidential and proprietary business information and trade secrets constitutes conversion of PLAINTIFFS' property.

201.    Despite PLAINTIFFS' demands, DEFENDANTS have failed and refused to return PLAINTIFFS' confidential and proprietary business information and trade secrets, including but not limited to the catalogue of the TORLONIA SCULPTURES.

202.    By reason of the foregoing, PLAINTIFFS have been damaged and are entitled to recover their damages from DEFENDANTS, including punitive damages.

<u>COUNT 10 – DTSA Trade Secret Misappropriation (All DEFENDANTS)</u>

203.    PLAINTIFFS incorporate herein the allegations in paragraphs 4-139.

204.    PLAINTIFFS were the owners of trade secrets. Specifically, PLAINTIFFS owned trade secrets in the deal structure necessary to bring the TORLONIA SCULPTURES overseas for exhibition and ELECTRUM owned trade secrets in its catalogue of the TORLONIA SCULPTURES. PLAINTIFFS further owned trade secrets in the knowledge and application of Italian law and the relationships necessary to bring about a sale or transfer of the TORLONIA SCULPTURES.  Those trade secrets constitute financial, business, or economic information that are protected by the Defend Trade Secrets Act.

205.    PLAINTIFFS made reasonable efforts to protect their trade secrets, including but not limited to the NON-CIRCUMVENTION AGREEMENT.

206.    PLAINTIFFS' trade secrets derive independent economic value from not being generally known to or readily ascertainable through proper means by another person or party.

207.    DEFENDANTS acquired PLAINTIFFS' trade secrets by improper means or disclosed or used PLAINTIFFS' trade secrets after improperly acquiring the trade secrets or acquired the trade secrets with knowledge that they were acquired by another that was under a duty to maintain secrecy.

208.    DEFENDANTS misappropriated PLAINTIFFS' trade secrets through misrepresentation, breach, and/or inducement of breach, and that misappropriation was willful and malicious.

209.    PLAINTIFFS were damaged by DEFENDANTS misappropriation and are entitled to their actual losses, damages for DEFENDANTS' unjust enrichment, exemplary damages, and attorneys' fees.

## JURY DEMAND

PLAINTIFFS demand a trial by a jury on all issue so triable.

## PRAYER FOR RELIEF

WHEREFORE, PLAINTIFFS respectfully request that judgment be entered in their favor and against DEFENDANTS and specifically request that the Court grant the following relief:

A.  Actual damages in the amount of no less than $77,000,000.

B.  Exemplary and/or punitive damages;

C.  Restitution;

D.  Attorneys' fees, expenses, and costs;

E.  Pre- and post-judgment interest, jointly and severally, against DEFENDANTS; and

F.  Such other further relief as the Court may deem just and proper, in law or in equity.


Dated: January 12, 2017                 Respectfully submitted,

                                        */s/ Elliot A. Hallak*
                                        Elliot A. Hallak (EAH-5479)
                                        ehallak@harrisbeach.com
                                        HARRIS BEACH PLLC
                                        677 Broadway, Suite 1101
                                        Albany, New York 12207
                                        Phone: (518) 427-9700
                                        Fax: (518) 427-0235

                                        Michael W. Shore
                                        mshore@shorechan.com*
                                        Alfonso Garcia Chan
                                        achan@shorechan.com*

Jennifer M. Rynell*
jrynell@shorechan.com
Andrew M. Howard
ahoward@shorechan.com*
SHORE CHAN DEPUMPO LLP
901 Main Street, Suite 3300
Dallas, TX 75202
Telephone: (214) 593-9110
Facsimile: (214) 593-9111

*pro hac vice* motions to be filed
Attorneys for Plaintiffs
**PHOENIX ANCIENT ART, S.A., PETRARCH LLC a/k/a
ELECTRUM, and REGULUS INTERNATIONAL CAPITAL
CORP.**