UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

PHOENIX ANCIENT ART, S.A., PETRARCH LLC
a/k/a ELECTRUM, and REGULUS
INTERNATIONAL CAPITAL CORP.,

                                   Plaintiffs,                    **OPINION AND ORDER**

                        - against -                              17 Civ. 241 (ER)

J. PAUL GETTY TRUST, J. PAUL GETTY
MUSEUM, TIMOTHY POTTS, LIVIO RUSSO, and
ARTURO RUSSO,
                                   Defendants.

---

Ramos, D.J.:

        Phoenix Ancient Art, S.A. ("Phoenix"), Petrarch LLC A/K/A Electrum ("Electrum"), and

Regulus International Capital Corp. ("Regulus") bring this action against the J. Paul Getty Trust,

the J. Paul Getty Museum (the "Getty"), and Timothy Potts (collectively, the "Getty

Defendants"), and Livio Russo and Arturo Russo (collectively, the "Russo Defendants"),

alleging misappropriation, fraud, breach of and interference with a contract, interference with

prospective business relationships, and conversion.  Pending before the Court are:  (1) the Getty

Defendants' motion to dismiss Counts Two through Ten of the Complaint for failure to state a

claim pursuant to Federal Rule of Civil Procedure 12(b)(6), Doc. 50; and (2) the Russo

Defendants' motion to dismiss the Complaint for lack of personal jurisdiction pursuant to

Federal Rule of Civil Procedure 12(b)(2) and for failure to state a claim, Doc. 45.  For the

reasons discussed below, the Getty Defendants' motion is GRANTED in part and DENIED in

part, and the Russo Defendants' motion is GRANTED.

## I.  Factual Background[1]

Phoenix is a world-leading dealer in rare and exquisite antiquities, and is managed by brothers Ali and Hicham Aboutaam.  *Id*. ¶ 4.  Electrum, a New York limited liability company, is the exclusive agent for Phoenix in the United States.  *Id*. ¶ 7.  Plaintiffs' claims stem from their efforts to broker the sale of the Torlonia family's collection of approximately 620 Roman and Greek sculptures (the "Torlonia Collection"), which is known as one of the world's most significant collections of classical sculptures and is valued in the billions of dollars.  *See* Complaint ("Compl.") ¶¶ 43, 49.  Prince Alessandro Torlonia (the "Prince") is responsible for the assets of the Torlonia family, including the sculptures.  *Id*. ¶ 42.  Since the 1960s, the Torlonia family kept the collection out of public view in its various palaces in Rome, causing an outcry from experts who called for the collection to be confiscated by the Italian government.  *Id*. ¶ 45.  The family long resisted government attempts to return the collection to the public and kept the collection out of public view.  *Id*. ¶ 46.

At some point in time, the Torlonia family decided to attempt to sell the collection, and the Russo Defendants became involved in their efforts to find a private buyer.[2]  *See id*. ¶ 48.  The Russo Defendants are world-renowned ancient coin collectors and engage in multiple high-dollar coin auctions every year.  *Id*. ¶ 47.  The Aboutaam family also collects ancient coins.  *Id*. ¶ 48.  Through this mutual interest, the Russo Defendants contacted Ali Aboutaam and told him about the Torlonia sculptures that were available for sale.  *Id*.  Plaintiffs allege that the Russo Defendants told Electrum that they believed that only Electrum could find a buyer for the

---

[1] The following facts are drawn from the Complaint and are assumed true for the purposes of deciding Defendants' motions.

[2] The timing of the Torlonia family's decision to find a buyer and the nature of the Russo Defendants' initial involvement in those efforts are unclear from the Complaint.

Torlonia Collection. *Id.* ¶ 50. The Russo Defendants provided Ali Aboutaam with an 1885 catalogue of the Torlonia sculptures. *Id.* ¶ 51. The catalogue was over 130 years old, included low-resolution black-and-white pictures and abbreviated descriptions only, and did not provide sufficient details regarding current status, condition, market value, restoration, or attributions regarding chain of title for the works of art. *Id.* After Hicham Aboutaam traveled to Rome to view the sculptures and met with Livio Russo and the Prince, Electrum immediately began working to find a buyer. *Id.* ¶ 52.

Beginning in the summer of 2010, Electrum painstakingly catalogued the Torlonia collection, took thousands of new photographs of the sculptures, and translated supporting documents from Italian to English to support the provenance of the collection in order to prepare it for sale. *Id.* ¶ 53–54. Plaintiffs allege that at all times they kept the contents of their catalogue and research under reasonable security measures. *Id.* ¶ 54. Over the next several years, Electrum continued its efforts in evaluating the Torlonia Collection, cultivating its relationships with Italian authorities, and attempting to find a buyer. *Id.* ¶ 55.

In the spring of 2013, Electrum invited Timothy Potts, the director of the Getty Museum, to visit their New York gallery. *Id.* ¶¶ 13, 56. The Getty Museum is the richest museum in the world, with an endowment that exceeds $4 billion. *Id.* ¶¶ 10. Electrum told Potts that it was cataloguing a significant collection that could be of interest to the Getty, and they discussed the substantial work Electrum had undertaken in preparing the collection for sale. *Id.* ¶ 57. At that time, Electrum did not tell Potts that the collection involved the Torlonia sculptures. *Id.* According to Plaintiffs, Potts was excited about the collection and expressed that the Getty would be very interested in a deal through which the Getty could acquire an interest in it. *Id.* ¶ 58. After Potts orally agreed to keep the opportunity in the strictest confidence—and agreed to

later document that oral promise in writing after consulting with the Getty's lawyers—Electrum shared that the collection was the Torlonia sculptures and showed Potts thousands of photographs it had taken of the collection. *Id.* ¶ 60–61.

On July 12, 2013, Potts, on behalf of the Getty, signed a Non-Disclosure and Non-Circumvention Agreement (the "NDNCA") with Electrum and Phoenix. *Id.* ¶ 62. Potts and the Getty agreed to "receive disclosure of confidential and proprietary information from Electrum pursuant to the terms of [that] agreement for the purpose of evaluating a possible transaction" and "agreed to maintain the confidentiality of the disclosed information." *Id.* ¶ 64. Potts and the Getty also agreed to "take all reasonable measures to protect the secrecy of and avoid disclosure or use of the Confidential Information" and to "take at least those measures that [the Getty] takes to protect its own most highly confidential information." *Id.* ¶ 65. Additionally, "[a]s an express prior condition to its receipt of information" regarding the Torlonia sculptures, Potts and the Getty agreed that they would "not contact either directly or indirectly" the Torlonia family or any party representing or related to the Torlonia family regarding the Torlonia sculptures, except exclusively through Electrum and Phoenix. *Id.* ¶ 67. The Getty further undertook the obligation to return to Electrum and Phoenix "all originals and copies of Confidential Information upon request." *Id.* ¶ 68. The NDNCA did not provide terms for compensation to Phoenix and Electrum. *See id.*; Doc. 74, Ex. A.

On November 8, 2013, Potts met with Electrum and Regulus in New York. *Id.* ¶ 70. Regulus is a Delaware corporation that agreed to participate in a cooperative venture with Electrum to assist in the sale or transfer of the Torlonia Collection. *Id.* ¶ 8. Electrum and Regulus told Potts that Regulus could advise the Getty regarding trade-secret deal structures for the Torlonia Collection that would allow foreigners to purchase rights to important cultural

collections in Italy.  *Id.* ¶ 70.  Throughout the first part of 2014, Plaintiffs continued facilitating a possible transaction between the Getty and the Torlonia family, serving as a conduit for communications, organizing visits by Potts to Italy to view the sculptures, and arranging meetings with Potts and members of the Torlonia family.  *See id.* ¶¶ 72–91.  Throughout this time, the Prince preferred to receive correspondence through the Russo Defendants.  *Id.* ¶ 78.  Accordingly, Electrum emailed the Russo Defendants a copy of the NDNCA no later than April 7, 2014.  *Id.* ¶ 83.  Plaintiffs, however, assert that the Russo Defendants and the Torlonia family had been informed of the NDNCA prior to that date.  *Id.*

On June 27, 2014, Potts and the Getty requested that Plaintiffs send them the original version of the catalogue of sculptures that Electrum had prepared, and, relying on the Getty's confidentiality obligations set forth in the NDNCA, Plaintiffs did as requested.  *Id.* ¶ 92.  After receiving the catalogue, however, Potts and the Getty suddenly stopped communicating with Plaintiffs regarding the Torlonia Collection.  *Id.* ¶ 93.  By February 19, 2015, the Prince became concerned by the Getty's apparent loss of interest and stated that he was considering gifting the collection to the Italian authorities in exchange for tax-related benefits.  *Id.* ¶ 94.  When Plaintiffs conveyed the Prince's concerns to Potts and the Getty, the Getty represented that it had decided to decline the opportunity to pursue purchasing the collection.  *Id.* ¶ 95.  The Getty claimed that applicable Italian law made acquiring the collection unappealing.  *Id.* ¶ 96.  According to Plaintiffs, the Getty's concerns were borne out of past conflicts with the Italian government involving art purchased without proper authentication of source.  *Id.* ¶ 97.  The Getty was also concerned that the Italian government would not allow exportation of the sculptures, given their value to the Italian public.  *Id.* ¶ 98.

Plaintiffs, however, claim that they had already developed a deal structure that would alleviate the Getty's concerns and the political risk of a transaction. *Id.* ¶ 99–101. In an attempt to salvage the negotiations between the Getty and the Torlonia family, on March 5, 2015, Plaintiffs told the Getty that they believed the potential sales price for the sculptures had decreased. *Id.* ¶ 102. Plaintiffs now estimated that the cost of the sculptures was between $350 million and $550 million, and proposed a deal structure involving a commission for Plaintiffs of 22% of the purchase price. *Id.* ¶ 103. Stephen Clark, general counsel for the Getty, expressed interest in Plaintiffs' proposal and agreed to discuss it further. *Id.* ¶ 104. Plaintiffs claim that by March 24, 2015, the Getty had once again expressed a lack of interest in the Torlonia Collection and claimed that the proposal did not make sense. *Id.* ¶ 105.

Plaintiffs proposed another deal structure that would decrease political risk to the Getty in June 2015, and Electrum met with Potts and forwarded additional information—including regarding the Prince's willingness to further decrease the purchase price—in July 2015. *Id.* 108–111. Shortly thereafter, however, Potts separately met with Livio Russo and the Prince's grandson in Los Angeles to discuss the sale of the Torlonia Collection. *Id.* ¶ 113. Plaintiffs did not learn of this meeting until well after it had occurred. *Id.* ¶ 116.

Plaintiffs assert that by the fall of 2015, all of the Defendants and the Prince had ceased discussing the sale of the Torlonia Collection with Plaintiffs. *Id.* ¶ 117. Through the remainder of 2015 and the first half of 2016, Plaintiffs claim that the Defendants conspired without Plaintiffs' knowledge or involvement regarding the sale or transfer of the sculptures to the Getty. *Id.* ¶ 119. Specifically, they assert that the Getty Defendants and the Russo Defendants met and communicated in violation of the NDNCA in an attempt to cut Plaintiffs out of the deal so they would not have to pay Plaintiffs a commission. *Id.* ¶ 120.

In March 2016, the New York Times reported that the Italian Ministry of Culture had signed an agreement with the Torlonia Foundation to display the Torlonia sculptures in Europe and the United States, with the intent of "finding a new permanent home for the collection." *Id.* ¶ 122–123. Salvatore Settis, a long-term former employee of the Getty, was selected to be the historian and curator of the exhibition. *Id.* ¶ 124. Plaintiffs assert that the structure of the final agreement between the Ministry of Culture and the Torlonia Foundation was essentially the same as the structure Plaintiffs had proposed for a deal between the Getty and the Torlonia Family. *Id.* ¶ 125, 128–133. After learning of the agreement, Plaintiffs attempted to schedule a call with the Getty, and in response to that request, Clark confirmed that Settis and Potts were actively discussing the possibility of exhibiting some of the sculptures at the Getty. *Id.* ¶ 127. Plaintiffs contend that such direct communication between Clark and Settis is a violation of the NDNCA. *Id.* ¶ 128. Plaintiffs also assert that various individuals have confirmed that the Getty violated the NDNCA throughout the time it was negotiating a potential deal through Plaintiffs. *Id.* ¶ 130–136.

On May 27, 2016, Arturo Russo met with Plaintiffs and told them that they should "forget" about any compensation regarding the Torlonia Collection because the Getty and the Torlonia Family were in direct contact. *Id.* ¶ 137. According to Plaintiffs, the Getty has denied that Plaintiffs are entitled to any compensation and has refused to return Plaintiffs' confidential information, in particular the catalogue and photographs of the Torlonia sculptures prepared by Electrum. *Id.* ¶ 139.

## II.    Procedural History

On January 12, 2017, Plaintiffs brought this action alleging the following claims:  (1) breach of contract (against the Getty only); (2) breach of third-party beneficiary contract (against

the Getty only); (3) breach of the implied covenant of good faith and fair dealing (against the Getty only); (4) tortious interference with contract (against Potts and the Russo Defendants only); (5) intentional interference with an advantageous business relationship; (6) fraud; (7) unjust enrichment; (8) unfair competition; (9) conversion; and (10) violation of the Defend Trade Secrets Act ("DTSA"). On May 4, 2017, the Getty Defendants moved to dismiss Counts Two through Ten on the ground that Plaintiffs' tort and quasi-contractual claims are duplicative of their breach of contract claim and that they otherwise fail on the merits. Doc. 50. The Russo Defendants also moved to dismiss, contending that the Court lacks personal jurisdiction over them and that Plaintiffs' claims against them fail on the merits. Doc. 45.

On May 5, 2015, the Court granted Plaintiffs' request for limited jurisdictional discovery with respect to the Russo Defendants. Doc. 81, 20:14–15. Jurisdictional discovery has demonstrated that the Russo Defendants are shareholders in two ancient coin-related companies—Numismatica Ars Classica Ltd. ("NAC") and Numismatica Ars Classica AG ("NAC AG")—that make substantial sales to New York residents. Doc. 94 at 9. Livio and Arturo each own 20% in NAC and 17% and 28.5% respectively in NAC AG. Doc. 94, Ex. 1 at 39:7–23. Additionally, Arturo draws a salary of at least £40,000 from NAC AG. *Id*. at 46:1–21.

## III. Legal Standard

### A. Rule 12(b)(2) Motion to Dismiss: Lack of Personal Jurisdiction

"A plaintiff opposing a motion to dismiss under Rule 12(b)(2) for lack of personal jurisdiction has the burden of establishing that the court has jurisdiction over the defendant." *BHC Interim Funding, LP v. Bracewell & Patterson, LLP*, No. 02 Civ. 4695 (LTS) (HBP), 2003 WL 21467544, at *1 (S.D.N.Y. June 25, 2003) (citing *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999)). To meet this burden, the plaintiff

must plead facts sufficient for a prima facie showing of jurisdiction. *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001). The court construes all of the plaintiff's allegations as true and resolves all doubts in its favor. *Casville Invs., Ltd. v. Kates*, No. 12 Civ. 6968 (RA), 2013 WL 3465816, at *3 (S.D.N.Y. July 8, 2013) (citing *Porina v. Marward Shipping Co.*, 521 F.3d 122, 126 (2d Cir. 2008); *Martinez v. Bloomberg LP*, 883 F. Supp. 2d 511, 513 (S.D.N.Y. 2012)). "However, a plaintiff may not rely on conclusory statements without any supporting facts, as such allegations would lack the factual specificity necessary to confer jurisdiction." *Art Assure Ltd., LLC v. Artmentum GmbH*, No. 14 Civ. 3756 (LGS), 2014 WL 5757545, at *2 (S.D.N.Y. Nov. 4, 2014) (internal quotation marks and citations omitted). As stated, courts may rely on additional materials outside the pleading when ruling on 12(b)(2) motions. *John Hancock Prop. & Cas. Ins. Co. v. Universale Reinsurance Co.*, No. 91 Civ. 3644 (CES), 1992 WL 26765, at *1 n.1 (S.D.N.Y. Feb. 5, 1992); *Darby Trading Inc. v. Shell Intern. Trading and Shipping Co. Ltd.*, 568 F. Supp. 2d 329, 334 (S.D.N.Y. 2008). When the Court is confronted by a motion raising a combination of Rule 12(b) defenses, it will pass on the jurisdictional issues before considering whether a claim was stated by the complaint. *See Darby Trading,* 568 F. Supp. 2d at 335; *Yellow Page Sols. Inc. v. Bell Atl. Yellow Pages Co.*, No. 00 Civ. 5663 (MM), 2001 WL 1468168, at *3 (citing *Rationis Enter., Inc. v. AEP/Borden Indus.*, 261 F.3d 264, 267–68 (2d Cir.2001)).

### B. Rule 12(b)(6) Motion to Dismiss: General Legal Standard

Under Rule 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Koch v. Christie's Int'l PLC*, 699 F.3d

141, 145 (2d Cir. 2012). However, the Court is not required to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

## IV.    Discussion

### A.  Claims against the Getty Defendants

#### 1.  Tort Claims

The Getty Defendants seek dismissal of Plaintiffs' tort claims on the ground that they are duplicative of their breach of contract claim. Getty Defendants' Memorandum in Support of Motion to Dismiss ("Getty Defs.' Mem.") at 10. The Getty Defendants also contend that Plaintiffs' tort claims fail on the merits. *Id*. at 15.

Under New York law, "a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated." *Negrete v. Citibank, N.A.*, 187 F. Supp. 3d 454, 471 (S.D.N.Y. 2016) (quoting *Clark–Fitzpatrick, Inc. v. Long Island R. Co.*, 70 N.Y.2d 382, 389 (1987)). This legal duty "must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract." *Clark–Fitzpatrick*, 70 N.Y.2d at 389. If an independent duty exists, "a plaintiff may maintain both tort and contract claims arising out of the same allegedly wrongful conduct."

*Bayerische Landesbank, New York Branch v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 58 (2d

Cir. 2012). "If, however, the basis of a party's claim is a breach of solely contractual

obligations, such that the plaintiff is merely seeking to obtain the benefit of the contractual

bargain through an action in tort, the claim is precluded as duplicative." *Id*.

Plaintiffs contend that their tort claims are not duplicative because the Getty Defendants

engaged in wrongful conduct beyond breaching the NDNCA. Plaintiffs' Memorandum of Law

in Opposition to the Getty Defendants' Motion to Dismiss (referred to as "Pls.' Mem." in section

IV.A. of this opinion) at 8. Plaintiffs' argument is premised on the theory that the Getty

Defendants misappropriated Plaintiffs' services, benefits, and property by falsely representing

that they intended to compensate Plaintiffs for facilitating a transaction involving the Torlonia

Collection. *Id*. Because the NDNCA did not address compensation for facilitating a deal,

Plaintiffs contend that the parties created legal relationships that, though related to the NDNCA,

imposed legal duties that arose outside the NDNCA, and that the Getty Defendants violated

those duties. *Id*. The Court addresses Plaintiffs' tort claims in turn.

### a. Conversion

Plaintiffs bring a claim for conversion based on the Getty Defendants' alleged refusal to

return the catalogue of Torlonia sculptures prepared by Electrum, despite their demands for its

return. Compl. ¶¶ 197–202. "Conversion is the unauthorized assumption and exercise of the

right of ownership over goods belonging to another to the exclusion of the owner's rights." *State

v. Seventh Regiment Fund, Inc.*, 98 N.Y.2d 249, 259 (2002) (internal quotation marks omitted).

"For an action in conversion to lie when the original possession of the property is lawful, a

plaintiff must make a demand for the allegedly converted property and the possessor must

refuse." *AD Rendon Commc'ns, Inc. v. Lumina Ams., Inc.*, No. 04 Civ. 8832 (KMK), 2007 WL

2962591, at *4 (S.D.N.Y. Oct. 10, 2007). A claim for conversion, however, "cannot be predicated on a mere breach of contract." *Wolf v. Nat'l Council of Young Israel*, 264 A.D.2d 416, 417 (2d Dep't. 1999). To survive a motion to dismiss, a plaintiff alleging conversion must plead "independent facts sufficient to give rise to tort liability." *Fesseha v. TD Waterhouse Investor Servs., Inc.*, 305 A.D.2d 268, 269 (App. Div. 2003) (internal quotation marks omitted).

Plaintiffs contend that their claim for conversion is not duplicative of their breach of contract claim because they have possessory rights to the catalogue that are independent of the NDNCA. Pl.'s Mem. at 13. In particular, Plaintiffs contend that the Getty Defendants would still be obligated to return the catalogue even if the NDNCA did not exist because they independently developed and created it. *Id*. The Court disagrees. Plaintiffs have not alleged any facts suggesting that the Getty Defendants' continued possession of the catalogue would be unauthorized in the absence of the NDNCA.[3] As Plaintiff's complaint alleges, it was the NDNCA that imposed restrictions on the Getty Defendants' possession of the catalogue and created an obligation to return it to Plaintiffs. Compl. ¶ 68; NDNCA ¶ 1 ("[The Getty] shall immediately return to Electrum all originals and copies of Confidential Information upon request."). Without the restrictions and obligations set forth in the NDNCA, Plaintiffs' transfer of the catalogue to the Getty Defendants would have been unrestricted and the Getty Defendants would have been able to do with it as they pleased. Plaintiffs' factual allegations, taken as true for purposes of this motion, are devoid of any suggestion that the Getty Defendants had an independent obligation to return the catalogue. As such, Plaintiffs' conversion is impermissibly

---

[3] Plaintiffs have not cited any case law or set forth a cogent argument explaining how someone who gives away an item voluntarily and without restrictions to another could be the victim of conversion merely because he developed and created that item.

duplicative and the Getty Defendants' motion to dismiss Count Nine of the Complaint is GRANTED.

### b. Fraud

In their Complaint, Plaintiffs allege that the Getty Defendants defrauded them by making various misrepresentations, including that they would (1) keep Plaintiffs' information confidential, (2) not circumvent Plaintiffs in a deal with the Torlonia family, (3) not contact or communicate with the Torlonia family without Plaintiffs' participation and consent, and (4) compensate Plaintiffs for facilitating a deal with the Torlonia family. Compl. ¶ 179. In their opposition to the instant motion, however, Plaintiffs appear to have abandoned most of their fraud claim, contending only that the Getty Defendants are liable for fraud because they misrepresented an intent to compensate Plaintiffs for facilitating a deal with the Torlonia family. Pls.' Mem. at 18. Plaintiffs, thus, appear to concede that the portions of their fraud claim based on the other alleged misrepresentations are duplicative of their breach of contract claim.

The Second Circuit has held that a plaintiff may distinguish a fraud claim from a breach of contract claim by demonstrating a fraudulent misrepresentation collateral or extraneous to the contract. *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996). Here, Plaintiffs contend that the Getty Defendants' misrepresentations that they intended to compensate Plaintiffs for facilitating a deal with the Torlonia family are collateral to the NDNCA. Pls.' Mem. at 9. As the Getty Defendants recognize, the NDNCA did not provide for compensation to Plaintiffs for facilitating a deal with the Torlonia family. *Id*. at 9–10; Getty Defs.' Mem. at 2, 5. As such, Defendants' alleged misrepresentations regarding compensation are sufficiently collateral to the NDNCA to support an independent fraud claim.

However, Plaintiffs have failed to plausibly allege that the Getty Defendants made any representations of an intent to compensate them for facilitating a deal with the Torlonia family, false or otherwise. Plaintiffs cite two passages in the Complaint that purportedly allege that the Getty Defendants represented an intent to compensate them. Pls.' Mem. at 4, 12, 16. None of the cited paragraphs, however, contains any statement by a Getty defendant promising compensation to Plaintiffs for facilitating a transaction. The first cited passage describes (1) initial conversations between Electrum and Potts regarding a potential deal involving the Torlonia Collection, (2) the Getty Defendants' oral agreement to keep certain information confidential, and (3) the negotiation and signing of the NDNCA. Compl. ¶¶ 57–68. Nothing in this passage alleges or even suggests that Potts or anyone else acting on behalf of the Getty Defendants made representations regarding compensation. *See id.* The relevant portion of the second passage alleges that Plaintiffs proposed a deal structure to the Getty Defendants involving a 22% commission of the price for themselves and that Stephen Clark, general counsel for the Getty, "expressed interest in that proposal and agreed to further discuss."[4] *Id.* ¶¶ 103–104.

The only statement by a Getty defendant alleged in the Complaint that is even tangentially related to the idea of future compensation is Clark's expression of interest in Plaintiffs' proposal and agreement to discuss further. The Court disagrees with Plaintiffs' suggestion that expressing an interest in something amounts to a promise to do that thing. Accepting Plaintiffs' factual allegations as true and drawing all reasonable inferences in their favor, the Court finds that Plaintiffs have not plausibly alleged that the Getty Defendants represented an intent to compensate them. Therefore, even accepting Plaintiffs' contention that

---

[4] The passage also describes further negotiations regarding the sale of the collection to the Getty, as well as the Getty Defendants' alleged actions to cut Plaintiffs off from discussions with the Torlonia family. Compl. ¶¶ 105–120. These paragraphs lack any allegations concerning Plaintiffs' claim that the Getty Defendants represented an intent to compensate them.

their fraud claim arises from misrepresentations that are collateral to the NDNCA, Plaintiffs'

fraud claim fails because they have not sufficiently pleaded that the Getty Defendants made

those misrepresentations.[5]  Accordingly, the Getty Defendants' motion to dismiss Count Six of

the Complaint is GRANTED.

### c.  Unfair Competition

Under New York law, an unfair competition claim may be based on "palming off" or

misappropriation.  *Sidney Frank Importing Co. v. Beam Inc.*, 998 F. Supp. 2d 193, 208–09

(S.D.N.Y. 2014).  To state a claim for unfair competition based on misappropriation, a plaintiff

must allege that the defendant:  "(1) misappropriated the plaintiff's labors, skills, expenditures,

or good will; and (2) displayed some element of bad faith in doing so."  *Id.* (internal quotation

marks and citation omitted).  As plead in their Complaint, Plaintiffs' unfair competition claim

alleges that the Getty Defendants misappropriated their "trade secrets and confidential and

proprietary information" by making misrepresentations and breaching the NDNCA.  Compl. ¶¶

190–196.  In their opposition to the instant motion, however, Plaintiffs appear to concede that

their claim is duplicative to the extent it relies on alleged misappropriation of their confidential

information.  *See* Pls.' Mem. at 11.  They contend that their claim survives because the Getty

Defendants, in addition to misappropriating confidential information, also misappropriated

Plaintiffs' "knowledge and *application* of Italian law and the *relationships* necessary to bring

about a sale or transfer of the Torlonia Sculptures."  *Id.*  In other words, Plaintiffs contend that

the Getty Defendants misappropriated their "labor, skill, and/or goodwill, which are collateral to

the NDNCA and any breach thereof."  *Id.*

---

[5] For the same reason, the allegations do not come close to satisfying the requirement of Federal Rule of Civil Procedure 9(b) that the circumstances constituting fraud be pleaded with particularity.

Plaintiffs' argument is unavailing because the Complaint's articulation of their unfair competition claim contains no allegations of misappropriation of "labor, skill, and/or goodwill," and instead only refers to misappropriation of "trade secrets and confidential and proprietary information," which overlaps with their contractual claim. *See* Compl. ¶¶ 191–193. Plaintiffs' claim fails for a second reason. In their opposition, Plaintiffs contend that the Getty Defendants misappropriated the fruits of Plaintiffs' labors by misrepresenting that they intended to compensate Plaintiffs for their services in facilitating a transaction between the Getty Defendants and the Torlonia family. Pls.' Mem. at 19. As discussed above, Plaintiffs have not sufficiently alleged that any Getty defendant made a representation regarding an intent to compensate Plaintiffs. *Supra* 14–15. Accordingly, Plaintiffs have failed to plausibly allege an unfair competition claim based on misappropriation and the Getty Defendants' motion to dismiss Count Eight of the Complaint is GRANTED.

### d. Intentional Interference

Plaintiffs claim that the Getty Defendants intentionally and maliciously cut them out of their continued relationship with the Torlonia family by using improper or illegal means. Compl. ¶ 174. To state a claim for intentional interference with business relations under New York law, a plaintiff must allege that: "(1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship." *Valley Lane Indus. Co. v. Victoria's Secret Direct Brand Mgmt., L.L.C.*, 455 F. App'x 102, 105 (2d Cir. 2012). To satisfy the third element, "the defendant's conduct must amount to a crime or an independent tort." *Id.* at 106.

Here, Plaintiffs contend that the Getty Defendants interfered with their relationship with the Torlonia family through independently tortious conduct, "which necessarily exceeds the bounds of the contract action." Pls.' Mem. at 12. In particular, they argue that the Getty Defendants acted with malice and intent to harm Plaintiffs by (1) refusing to cease contact with the Torlonia family except through Plaintiffs, (2) refusing to return the catalogue of the Torlonia sculptures, (3) misrepresenting an intent to compensate Plaintiffs, and (4) misappropriating the benefits of Plaintiffs' trade secrets, labors, skills, and goodwill. *Id*. at 12.

Plaintiffs' suggestion that communicating directly with the Torlonia family and refusing to return the catalogue is wrongful independent of the NDNCA, simply because it was done "with malice and intent to harm," is unavailing. Despite Plaintiffs' colorful characterization, these allegations merely describe alleged breaches of the NDNCA. Plaintiffs have not alleged any limitations on the Getty Defendants' ability to communicate with the Torlonia family outside the NDNCA and, as the Court discussed above with respect to Plaintiffs' conversion claim, the Getty Defendants' obligation to return the catalogue arises solely from the NDNCA.

Moreover, Plaintiffs may not base their interference claim on misrepresentations of an intent to compensate because, as the Court has already set forth, Plaintiffs have failed to sufficiently allege that the Getty Defendants made such representations. *Supra* pp. 14–16. Similarly, their interference claim cannot survive to the extent it is based on misappropriation because, as the Court has also already set forth, Plaintiffs' claims of misappropriation arise from their insufficiently-plead allegation of misrepresentation of an intent to compensate. *Supra* p. 16. Therefore, Plaintiffs have failed to sufficiently plead that the Getty Defendants intentionally interfered with their business relationship with the Torlonia family by engaging in independently wrongful conduct, and as such, fail to satisfy the third element of an intentional interference

claim. Accordingly, the Getty Defendants' motion to dismiss Count Five of the Complaint is GRANTED.

### 2. Quasi-Contractual Claims

The Getty Defendants also seek dismissal of Plaintiffs' quasi-contractual claims on the ground that they impermissibly duplicate their breach of contract claim. Getty Defs.' Mem. at 19. The Court addresses these claims in turn.

### a. Breach of Implied Covenant of Good Faith

"Under New York law, parties to an express contract are bound by an implied duty of good faith, but breach of that duty is merely a breach of the underlying contract." *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 80 (2d Cir. 2002) (quotation marks omitted). "Therefore, when a complaint alleges both a breach of contract and a breach of the implied covenant of good faith and fair dealing based on the same facts, the latter claim should be dismissed as redundant." *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013). In their response to the instant motion, Plaintiffs acknowledge that their claim for breach of the implied covenant of good faith is based on the same facts as their breach of contract claim. Pls.' Mem. at 6, n. 13. Accordingly, the Getty Defendants' motion to dismiss Count Three of the Complaint is GRANTED.

### b. Unjust Enrichment

As Plaintiffs concede, "[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in unjust enrichment for claims arising out of the same subject matter." *Kalimantano GmbH v. Motion in Time, Inc.*, 939 F. Supp. 2d 392, 418 (S.D.N.Y. 2013) (citing *Clark–Fitzpatrick*, 70 N.Y.2d at 388). Under New York law, recovery pursuant to an unjust enrichment theory is available only in the absence of a

governing enforceable agreement. *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of New Jersey, Inc.*, 448 F.3d 573, 586–587 (2d Cir. 2006). Plaintiffs, however, contend that their unjust enrichment claim does not arise out of the same subject matter governed by the NDNCA because they performed compensable work that benefitted the Getty Defendants that is not addressed by the NDNCA. Pls.' Mem. at 10. In particular, they contend that the Getty Defendants benefitted from their management of communications with the Torlonia family, coordination of visits to inspect the Torlonia sculptures, and utilization of their relationships and goodwill with Italian officials. *Id.*

Plaintiffs' contention is at odds with the facts they alleged in their Complaint. In their Complaint, Plaintiffs described the NDNCA as "relating to access to the Torlonia Family, relationships with Italian officials, knowledge, trade secrets, and access relating to the Torlonia Sculptures, and knowledge regarding appropriate deal structures to bring the Torlonia Sculptures to the public." Compl. ¶ 62. While the NDNCA may not have specifically enumerated all of the services Plaintiffs agreed to provide, it undoubtedly purported to govern the parties' relationship in connection with a potential transaction involving the Torlonia Collection—a subject matter that necessarily includes Plaintiffs' services in brokering such a transaction. Thus, the NDNCA, if enforceable, would preclude recovery under an unjust enrichment claim.

However, whether the NDNCA is actually an enforceable agreement is disputed at this juncture. While Plaintiffs may not ultimately *recover* under both the breach of contract and unjust enrichment claims, courts in this Circuit routinely allow plaintiffs to *plead* such claims in the alternative. *See Maalouf v. Salomon Smith Barney, Inc.*, No. 02 Civ. 4770 (SAS), 2003 WL 1858153, at *7 (S.D.N.Y. Apr. 10, 2003) (noting that plaintiff is allowed to plead both contract and quasi-contract claims even though he may only recover on one such ground); *Orange Cnty.*

*Choppers, Inc. v. Olaes Enters., Inc.*, 497 F. Supp. 2d 541, 557 (S.D.N.Y. 2007) (citing *Maalouf* and Rule 8(a) of the Federal Rules of Civil Procedure for the principle that plaintiff may plead breach of contract and unjust enrichment claims alternatively despite defendant's contention that a valid and enforceable contract governed the dispute); *Contractual Obligation Prods., LLC v. AMC Networks, Inc.*, No. 04 Civ. 2867 (BSJ) (HBP), 2006 WL 6217754, at *7 (S.D.N.Y. Mar. 31, 2006) (observing that the argument that quasi-contract claim was barred as duplicative of contract claim was "misguided at the pleading stage"). Accordingly, Plaintiffs' claim for unjust enrichment survives as a potential alternative cause of action should Plaintiffs' breach of contract claim fail, and the Getty Defendants' motion to dismiss Count Seven of the Complaint is DENIED.

### 3. DTSA Claim

Plaintiffs allege that the Getty Defendants are liable for trade secret misappropriation under the DTSA. Compl. ¶¶ 203–209. The DTSA applies only to acts of misappropriation that occur on or after the effective date of the Act, May 11, 2016. *Champions League, Inc. v. Woodard*, 224 F. Supp. 3d 317, 326 (S.D.N.Y. 2016). The Getty Defendants contend that to plead a claim for violation of the DTSA, Plaintiffs must allege, *inter alia*, "acquisition," "disclosure," or "use" of a trade secret after that date. Getty Defs.' Mem. at 22. The Complaint does not allege that the Getty Defendants acquired confidential information from Plaintiffs after the summer of 2015, Compl. ¶ 117, and the only alleged wrongful disclosure or use of Plaintiffs' confidential information occurred prior to May 11, 2016, in March 2016, when the New York Times announced the agreement between the Torlonia Foundation and the Italian Ministry of Culture. *Id.* ¶¶ 122–125. Thus, the Getty contends, Plaintiffs have not plausibly alleged that the Getty Defendants engaged in any conduct governed by the DTSA. Getty Defs.' Mem. at 22.

Plaintiffs do not dispute that they failed to allege that the Getty Defendants acquired, disclosed, or used Plaintiffs' trade secrets after the DTSA went into effect. *See* Pls.' Mem. at 20–21. Instead, they contend that in addition to acquisition, disclosure, and use, the DTSA prohibits *concealment* of a trade secret, and that the Getty Defendants have concealed Plaintiffs' trade secrets after the DTSA went into effect by refusing to return the catalogue of Torlonia sculptures. *Id*. at 21. As the Getty Defendants point out, concealment only violates the DTSA's *criminal* provision, 18 U.S.C. § 1832, and Plaintiffs have not cited any authority suggesting that the provision authorizes private causes of action. Indeed, courts outside this Circuit have held that private citizens do not have the right to enforce the DTSA's criminal provision. *See Steves & Sons, Inc. v. JELD-WEN, Inc.*, 271 F. Supp. 3d 835, 842–43 (E.D. Va. 2017); *Nelson Brothers Professional Real Estate LLC v. Beau Jaussi et al.*, No. 17 Civ. 0158 (DOC), 2017 WL 8220703, at *6 (C.D. Cal. Mar. 23, 2017). Therefore, Plaintiffs are unable to rely on a theory of "concealment" to plead a DTSA claim, and the Getty Defendants' motion to dismiss Count Ten of the Complaint is GRANTED.

### 4. Claims against Potts

By only contending that they have sufficiently pleaded claims against Potts for intentional interference, fraud, unfair competition, and conversion, Plaintiffs appear to concede the balance of their claims against Potts. *See* Pls.' Mem. at 23. Accordingly, the Getty Defendants' motion to dismiss Plaintiffs' claims for tortious interference with contract (Count Four), unjust enrichment (Count Seven), and DTSA (Count Ten) claims against Potts is GRANTED.

As the Court has set forth generally, Plaintiffs' intentional interference, fraud, unfair competition, and conversion claims are duplicative of their contractual claim to the extent they

allege duties that are not independent of the NDNCA. Potts cannot be held liable in tort for claims that are duplicative of Plaintiffs' breach of contract claim. *See Courageous Syndicate, Inc. v. People-to-People Sports Comm., Inc.*, 141 A.D.2d 599, 600 (1988) ("Generally, a director of a corporation is not personally liable to one who has contracted with the corporation on the theory of inducing a breach of contract . . . ."). The only claims that the Court has found to *not* be duplicative are those alleging tortious conduct based on the Getty Defendants' alleged misrepresentations of an intent to compensate Plaintiffs. However, the Court has determined that Plaintiffs have not sufficiently alleged that any Getty Defendant, including Potts, made such representations. Accordingly, Plaintiffs have failed to sufficiently state claims against Potts, and the Getty Defendants' motion to dismiss all remaining claims against him is GRANTED.

### 5. Claims brought by Regulus

The Getty Defendants contend that "the threadbare allegations in the Complaint concerning Regulus' involvement in this case are insufficient to state a claim—any claim—for relief." Getty Defs.' Mem. at 24. In light of the Court's dismissal of a number of Plaintiffs' claims against the Getty Defendants, the remaining claims asserted on behalf of Regulus are for (1) breach of third party beneficiary contract, and (2) unjust enrichment.

Regulus claims that despite not being a party to the NDNCA, it is entitled to recover for the Getty's breach of the NDNCA's confidentiality obligations as a third party beneficiary. Compl. ¶ 153. "Under New York law, a third party may enforce a contract when 'recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and . . . the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.'" *Bayerische*, 692 F.3d at 52 (quoting *Levin v. Tiber Holding Corp.*, 277 F.3d 243, 248 (2d Cir. 2002)). "A third party is an intended beneficiary where either (1) no

one other than the third party can recover if the promisor breaches the contract or (2) the language of the contract otherwise clearly evidences an intent to permit enforcement by the third party."  *Piccoli A/S v. Calvin Klein Jeanswear Co.*, 19 F. Supp. 2d 157, 162 (S.D.N.Y. 1998) (internal quotation marks omitted); *see also United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, 988 F. Supp. 367, 373 (S.D.N.Y. 1997) ("Courts have found that third-party status may be established where only the third party may recover if the promisor breaches the contract; conversely, if another besides the third party may recover, beneficiary status is negated.").

The NDNCA defines "confidential information" as including "information disclosed to a party by third parties at the direction of either Electrum or [the Getty]."  NDNCA at 1.  Plaintiffs contend that this language in the NDNCA shows an intent to afford third-parties and their information the same confidentiality protections that the parties to the contract enjoy.  Pls.' Mem. at 23.  Therefore, Plaintiffs assert, a provider of confidential information like Regulus is a third-party beneficiary of an agreement to maintain such confidentiality, and as such, has a right to enforce the NDNCA's confidentiality provisions.  *Id.*

The Getty Defendants contend that Regulus cannot be a third party beneficiary because it did not come into the picture until four months after the NDNCA was signed, and a third party claiming to be a beneficiary of a contract must demonstrate that the contractual parties intended to confer a benefit at the time of contracting.  Defs.' Mem. at 24.  "Although a third party need not be specifically mentioned in the contract before third-party beneficiary status is found, New York law requires that the parties' intent to benefit a third party must be shown on the face of the agreement."  *In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 725 F. Supp. 712, 733 (S.D.N.Y. 1989).  "Absent such intent, the third party is merely an incidental beneficiary with no right to enforce the contract."  *Id.*  The Getty Defendants have not cited any authority indicating that a

contract must demonstrate that the contracting parties intended to benefit a *specific* third party, as opposed to third parties in general.  Indeed, the authority examined by the Court suggests that it is sufficient if the contractual counterparts intended to benefit *a* third party.  *See In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 725 F. Supp. at 733.  Construing the pleadings liberally, the Court finds that Regulus has sufficiently alleged that Phoenix/Electrum and the Getty intended that a third-party provider of confidential information be protected by the NDNCA, granting Regulus third-party beneficiary status to bring a breach of third-party beneficiary contract claim against the Getty.  Accordingly, the Getty Defendants' motion to dismiss Count Two of the Complaint is DENIED.

The Court also rejects the Getty Defendants' motion to dismiss Regulus' claim for unjust enrichment.  The Getty Defendants contend that "the Complaint contains only the most conclusory allegations about how Regulus was involved in the transaction or how Regulus was injured by the Getty's alleged conduct."  Getty Defs.' Mem. at 25.  However, as the Getty Defendants concede, Plaintiffs have set forth allegations that Regulus provided services to the Getty related to developing potential deal structures and that the Getty did not compensate Regulus for those services.  Compl. ¶¶ 70, 138, 150.  In the context of an unjust enrichment claim, such allegations are sufficient to survive a motion to dismiss.  *See Baron v. Pfizer, Inc.*, 42 A.D.3d 627, 629 (2007) ("A claim for unjust enrichment will lie when (1) the defendant was enriched, (2) at the expense of the plaintiff, and (3) . . . it would be inequitable to permit the defendant to retain that which is claimed by the plaintiff.").   Accordingly, the Getty Defendants' motion to dismiss Count Seven of the Complaint, to the extent pleaded by Regulus, is DENIED.

### B. Personal Jurisdiction over the Russo Defendants

In a diversity action, personal jurisdiction is determined in accordance with the law of the forum in which the federal court sits. *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001). This determination involves a two-step analysis. *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996). In New York, the Court must first determine whether personal jurisdiction is appropriate pursuant to the State's general jurisdiction statute, C.P.L.R. § 301, or its long arm jurisdiction statute, C.P.L.R. § 302. *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 164 (2d Cir. 2010). If and only if the Court's exercise of personal jurisdiction is deemed appropriate according to New York law, the second step is an evaluation of whether the Court's exercise of personal jurisdiction comports with the Due Process Clause of the United States Constitution. *Id.*

The Complaint does not specifically identify the statutory basis for this Court's personal jurisdiction over the Russo Defendants. However, Plaintiffs' submissions argue that personal jurisdiction is warranted under New York's long arm statute, C.P.L.R. § 302(a). Plaintiffs' Memorandum in Opposition to the Russo Defendants' Motion to Dismiss (referred to as "Pls.' Mem." in section IV.B. of this opinion) at 1–2. As Plaintiffs do not allege that the Russo Defendants are subject to New York's general jurisdiction statute, the Court will evaluate jurisdiction under New York's long arm statute only.

### 1. Long Arm Jurisdiction

Under C.P.L.R. § 302(a), a court may exercise personal jurisdiction over any non-domiciliary who, either in person or through an agent: (1) "transacts any business within the state or contracts anywhere to supply goods or services in the state;" (2) "commits a tortious act within the state . . . ;" (3) "commits a tortious act without the state causing injury to person or

property within the state . . . if he (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce;" or (4) "owns, uses or possesses any real property situated within the state." N.Y. C.P.L.R. § 302(a)(1)-(4) (McKinney).[6]

### a. Section 302(a)(1)

"To establish personal jurisdiction under Section 302(a)(1), two requirements must be met: (1) the defendant must have transacted business within the state; and (2) the claim asserted must arise from that business activity."[7] *Barrett v. Tema Dev. (1988), Inc.*, 251 F. App'x 698, 700 (2d Cir. 2007) (internal quotation marks and citation omitted). A defendant "transacts business" in New York when, looking at the totality of the circumstances, he "purposefully avails [himself] of the privilege of conducting activities within [New York], thus invoking the benefits and protections of its laws." *Hill v. HSBC Bank plc*, 207 F. Supp. 3d 333, 338–39 (S.D.N.Y. 2016). "Random," "fortuitous," or "attenuated" contacts are not sufficient. *SAS Grp., Inc. v. Worldwide Inventions, Inc.*, 245 F. Supp. 2d 543, 548 (S.D.N.Y. 2003) (internal quotation

---

[6] Section 203(a)(4) does not apply as Plaintiffs do not allege that the Russo Defendants own, use, or possess real property in New York.

[7] Section 302(a)(1) also provides for personal jurisdiction over a non-domiciliary who contracts anywhere to supply goods or services in the state. *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 786 (2d Cir. 1999). A defendant contracts to supply services in the state "when he projects himself into New York to perform services and purposefully avails himself of the privileges and benefits of performing such services in the State." *Liberatore v. Calvino*, 742 N.Y.S.2d 291, 293 (1st Dep't 2002) (citing *Bank Brussels Lambert*, 171 F.3d at 789). Here, Plaintiffs allege that the Russo Defendants requested on multiple occasions that Plaintiffs serve as a conduit of communications between the Getty and the Torlonia family, and that numerous communications were sent "through New York" this way. Pls.' Mem. at 4–5. Plaintiffs contend that as a result of this method of communication, the Russo Defendants caused Plaintiffs to render services in New York, conferring personal jurisdiction. *Id*. at 5. This argument is meritless. As Defendants indicate, Plaintiffs' provision of services in New York is irrelevant to the jurisdictional inquiry under Section 302(1)(a). "The appropriate focus of an inquiry under CPLR § 302(a)(1) is on what the non-domiciliary defendant did in New York and not on what the plaintiffs did." *Int'l Customs Assocs., Inc. v. Ford Motor Co.*, 893 F. Supp. 1251, 1262 (S.D.N.Y. 1995)).

marks and citation omitted).  It is the "nature and quality" and not the amount of New York

contacts that determine whether purposeful activity occurred.  *Id*. (internal quotation marks and

citation omitted).

Plaintiffs contend that the Russo Defendants transacted business in New York because

they met with Electrum representatives in the state on various occasions and discussed a possible

transaction involving the Torlonia Collection.[8]  Pls.' Mem. at 3–4.  With respect to Livio,

Plaintiffs point to evidence that he met with Hicham Aboutaam, Electrum's president, in New

York in February, April, and October of 2012, and made representations regarding his

willingness to share a seller's commission with Plaintiffs, requirements for a potential deal by

the owner of the Torlonia Collection, and the status of the sculptures in the Torlonia Collection.

*Id*. at 3.  Arturo, on the other hand, met Hicham Aboutaam in New York in January 2013 and

discussed the possibility of a transaction involving the Torlonia Collection.  *Id*.  Arturo and

Hicham Aboutaam met again in New York in January 2014, and, among other topics, discussed

Electrum's ongoing negotiations with Livio and with the Torlonia family's legal adviser

regarding the collection.  *Id*.

A handful of meetings in New York during which a transaction was discussed in the

abstract does not constitute "purposeful availment" of New York law.  Meetings that do not

result in the execution of a contract or are not essential to or do not substantially advance the

business relationship rarely provide the basis for jurisdiction pursuant to Section 302(a)(1).  *See*

---

[8] Plaintiffs also appear to contend, for the first time in their opposition memorandum, that Livio is a third-party beneficiary of the NDNCA and has therefore availed himself of the protection of New York law because the NDNCA has a New York choice-of-law provision.  Pls. Mem. at 5.  That argument is unavailing.  While New York choice-of-law provisions are significant considerations under a "transacting business" analysis, they are insufficient, on their own, to convey personal jurisdiction over a defendant.  *ESI, Inc. v. Coastal Corp.*, 61 F. Supp. 2d 35, 59 (S.D.N.Y. 1999).  Presumably, courts grant choice-of-law provisions significant consideration because they are highly probative of a conscious intent to purposefully avail oneself of the benefits and protections of New York law. However, such a theory is tenuous in the case of a third-party beneficiary that has *not* participated in the negotiation of the contract, let alone the choice-of-law decision.

*Posven, C.A. v. Liberty Mut. Ins. Co.*, 303 F. Supp. 2d 391, 398-99 (S.D.N.Y. 2004) (collecting cases); *Bozell Group, Inc. v. Carpet Co-op of Am. Ass'n, Inc.*, No. 00 Civ. 1248 (RWS), 2000 WL 1523282, at *6 (S.D.N.Y. Oct. 11, 2000) (finding two meetings in New York that took place three months apart, were not part of a systematic pattern of New York visits, and did not result in any contract being signed, did not rise to the level of "transacting business" required for Section 302 jurisdiction); *PaineWebber Inc. v. WHV, Inc.,* No. 95 Civ. 0052 (LMM), 1995 WL 296398, at *3 (S.D.N.Y. May 16, 1995) ("occasional meetings in the forum state that are exploratory, unproductive or insubstantial are insufficient to establish requisite contacts with the state"). Here, there is no evidence that any meaningful negotiation occurred or substantial decisions were made at these meetings. It is not clear what, if anything, was accomplished at these meetings, thus they do not amount to the transaction of business.

Even if the Russo Defendants' meetings with Electrum representatives did rise to the level of "transacting business" in New York, Plaintiffs' claims do not "arise out of" those contacts as is required for jurisdiction pursuant to Section 302(a)(1). A claim "arises out of" the transaction of business when there is a "substantial nexus" between the transaction of business and the cause of action alleged. *Bozell*, 2000 WL 1523282, at *7. Plaintiffs' claims arise out of alleged wrongful conduct by the Russo Defendants in connection with a potential transaction between the Torlonia family and the Getty—a transaction that had not yet even been contemplated when most of the New York meetings took place. At best, the Russo Defendants' New York meetings with Hicham Aboutaam were mere "link[s] in the chain of events leading to the claim[s] for which relief is sought" and cannot serve as the basis for jurisdiction under Section 302(a)(1). *Id.* at 7.[9]

---

[9] Significantly, as the Russo Defendants point out, Plaintiffs have refused to produce documents and communications relating to proposed deals regarding the Torlonia Collection not involving the Getty Defendants on

### b. Section 302(a)(2)

Under Section 302(a)(2), a court may exercise personal jurisdiction over a non-domiciliary who "commits a tortious act within the state . . . " either in person or through an agent. Courts typically require that the defendant have been physically present in New York while committing the tortious act to confer jurisdiction under Section 302(a)(2). *See Overseas Media, Inc. v. Skvortsov*, 277 F. App'x 92, 95 (2d Cir. 2008); *Bensusan Rest. Corp. v. King*, 126 F.3d 25, 28 (2d Cir. 1997). According to Plaintiffs, the Court has personal jurisdiction because the Russo Defendants made false representations during their meetings with Plaintiffs in New York. Pls. Mem. at 7. Specifically, Plaintiffs point to Hicham Aboutaam's declaration stating that Arturo and Livio represented to him in New York that Electrum would participate in any transaction regarding the Torlonia Collection. Pl.'s Ex. 61 ¶ 12. Plaintiffs claim that they discovered those representations to be false when the Getty and Russo Defendants cut them out of the negotiations with the Torlonia family. Pls.' Mem. at 7. Plaintiffs' argument fails, however, because they have not properly alleged all of the elements of a fraudulent misrepresentation claim under New York law. In particular, they have not alleged any facts purporting to establish that they *relied* on the Russo Defendants' specific misrepresentations, nor have they alleged that they relied on those misrepresentations while present in New York. *See Saudi Computer Aided Translation Ltd. v. Weidner Commc'ns Corp.*, 663 F. Supp. 1104, 1107 (S.D.N.Y. 1987) (rejecting plaintiff's assertion of personal jurisdiction under Section 302(a)(2) because plaintiff did not allege that each element of the tort occurred in New York.).

---

the ground that such information is irrelevant to the claims and defenses in this action. Russo Defs.' Ex. D. at 5. That position is untenable with Plaintiffs' contention here that meetings discussing potential transactions not involving the Getty have a substantial nexus to their claims for purposes of personal jurisdiction.

### c.   Section 302(a)(3)

Section 302(a)(3) applies to non-domiciliary defendants who "commit[] . . . tortious act[s] without the state causing injury to person or property within the state."  This provision applies if the non-domiciliary "(i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce . . . ." *Bank Brussels Lambert*, 171 F.3d at 791.  In determining whether Section 302(a)(3) confers jurisdiction, courts apply a "situs-of-injury test, which asks them to locate the 'original event which caused the injury.'" *Id.*  "[T]he situs of such a nonphysical commercial injury is the place where 'the critical events associated with the dispute took place' and not where the resultant monetary loss occurred." *Darby Trading*, 568 F. Supp. 2d at 337 (quoting *Am. Eutectic Welding Alloys Sales Co. v. Dytron Alloys Corp.*, 439 F.2d 428, 433-34 (2d Cir. 1971)).

According to Plaintiffs, the Court has jurisdiction over the Russo Defendants because they engaged in tortious interference and fraud abroad that caused injury in New York.  Pls.' Mem. at 8.  Plaintiffs contend that the Russo Defendants satisfy Section 302(a)(3)(i) because they are each shareholders—and Arturo is a salaried employee—in NAC and NAC AG, companies that derive substantial revenue from goods consumed in New York.  *Id.* at 9.  They contend that the Russo Defendants also satisfy Section 302(a)(3)(ii) because they derive substantial revenues from international commerce from their ownership interests in and salary from NAC and NAC AG.  *Id.*

As the Russo Defendants indicate, a company's revenues are not automatically attributable to its shareholders and employees for purposes of satisfying the substantial revenue requirement of Section 302(a)(3). *See Lehigh Valley Indus., Inc. v. Birenbaum*, 389 F. Supp. 798, 805 (S.D.N.Y.), *aff'd sub nom. Lehigh Val. Indus., Inc. v. Birenbaum*, 527 F.2d 87 (2d Cir. 1975) ("While plaintiffs are correct in asserting that the revenue derived from interstate commerce need not be related to the acts out of which the case arises, they are incorrect in reasoning that the revenue derived by [the corporation] is automatically attributable to its sole shareholder defendant . . . ."); *Drake v. Lab. Corp. of Am. Holdings*, No. 02 Civ. 1924 (FB)(RML), 2007 WL 776818, at *11 (E.D.N.Y. Mar. 13, 2007), *aff'd*, 417 F. App'x 84 (2d Cir. 2011) ("Although the parties do not dispute that [the corporation] has derived substantial revenue from interstate commerce, the revenues from interstate commerce derived by [a corporation] cannot be attributed to [its non-domiciliary employee]."). Plaintiffs have not set forth any facts showing that the Russo Defendants derive substantial revenue independent of their roles in NAC and NAG AG. Accordingly, they have failed to satisfy the requirements of Section 302(a)(3).

As Plaintiffs have failed to meet their burden of demonstrating long-arm jurisdiction under New York law, the Court need not determine whether exercising personal jurisdiction over the Russo Defendants comports with due process. The Court also need not address the Russo Defendants' Federal Rule of Civil Procedure 12(b)(6) motion to dismiss for failure to state a claim. Accordingly, the Russo Defendants' motion to dismiss all of Plaintiffs' claims against them is GRANTED.

## V. Leave to Amend

Rule 15 of the Federal Rules of Civil Procedure instructs courts to "freely give leave" to replead "when justice so requires." Fed. R. Civ. P. 15(a)(2). The Supreme Court has held that it

would be an abuse of discretion, "inconsistent with the spirit of the Federal Rules," for a district court to deny leave without some justification, "such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Foman v. Davis*, 371 U.S. 178, 182 (1962).  When a motion to dismiss is granted, "[i]t is the usual practice . . . to allow leave to replead." *Schindler v. French*, 232 F. App'x 17, 19 (2d Cir. 2007) (internal quotation marks and citation omitted).

The Getty Defendants have not articulated any reasons why Plaintiffs should not be granted leave to amend.  Allowing Plaintiffs to amend their claims for intentional interference, fraud, unfair competition, conversion, and DTSA against the Getty Defendants would not be futile and would otherwise be in the interest of justice.  Accordingly, the Court grants Plaintiffs leave to amend those claims.[10]

The Court, however, reaches a different conclusion with respect to Plaintiffs' claims against the Russo Defendants.  Plaintiffs have failed to establish a *prima facie* case of personal jurisdiction, despite having the aid of jurisdictional discovery.  Accordingly, the Court finds that allowing Plaintiffs to amend their claims against the Russo Defendants would be futile, and they will not be permitted to do so.

## VI.    Conclusion

For the foregoing reasons, the Getty Defendants' motion to dismiss is GRANTED in part and DENIED in part, and the Russo Defendants' motion to dismiss is GRANTED.  Plaintiffs' claims against the Russo Defendants are dismissed with prejudice for lack of personal

---

[10] Plaintiffs conceded their claim for breach of the implied covenant of good faith against the Getty (Count Three) and tortious interference with respect to Potts (Count Four).  Plaintiffs will not be given an opportunity to replead those claims.

jurisdiction. Plaintiffs are permitted to proceed on their unjust enrichment claim against the Getty Defendants, and Regulus is permitted to proceed on its breach of third party beneficiary contract claim.[11] They may replead their intentional interference, fraud, unfair competition, conversion, and DTSA claims against the Getty Defendants, but may not replead the claims they have conceded (breach of the implied covenant of good faith and fair dealing against the Getty and tortious interference with contract against Potts). Plaintiffs' Amended Complaint must be filed, if at all, on or before **April 20, 2018**. If Plaintiffs choose not to amend, the parties are directed to contact the Court to schedule a status conference. The Clerk of the Court is respectfully directed to terminate the motions, Doc. 45, Doc. 50.

It is SO ORDERED.

Dated:  March 29, 2018
        New York, New York

_____
Edgardo Ramos, U.S.D.J.

---

[11] The Getty has not moved to dismiss Plaintiffs' breach of contract claim.