# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PHOENIX ANCIENT ART, S.A., PETRARCH LLC a/k/a ELECTRUM, and REGULUS INTERNATIONAL CAPITAL CORP. | CASE NO. 1:17-cv-00241-ER |
| **Plaintiffs,** | **PLAINTIFFS' FIRST AMENDED COMPLAINT** |
| **VS.** | |
| **J. PAUL GETTY TRUST, J. PAUL GETTY MUSEUM, and TIMOTHY POTTS** | **DEMAND FOR JURY TRIAL** |
| **Defendants.** | |

PLAINTIFFS file suit against the J. Paul Getty Trust (the "TRUST"), J. Paul Getty Museum (the "GETTY MUSEUM") (with the TRUST, the "GETTY"), and Timothy Potts ("POTTS") (collectively, "DEFENDANTS"), for their misappropriation, unjust enrichment, fraud, breach of contract, and interference with prospective business relationships. PLAINTIFFS, through years of hard work, professional judgment, and extensive knowledge regarding antiquities, created exclusive relationships with the Torlonia family and Italian officials designed to effectuate transfer, sale, exhibition, export, and/or commercialization of the Torlonia family's extensive art collection. DEFENDANTS, through a combination of breach of contract, unjust enrichment, tortious interference, fraud, and misappropriation, have sought to deprive PLAINTIFFS of the value of their years' worth of knowledge, skill, labor, and goodwill and to use such knowledge, skill, labor, and goodwill to unfairly obtain access to the valuable Torlonia

Collection and representatives without having to invest the same time, effort, skill, and money as PLAINTIFFS.

The Torlonia Collection at issue in this case concerns Greek and Roman sculptures valued in the billions of dollars. Contemplating the substantial value and effort they invested in making the Torlonia Collection ready and available for sale, transfer, exportation, and/or exhibition and in developing innovative strategies for navigating Italian law and effectuating such a transfer, PLAINTIFFS protected their plans, proprietary information, trade secrets, and exclusive relationship with the Torlonia family through a confidentiality and non-circumvention agreement that DEFENDANTS signed but never intended to honor. In violation of their contractual and legal duties, DEFENDANTS stole PLAINTIFFS' confidential information and valuable business relationship. DEFENDANTS made various fraudulent misrepresentations and failed to disclose material facts to PLAINTIFFS in an effort to avoid compensating PLAINTIFFS. DEFENDANTS further misappropriated and were unjustly enriched with PLAINTIFFS' skill, labor, and goodwill expended and developed in preparing the Torlonia Collection for sale, transfer, export, commercialization, and/or exhibition, including but not limited to developing the necessary relationships with Italian officials. DEFENDANTS deprived PLAINTIFFS of the value thereof by tortiously interfering in PLAINTIFFS' business relationships and unfairly competing with PLAINTIFFS. PLAINTIFFS further allege as follows:

**JURISDICTION AND VENUE**

1.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332 over this civil action in which the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, between citizens of different states.

2.      As further explained below, this Court has personal jurisdiction over DEFENDANTS at least because DEFENDANTS are present within or have ongoing systematic contacts with the United States, the State of New York, and the Southern District of New York. DEFENDANTS have purposefully and regularly availed themselves of the privileges of conducting business in the State of New York and in the Southern District of New York. As also explained below, PLAINTIFFS' claims arise directly from DEFENDANTS' activities in the State of New York and in the Southern District of New York.

3.      Venue is proper in this Court under 28 U.S.C. §§ 1391(b), (c), and (d) because, as explained below, a substantial part of the events or omissions giving rise to the claims occurred in this District.

4.      DEFENDANTS have litigated this case since the filing of the Original Complaint without challenge to jurisdiction or venue and have waived any challenge thereto.

**THE PARTIES**

**A.      PLAINTIFFS.**

5.      Phoenix Ancient Art, S.A. ("PHOENIX") is a world-leading dealer in rare and exquisite antiquities. PHOENIX is managed by brothers Ali and Hicham Aboutaam

and was founded in the mid-1960s. PHOENIX's principal place of business is at 6, rue
Verdaine, P.O. Box 3516, 1211 Geneva 3, Switzerland.

6.      PHOENIX has galleries in Geneva and New York City. Its offerings include
antiquities of the highest quality from a broad geographic range covering the Mediterranean
and western and central Asia. PHOENIX exhibits objects from the Greek, Roman, and
Byzantine worlds and cultures in Mesopotamia, the Near East, Egypt, Europe, the Balkans,
Eurasia, and the Steppes.

7.      PHOENIX's works of art have been purchased for public display by many of
the world's preeminent museums. PHOENIX expends significant effort to establish the
authenticity and provenance of its offered works of art. This extends from scholarly
historical and stylistic analysis to scientific reports based on thermo-luminescence, carbon-
14, metallurgic, and other testing. These analyses ensure that each artifact is authentic
regarding its description and date.

8.      Petrarch LLC a/k/a Electrum ("ELECTRUM") is the exclusive U.S. agent
for PHOENIX and is a New York limited liability company with a principal place of
business at 47 East 66th Street, New York, New York 10065.

9.      Regulus International Capital Corp. ("REGULUS") is a Delaware
corporation with a principal place of business at 67 Holly Hill Lane, Greenwich,
Connecticut 06830. REGULUS and ELECTRUM agreed to participate in a cooperative
venture to assist in the sale, transfer, temporary exportation, and/or exhibition of art owned
by the Torlonia family.

10.     PHOENIX, ELECTRUM, and REGULUS are collectively referred to herein
as PLAINTIFFS.

**B.      DEFENDANTS.**

11.      The GETTY MUSEUM is the richest museum in the world and has an endowment that exceeds $4 billion.

12.      In its bylaws, the TRUST claims to be formerly known as The J. Paul Getty Museum and claims a principal office at 1200 Getty Center Drive, Los Angeles, California 90049. The TRUST bylaws explicitly provide that contracts executed by TRUST officers are valid and binding on the TRUST.

13.      The GETTY MUSEUM and TRUST may be served through James Cuno at 1200 Getty Center Drive, Los Angeles, California 90049. The GETTY MUSEUM and TRUST were served with the Original Complaint and have not challenged service.

14.      POTTS is a director of the GETTY who has repeatedly travelled to New York, New York regarding the acts and omissions complained of herein. POTTS can be served with process at 1200 Getty Center Drive, Los Angeles, California 90049. POTTS was served with the Original Complaint and has not challenged service or jurisdiction.

## FACTUAL BACKGROUND

**A.  The GETTY.**

15.      The GETTY MUSEUM and the TRUST are creations of their namesake, J. Paul Getty who earned billions of dollars after striking oil in the Neutral Zone between Saudi Arabia and Kuwait. In 1957, J. Paul Getty was declared the richest man in the United States.

16.      J. Paul Getty's family life, however, was tragic. One of his sons committed suicide, a daughter-in-law suffered a fatal heroin overdose, and a grandson was kidnapped and mutilated when J. Paul Getty refused to pay nearly $17 million in ransom. When J.

Paul Getty died in 1976, he left behind three living children but willed the bulk of his estate to the GETTY MUSEUM.

17.     After inheriting $1.2 billion from J. Paul Getty, the GETTY MUSEUM became the richest museum in the world, a status that continues to this date.

18.     The GETTY has a history of legal troubles for allegedly dubious acquisitions.

19.     For example, the Italian government initiated both civil and criminal actions against former GETTY antiquities curator, Marion True, who served in that position from 1986 to 2005.

20.     The Italian government claimed that 46 ancient artworks were looted and smuggled out of the country prior to being purchased by the GETTY. Maurizio Fiorilli was a government lawyer who represented Italy in these charges.

21.     Fiorilli stated that those charges resulted in a "cultural embargo" between Italy and the GETTY during which Italian authorities ignored several requests by the GETTY to borrow Italian art.

22.     The Attorney General of the State of California launched a civil investigation of the TRUST in 2006. After conducting that investigation, the Attorney General found that the officers of the TRUST "improperly allowed the expenditure of charitable funds when they permitted the Trust to pay the travel expenses of [the Trust's president's] wife," "improperly allowed the use of charitable funds to make gifts of more than token value to retiring Trust officials," "improperly used Trust resources for private benefit when [the president] directed employees to run personal errands," and paid improper consulting funds to a graduate art student. But finding that the TRUST's president agreed (pursuant to a settlement) to pay the TRUST $250,000 cash and forfeit more than $2 million in benefits,

the Attorney General declined to take any legal action because "the Trust ha[d] been compensated for the losses as a result of the settlement."

23.     In 2007, the GETTY agreed to return 40 of 46 challenged artworks to Italy. The Italian government, in turn, dropped its civil charges against Ms. True.

24.     The GETTY, however, refused to return a bronze sculpture known as the "Victorious Youth" to the Italian government. This particular bronze sculpture dates from around 300-100 B.C. In 2010, an Italian court ordered that the GETTY hand over the sculpture. But the GETTY appealed and continues to appeal that ruling, and ultimately had the case remanded back to a regional Italian court. The GETTY has still not returned the "Victorious Youth" to Italy.

25.     In 2010, the GETTY again faced a lawsuit for alleged improper antiquity acquisition. The Armenian Orthodox Church sued the GETTY for allegedly harboring stolen illuminated medieval manuscripts, failing to verify the ownership of those manuscripts, and violating ethical duties.

26.     The GETTY ultimately settled those claims, issued a recognition that the Armenian Orthodox Church owned the disputed artwork, and agreed to pay the Church's legal expenses.

27.     POTTS publicly admitted there were "lots of gray areas and facts [the GETTY did not] know" relating to the chain of title of the manuscript pages they acquired from the Armenian Orthodox Church.

28.     The GETTY's questionable acquisition tactics have spurred scholastic discussion. In 2012, the International Foundation for Art Research published an article

regarding the GETTY's conduct.[1] That article reviewed *Chasing Aphrodite: The Hunt for Looted Antiquities at the World's Richest Museum* and its allegations that the GETTY "ignored" issues regarding looting of antiquities.

29.     According to *Chasing Aphrodite*, while J. Paul Getty's death in 1976 left the museum well-funded, it was also unencumbered by ethical, moral, or financial constraints on spending.

30.     To catch up with the more-established antiquities museums of the world, the GETTY launched an ambitious acquisition program that was less strict regarding the provenance of the objects it acquired than competitor museums.

31.     The authors of *Chasing Aphrodite* obtained leaked internal documents and expanded their work into a narrative of avarice and arrogance throughout the GETTY.

32.     Those authors confirmed that the aforementioned Ms. True was ultimately replaced by POTTS.

33.     The GETTY hired POTTS because of his appetite for risk in acquiring extraordinary works of art.

34.     POTTS' proclivities led him to engage in the unethical and illegal acquisition tactics alleged herein.

**B.  The Torlonia Family.**

35.     Originally emigrants from France who arrived to make uniforms for the occupying Napoleonic army, the Torlonia family began to acquire great wealth in the 18th and 19th centuries through their administration of Vatican finances.

---

[1] *The Fall and Rise of Marion True and the Getty Museum*, IFAR Journal, Vol. 13, No. 3 (2012).

36.     Giovanni Torlonia established the family bank that worked for the Vatican and was ultimately named the Duke of Bracciano, Count of Pisciarelli, Marquess of Romavecchia e Turrita, and First Prince of Civitella Cesi. The latter title was bestowed by Pope Pius VI.

37.     Giovanni's successors lived as nobility, enjoyed high-profile positions, and included senators and a Mayor of Rome. One of Giovanni's great-great-grandchildren married into the Spanish Royal Family.

38.     In the 1920s, the Torlonia family rented one of their expansive villas to Mussolini and his family, where the Mussolinis resided for almost ten years. After the end of World War II, the Torlonia family shrank from public view, likely because of the political backlash of harboring one of history's most vilified despots.

39.     The Torlonia family's villa fell into disrepair until it was claimed by Italy in 1977 and opened to the public. Mussolini's bunkers on the property were only recently opened to public view.

40.     As discussed below, the Torlonia family experienced significant governmental pressure regarding its vast art collections.

41.     Upon information and belief, the current Prince, Prince Alessandro Torlonia, and/or the Fondazione Torlonia ("Torlonia Foundation") are responsible for the assets of the Torlonia family. Various members of the family participated in the acts complained of herein, including his grandson, Alessandro Poma Murialdo ("MURIALDO"), who is the administrator or chairman of the Torlonia Foundation.

C.     **The Torlonia Collection.**

42.     The Torlonia Collection is known as one of the world's most significant collections of classical sculptures and the world's most important private collection of classical art.

43.     The Torlonia Collection was started by Giovanni Torlonia in the 1800s and consists of works that were unearthed on the family's estates, works that were used as security for defaulted loans, and purchases from other collectors.

44.     Since the 1960s, the Torlonia Collection was maintained out-of-view in several of the Torlonia family's palaces in Rome. During the 1960s, the Torlonia family converted the exhibition hall holding the collection into apartments and moved the collection to various basements out of public view. This caused an outcry among experts who called for the collection to be confiscated by the Italian government.

45.     The Torlonia family, however, long resisted government attempts to return the artwork to the public and kept the collection out of sight.

D.     **ELECTRUM is hired to catalogue the TORLONIA SCULPTURES.**

46.     Livio Russo ("LIVIO") and Arturo Russo ("ARTURO") (collectively, the "RUSSOS") are world-renowned numismatists and engage in multiple high-dollar coin auctions on a yearly basis.

47.     The Aboutaam family also collects ancient coins. Through this mutual interest, Ali Aboutaam was contacted by the RUSSOS and told about the portions of the Torlonia Collection that were available for possible sale, loan, temporary export, and/or exhibition.

48.     The Torlonia Collection includes approximately 620 Greek and Roman sculptures that were described in an 1885 catalogue entitled the *I monumenti del Museo Torlonia riprodotti con la fototipia*. Those 620 sculptures are hereinafter referred to as the TORLONIA SCULPTURES.

49.     The RUSSOS provided Ali with the 1885 catalogue of the TORLONIA SCULPTURES, which the Torlonia family provided to the RUSSOS. That catalogue was over 130 years old, included low-resolution black-and-white pictures and abbreviated descriptions only, and did not provide sufficient details regarding current status, condition, market value, restoration, or attributions regarding chain of title for the artworks.

50.     On January 21, 2010, Hicham flew to Rome. LIVIO met him at the airport, and they proceeded directly to meet the Prince and view the collection. ELECTRUM's work began immediately thereafter.

51.     Beginning in the summer of 2010, ELECTRUM utilized its professional judgment and extensive knowledge regarding antiquities to painstakingly catalogue the TORLONIA SCULPTURES, take thousands of new pictures, and translate documents from Italian to English to support the provenance of the vast collection.

52.     The purpose of ELECTRUM's efforts in cataloguing the TORLONIA SCULPTURES was to ready the collection for sale, transfer, temporary exportation, and/or exhibition. At all times, PLAINTIFFS kept the contents of their catalogue and research under reasonable security measures to maintain the independent economic value of that catalogue and research as it related to the potential sale, transfer, temporary exportation, and/or transfer of the TORLONIA SCULPTURES.

- 11 -

53.     Over the next several years, ELECTRUM continued its efforts in evaluating the TORLONIA SCULPTURES, developing its trade secrets, cultivating its relationships with Italian authorities, and attempting to find a buyer for the collection. ELECTRUM expended years of effort working to make a transaction involving the TORLONIA SCULPTURES possible. Aware that any exportation or exhibition of the TORLONIA SCULPTURES would face substantial legal substantial legal hurdles, particularly if it involved a sale, PLAINTIFFS invested considerable time, money, and effort into developing alternative transaction structures that would provide similar access to and/or opportunities for commercialization of the TORLONIA SCULPTURES.

54.     By way of example, PLAINTIFFS expended significant capital to commission a legal opinion from Maurizio Fiorilli regarding the possibility of and impediments to a sale, transfer, temporary export, and/or international exhibition of the TORLONIA SCULPTURES under Italian law. PLAINTIFFS then expended significant capital obtaining the legal opinion. That opinion, which PLAINTIFFS received in June 2012, included concern that sale of all rights or permanent exportation of the TORLONIA SCULPTURES was not practically possible. In response, PLAINTIFFS directed their efforts towards transaction structures involving temporary exportation of the TORLONIA SCULPTURES, de-notification procedures, and other means of holding rights in the TORLONIA SCULPTURES and informed interested parties, including the GETTY, accordingly, after appropriate security measures were taken.

55.     In the spring of 2013, ELECTRUM invited POTTS to visit its New York gallery.

56.     When POTTS and ELECTRUM representatives met in New York City in the spring of 2013, ELECTRUM disclosed that it was cataloguing a significant collection that could be of interest to the GETTY. ELECTRUM also discussed the substantial work it had undertaken in preparing that collection for sale, transfer, temporary export, and/or exhibition. At that time, however, ELECTRUM did not specifically name or describe the TORLONIA SCULPTURES nor reveal any of its trade-secret information.

57.     POTTS was excited about the collection and ELECTRUM's efforts, trade secrets, and relationships and expressed that the GETTY would be very interested in a deal through which the GETTY could acquire any sort of interest in or right to exhibit that collection.

58.     ELECTRUM explained to POTTS that it had developed proprietary means and relationships with Italian authorities necessary to bring the collection to public view.

59.     POTTS orally agreed to keep this opportunity and its details in the strictest confidence and to respect ELECTRUM's exclusive relationships. Thereafter, ELECTRUM shared that the collection was the TORLONIA SCULPTURES and provided the Torlonia family's history and some of the concerns regarding the structures necessary to effectuate a transfer of rights. POTTS agreed to later formally document the oral confidentiality and non-circumvention agreement in writing after consulting with the GETTY's attorneys.

60.     After the parties entered this oral agreement, ELECTRUM showed POTTS thousands of photographs of the TORLONIA SCULPTURES. POTTS requested that ELECTRUM send him a large selection of these photographs to his private residence for further review.

- 13 -

61.     During this meeting and after ELECTRUM showed POTTS the photographs of the TORLONIA SCULPTURES, ELECTRUM informed POTTS that it was not receiving any compensation from the seller's side of any transaction involving the TORLONIA SCULPTURES and that ELECTRUM would be looking to the GETTY for compensation. POTTS responded that the GETTY does not pay commissions. ELECTRUM responded to that by asserting that it would not invest the substantial time, effort, labor, and skill necessary to effectuate any potential transaction regarding the TORLONIA SCULPTURES as a matter of charity and would need to be compensated. POTTS represented that the GETTY would find a solution.

**E.     The Non-Disclosure and Non-Circumvention Agreement.**

62.     On July 10, 2013, ELECTRUM provided a draft Non-Disclosure and Non-Circumvention Agreement to the GETTY. The draft Non-Disclosure and Non-Circumvention Agreement referred to the evaluation of a "possible Transaction." It included a provision for injunctive relief and required that the GETTY would "not contact, either directly or indirectly, the owner of the Important Collection of Roman Sculptures that are the subject of the potential transaction."

63.     The next day at 7:22 PM CDT, POTTS circulated a revised draft Non-Disclosure and Non-Circumvention Agreement ostensibly showing all of the GETTY's changes in redline format. In the revised draft, the GETTY had deleted and redlined the provision for injunctive relief and had corrected the reference to a "possible Transaction" to refer to a "possible transaction." The GETTY, however, surreptitiously removed the word "not" from the provision requiring that the GETTY would "not contact, either directly or indirectly, the owner of the Important Collection of Roman Sculptures that are the subject

of the potential transaction," which would have allowed the GETTY unfettered access to PLAINTIFFs' contacts. The GETTY did not include this surreptitious change in its redline. Ultimately, ELECTRUM recognized the word was missing and "not" was hand-written into the final version of the Non-Disclosure and Non-Circumvention Agreement and then initialed by POTTS.

64.     On July 12, 2013, POTTS, acting on behalf of the GETTY, signed the final Non-Disclosure and Non-Circumvention Agreement ("NDNCA") with ELECTRUM relating to the confidentiality of PLAINTIFFS' proprietary information, trade secrets, and access to the TORLONIA SCULPTURES; to the confidentiality of PLAINTIFFS' proprietary information and trade secrets regarding appropriate deal structures for sale, transfer, temporary export, and/or exhibition of the TORLONIA SCULPTURES; and to access to the Torlonia family and/or parties representing or related to the Torlonia family.

65.     In the NDNCA, the GETTY agreed to "receive disclosure of confidential and proprietary information from Electrum pursuant to the terms of [that] agreement for the purpose of evaluating a possible transaction" and "agreed to maintain the confidentiality of the disclosed information."

66.     The NDNCA expressly referred to a "possible transaction" thus contemplating the myriad potential forms that such an agreement could take, such as a sale, transfer of rights, lease, exhibition, or right of temporary export. As noted above, ELECTRUM was fully aware of the difficulties involved in making the TORLONIA SCULPTURES publicly available outside Italy and had already contemplated alternative transaction structures to accomplish that goal, including obtaining a legal opinion confirming that a sale of all rights or permanent exportation of the TORLONIA

SCULPTURES may not be possible, and POTTS was made aware of these concerns. In recognition of the need for this flexibility, the GETTY specifically revised the NDNCA to correct the mis-capitalization of "Transaction" and give the language its plain language meaning to take into account the various possible deal structures through which the DEFENDANTS could obtain access to and benefit from the Torlonia Collection.

67.    The GETTY also agreed to "take all reasonable measures to protect the secrecy of and avoid disclosure or use of the Confidential Information" and "take at least those measures that [the GETTY] takes to protect its own most highly confidential information."

68.    Simply put, the NDNCA prohibited DEFENDANTS from using PLAINTIFFS' Confidential Information "in any way except for the purpose of evaluating the possible transaction."

69.    Additionally, "[a]s an express prior condition to its receipt of information" regarding the TORLONIA SCULPTURES, the GETTY agreed that it would "not contact either directly or indirectly" the Torlonia Family or any party representing or related to the Torlonia family regarding the TORLONIA SCULPTURES, except exclusively through ELECTRUM.

70.    The GETTY further undertook the obligation to return to ELECTRUM "all originals and copies of Confidential Information upon request."

71.     POTTS executed the NDNCA on behalf of the GETTY as well as "all affiliates, officers, directors, employees, and agents thereof."

**F.     The GETTY's Continued Interest in the TORLONIA SCULPTURES.**

72.     In the fall of 2013, DEFENDANTS requested the catalogue prepared by PLAINTIFFS. Relying on DEFENDANTS' representations that induced them to enter into the NDNCA, PLAINTIFFS sent the detailed catalogue to DEFENDANTS.

73.     POTTS, on behalf of the GETTY, again visited ELECTRUM in New York City to discuss the acquisition of the TORLONIA SCULPTURES. On November 8, 2013, ELECTRUM, REGULUS, and POTTS met at the Rouge Tomate Restaurant in Manhattan. PLAINTIFFS explained that REGULUS could provide important guidance regarding its trade-secret deal structures for the TORLONIA SCULPTURES that would allow foreigners to purchase rights, such as the right to temporarily export, to important cultural collections in Italy.

74.     After that meeting, on November 15, 2013, DEFENDANTS requested PLAINTIFFS' thousands of photographs of the TORLONIA SCULPTURES. Again, in reliance on DEFENDANTS' representations that induced PLAINTIFFS to enter into the NDNCA and on the protections of the NDNCA, PLAINTIFFS forwarded the requested information. This package of detailed photographs and information weighed over 12 pounds and included certain of PLAINTIFFS' trade secrets.

75.     By January of 2014, DEFENDANTS had identified a list of sculptures from the TORLONIA SCULPTURES in which the GETTY was interested.

76.     To that end, DEFENDANTS planned on visiting Rome in early 2014 to inspect said sculptures.

77.     POTTS thus sent PLAINTIFFS, on January 13, 2014, a list of 119 sculptures he desired to examine from the TORLONIA SCULPTURES during his visit to Rome.

78.     The same day, POTTS, knowing that only PLAINTIFFS had an exclusive understanding of the proper channels and means with which to communicate with the Prince, requested that ELECTRUM draft a letter for POTTS to send to Prince Alessandro Torlonia. In that letter, POTTS made known his planned trip to Rome to inspect the renowned TORLONIA SCULPTURES with Hicham.

79.     POTTS scheduled two days to inspect the sculptures and determine in more detail which ones may be of interest to the GETTY.

80.     POTTS recognized the TORLONIA SCULPTURES as a famous collection filled with masterpieces with importance to the history of collecting antiquities in Italy and to the understanding of ancient Roman art.

81.     DEFENDANTS relied on Hicham to draft and send the letter to the Prince, as the Prince had particular requirements regarding formal protocols, did not maintain an address, and preferred to have correspondence sent to his agents who would then print and hand deliver such correspondence to the Prince. Those agents were the RUSSOS. The GETTY would never have known of the RUSSOS and their access to the Prince or the Torlonia family if not for PLAINTIFFS and their efforts.

82.     The RUSSOS submitted DEFENDANTS' letter to the Prince and circulated the Prince's response to DEFENDANTS through Hicham.

83.     Prince Alessandro Torlonia expressed sincere appreciation for the GETTY's interest in the TORLONIA SCULPTURES but also concern regarding the late notice, noting along the way that individual pieces in the collection were not for sale.

84.     On January 16, 2014, POTTS, on behalf of the GETTY, visited Rome with PLAINTIFFS and met with the grandson of the Prince, an attorney for the Prince, and

LIVIO. At that meeting, POTTS expressed interest in the TORLONIA SCULPTURES and stated an intent to reschedule a visit soon.

85.     On January 17, 2014, PLAINTIFFS, through their connections in Italy, arranged for POTTS to visit the Vatican. Demonstrating PLAINTIFFS' broad access to items of importance to Italian art, PLAINTIFFS arranged for POTTS to view the Pope's private chapel, which is attached to the Sistine Chapel, and to visit the living quarters for the Pope and senior Vatican officials.

86.     In the evening on January 17, 2014, Hicham and Lee Miller of PLAINTIFFS attended a late dinner with POTTS at the Casina Valadier restaurant in Rome. During dinner, and as a follow up to the GETTY's earlier promise to find a solution, PLAINTIFFS again asked how the GETTY was going to compensate them for any transaction regarding the TORLONIA SCULPTURES. PLAINTIFFS explained to POTTS that a buyer's premium is common for transaction in the art market. PLAINTIFFS further explained a buyer's premium is expected when working with Christie's and Sotheby's, who are not even required to navigate the complicated legal and political landscape necessary to facilitate a transaction such as the one contemplated regarding the TORLONIA SCULPTURES. POTTS represented that a buyer's premium would be agreeable to the GETTY as a method of compensating PLAINTIFFS for their work regarding the TORLONIA SCULPTURES.

87.     In a letter to the Prince dated April 3, 2014, DEFENDANTS confirmed the TORLONIA SCULPTURES were "potentially of great interest" to the GETTY.

88.     As was required by the Prince's practices and the express terms of the NDNCA, DEFENDANTS forwarded this letter to PLAINTIFFS, who transmitted it to the Prince through the RUSSOS.

89.     Through PLAINTIFFS, POTTS and other agents of the GETTY again attempted to meet with Prince Alessandro Torlonia regarding the TORLONIA SCULPTURES during meetings in Rome on April 18th and 19th, 2014.

90.     No later than April 17, 2014, ELECTRUM emailed the RUSSOS a copy of the NDNCA, which the RUSSOS delivered to the Torlonia family. However, ELECTRUM had verbally informed the RUSSOS and the Torlonia family of the NDNCA prior to April 17, 2014.

91.     POTTS, on behalf of the GETTY, again met with ELECTRUM, the Prince, and representatives of the Torlonia family in Rome on April 18, 2014.

92.     POTTS, on behalf of the GETTY, sent PLAINTIFFS another letter to forward to the Prince wherein he confirmed that he had been offered an opportunity to see a group of Roman marble sculptures of possible interest for acquisition by the GETTY. POTTS also agreed, on behalf of the GETTY, to treat the owner's name and the information related to the sculptures as confidential.

93.     Like the others, this letter was drafted by PLAINTIFFS and approved by DEFENDANTS for transmission by PLAINTIFFS to the RUSSOS, who in turn sent it to the Prince.

94.     After PLAINTIFFS had already submitted the GETTY's agreement to keep information related to the sculptures confidential to the RUSSOS, the GETTY requested that PLAINTIFFS stop transmission of that agreement so that the GETTY's legal department could review that "NDA."

95.     By April 29, 2014, the GETTY had revised the letter. In the revised letter, POTTS confirmed he saw the group of Roman marble sculptures of possible interest for

acquisition by the GETTY on April 18, 2014 but requested that the Prince keep the GETTY's interest in those objects confidential.

**G.  PLAINTIFFS continue to assist the GETTY in its efforts to obtain rights to the TORLONIA SCULPTURES.**

96.     On June 27, 2014, DEFENDANTS requested that PLAINTIFFS send the original and dated versions of the catalogue of the TORLONIA SCULPTURES to them. Again relying on DEFENDANTS' oral representations prior to the NDNCA and the protections in the NDNCA, PLAINTIFFS did as requested.

97.     After receiving the catalogues, however, DEFENDANTS suddenly stopped communicating with PLAINTIFFS regarding the GETTY's intent for the TORLONIA SCULPTURES.

98.     By February 19, 2015, the Prince became anxious because he had not heard from or been visited again by the GETTY. The Prince stated he considered gifting the collection to the Italian authorities in lieu of taxes absent a commitment from the GETTY.

99.     When PLAINTIFFS conveyed the Prince's concerns to POTTS and the GETTY, the GETTY represented it had decided to decline the opportunity to pursue PLAINTIFFS' proposal.

100.    The GETTY stated it would be wonderful for the TORLONIA SCULPTURES to be available to the public, but claimed applicable Italian law made the GETTY's involvement unappealing.

101.    The GETTY's concern with Italian law was borne out of its multiple conflicts with the Italian government regarding art purchased by the GETTY without proper authentication of source. For example, the GETTY had ongoing litigation with the Italian

government regarding the Victorious Youth, had previously funded the defense of its prior curator (Marion True), and had previously returned 40 statutes to Italy that had been purchased by the GETTY after being looted.

102.    The GETTY was also concerned regarding whether the Italian government would allow temporary exportation of the TORLONIA SCULPTURES, or parts thereof, particularly given the collection's value to the Italian public.

103.    Only through PLAINTIFFS' extensive knowledge regarding antiquities, professional judgment, exclusive relationships with Italian government officials and the Torlonia family, and work to create mechanisms to allow temporary export, de-notification, or exhibition could DEFENDANTS overcome these difficulties. Specifically, PLAINTIFFS developed trade-secret deal structures that would allow for the GETTY to hold a type of ownership of the TORLONIA SCULPTURES in a manner that was consistent with Italian law and permit temporary export or de-notification of the collection or the pieces of the collection of interest to the GETTY.

104.    PLAINTIFFS also assembled a unique insurance plan to limit the GETTY's exposure to political risk regarding acquiring ownership, control, export, or exhibition of the TORLONIA SCULPTURES.

105.    Continuing in their attempt to bring the Torlonia family, Italian authorities, and the GETTY together to allow for the public display of the TORLONIA SCULPTURES, PLAINTIFFS expressed to the GETTY on March 5, 2015 that they, along with the Prince's advisors, believed the potential sales price for the TORLONIA SCULPTURES had decreased.

106.   PLAINTIFFS estimated the cost of the TORLONIA SCULPTURES was between $350 million and $550 million, net of the commission that the GETTY would be required to pay PLAINTIFFS. To facilitate the deal, PLAINTIFFS agreed to change the deal structure and agreed to a commission of 22% of the price paid to the Prince.

107.   Mr. Stephen Clark, general counsel for the GETTY, expressed interest in that proposal and agreed to further discuss it. At no time prior to this dispute did DEFENDANTS express to PLAINTIFFS that the GETTY did not intend to compensate PLAINTIFFS.

108.   On March 24, 2015, the GETTY feigned a lack of interest in the TORLONIA SCULPTURES and claimed the proposal did not make sense for the GETTY regarding "this superb collection" of "important art."

109.   In June of 2015, the Italian press reported on the TORLONIA SCULPTURES. Describing the collection as the "largest still in private hands," the Italian press expressed concern that it was for sale to "U.S. businessmen." Citing the Italian Minister of Culture, the press stated a sale was immediately pending and requested that the government intervene in the purchase.

110.   On June 19, 2015, PLAINTIFFS proposed a new trade-secret deal structure to the GETTY regarding the TORLONIA SCULPTURES to avoid political risk.

111.   Meanwhile, PLAINTIFFS worked with the Italian government to ensure that it would not intervene in a sale, transfer, or foreign exhibition of the TORLONIA SCULPTURES on the grounds that the collection was in disrepair. PLAINTIFFS were in the best position to do so given their substantial involvement in cataloguing and describing the TORLONIA SCULPTURES.

112.    In July of 2015, ELECTRUM and POTTS met at the GETTY MUSEUM.

113.    As a follow-up to that meeting and at the GETTY's request, PLAINTIFFS forwarded to the GETTY additional details regarding the Ministry of Culture in Italy, the Ministry's assurance to the Prince that the Italian government was supportive of the sale, temporary export, or exhibition of the TORLONIA SCULPTURES and would provide a building in Rome to exhibit the works while they were not on temporary export or exhibition abroad, and that the Prince was willing to further reduce his price for the sale of rights to the TORLONIA SCULPTURES.

114.    Also in July of 2015, the Roman press reported on meetings between the Ministry of Culture and the Torlonia family. Because of PLAINTIFFS' significant work in cataloguing the collection, the Ministry reported on the well-being of the TORLONIA SCULPTURES and expressed an interest in "ways to initiate a project that makes what has been defined as 'the most important private collection of ancient art in the world' fully accessible." These "ways to initiate project" to make the TORLONIA SCULPTURES "fully accessible" included the alternative transaction structures that PLAINTIFFS had been developing over the past years.

**H.    DEFENDANTS cut PLAINTIFFS out of the deal.**

115.    In the late summer and fall of 2015, DEFENDANTS and the Prince ceased discussing the sale, transfer, temporary exportation, and/or exhibition of the TORLONIA COLLECTION with PLAINTIFFS. DEFENDANTS had, in fact, already engaged in direct contact with the RUSSOS and the Torlonia family.

116.    While DEFENDANTS were thereafter silent regarding their intent to purchase the TORLONIA SCULPTURES with PLAINTIFFS, they were working without

- 24 -

PLAINTIFFS to effectuate a sale, transfer, temporary exportation, and/or exhibition of the TORLONIA SCULPTURES.

117.   On August 24, 2015 at 6:06 PM CDT, POTTS misrepresented to Hicham in an email that DEFENDANTS were not "prepared to revisit this opportunity." But DEFENDANTS were in active negotiations with LIVIO and the Torlonia family to arrange in-person meetings less than two weeks later.

118.   Beginning at least as early as September 5, 2015, DEFENDANTS and LIVIO and/or the Torlonia family participated in multiple written communications regarding a "potential collaboration" between DEFENDANTS and the Torlonia family for the exhibition and management of the TORLONIA SCULPTURES. These communications included MURIALDO, the purported "Chairman" of the Torlonia Foundation, and at least one September 5, 2015 letter with these representations was written on Torlonia Foundation letterhead. Each of these communications was in violation of the NDNCA.

119.   The Prince, his family, and/or the Torlonia Foundation were anxious to set up a meeting; less than a day after setting an appointment with POTTS and the GETTY, MURIALDO and LIVIO flew from Rome via London to Los Angeles to discuss a deal and to review the GETTY's exhibition of Greek Bronzes.

120.   The GETTY and POTTS met with LIVIO and MURIALDO in Los Angeles on September 18, 2015. The GETTY's records confirm that the meeting and dinner between LIVIO, POTTS, and MURIALDO of the Torlonia family were "the culmination of an ongoing effort to cultivate a relationship with the Torlonia family, as part of an ongoing efforts [sic] for exhibit collaboration."

121.    While the parties to that meeting discussed the sale, transfer, temporary exportation, and/or exhibition of the TORLONIA SCULPTURES, PLAINTIFFS did not learn of this meeting until well after it had occurred and did not learn further details until discovery in this case had begun.

122.    Thereafter, DEFENDANTS continued communicating with LIVIO, MURIALDO, and the Torlonia Foundation, including discussions of meetings with Italian officials regarding arrangements for an exhibition of the TORLONIA SCULPTURES abroad.

123.    Through the remainder of 2015 and most of 2016, DEFENDANTS conspired without PLAINTIFFS' knowledge or involvement regarding the ultimate sale, transfer, exhibition, and/or temporary export of the TORLONIA SCULPTURES to the GETTY.

124.    Approximately 30 members of the GETTY's Board of Trustees traveled to and stayed at Villa Albani, owned by the Torlonia family, in May 2016.

125.    From September 2015 through most of 2016, the GETTY, LIVIO, MURIALDO, and the Torlonia Foundation had extensive communications regarding exhibition of the TORLONIA SCULPTURES abroad, including an exhibition at the GETTY, without PLAINTIFFS' knowledge, participation, or consent.

126.    Such communication included specific discussions of possible exhibition of the TORLONIA SCULPTURES at the GETTY as early as fall 2018.

127.    DEFENDANTS were so confident of the success of their negotiations that, in August 2016, they began making conservation efforts to prepare for eventual receipt and exhibition of some of the TORLONIA SCULPTURES.

128.    During this period, DEFENDANTS met, corresponded, conducted telephone calls, and otherwise communicated in violation of the NDNCA in an attempt to cut PLAINTIFFS out of the deal so they would not have to pay PLAINTIFFS any compensation for the sale of, investment in, export of, and/or acquisition of control of the vast TORLONIA SCULPTURES.

129.    DEFENDANTS also violated PLAINTIFFS' confidentiality and trade secret rights by utilizing ELECTRUM's private catalogue of the TORLONIA SCULPTURES, PLAINTIFFS' exclusive relationships, and PLAINTIFFS' trade-secret deal structures to effectuate a sale, transfer, temporary exportation, and/or exhibition of the TORLONIA SCULPTURES.

130.    DEFENDANTS further misappropriated PLAINTIFFS' time, skill, labor, and goodwill invested in developing the understandings of Italian law, in preparing, cataloguing, and authenticating of the TORLONIA SCULPTURES, and in building the connections and personal relationships necessary to affect a transaction involving the TORLONIA SCULPTURES. PLAINTIFFS invested substantial time, effort, and money to make a transaction involving the TORLONIA SCULPTIRES possible, and DEFENDANTS stole the value of that investment for themselves.

131.    On March 15, 2016, to PLAINTIFFS' surprise, the New York Times reported on the TORLONIA SCULPTURES.

132.    In or around March of 2016, representatives of the Culture Ministry signed an accord with the Torlonia Foundation to display the TORLONIA SCULPTURES, starting with a display of approximately 60 sculptures in Rome. The TORLONIA SCULPTURES

were then to travel elsewhere in Europe and to the United States with the intent of finding a new permanent home for the collection.

133.    Salvatore Settis, a long-term former employee of the GETTY, was selected to be the historian and curator to curate the exhibition of the TORLONIA SCULPTURES. Mr. Settis described cataloguing the TORLONIA SCULPTURES as a "monumental work." In this manner, DEFENDANTS' usurpation of trade secret rights and breach of confidentiality in ELECTRUM's catalogue of the TORLONIA SCULPTURES was made plain.

134.    Unbeknownst to PLAINTIFFS, DEFENDANTS had been in contact with Mr. Settis to collaborate on "the possibility of an exhibition in Rome and at the Getty of sculptures from" the TORLONIA SCULPTURES since at least October 7, 2015 as a result of their conspiring and communicating directly with LIVIO and MURIALDO.

135.    The Culture Minister claimed the agreement to transfer the TORLONIA SCULPTURES was historic and noted that agreement was finally reached because "there was a new approach on the part of the ministry to a potential partnership between the public and private" that "could become a model for other similar cases." This "new approach" was PLAINTIFFS' trade-secret and confidential deal structure proposed under constraints of secrecy to only the GETTY, the Torlonia family, and the RUSSOS and was possible only by virtue of PLAINTIFFS' years of hard work and relationship-building.

136.    This "new approach" is also why the NDNCA included language regarding a "potential transaction," rather than simply "sale."

137.    As early as October 20, 2015, MURIALDO and the Torlonia Foundation had specifically requested DEFENDANTS' suggestions for the project. Commenting on the

- 28 -

agreement with the Ministry of Culture, MURIALDO stated that one of the principles of the agreement was that the exhibition would be shown abroad.

138.    Surprised by these recent developments (as disclosed publicly by the Times), PLAINTIFFS attempted to schedule a call with the GETTY. In response to that request, Mr. Clark of the GETTY confirmed that, on March 18, 2016, Mr. Settis and POTTS were "actively discussing the possibility of exhibiting some of these wonderful works of art at the Getty."

139.    That direct communication, as admitted by the GETTY, is yet another violation of the NDNCA.

140.    Nonetheless, DEFENDANTS responded to PLAINTIFFS on April 26, 2016 in a letter signed by POTTS by representing that the GETTY was not engaged in discussions to "acquire" any works of art in the Torlonia Collection and claiming not to be aware of any agreement that would limit the GETTY's ability to discuss temporary exhibition of works of art from the Torlonia Collection.

141.    DEFENDANTS' statements were false or failed to disclose the truth because the GETTY was in negotiations to acquire rights in or for exhibition of the TORLONIA SCULPTURES and was engaged in direct communications with the Torlonia family and its representatives in violation of the NDNCA.

142.    DEFENDANTS compounded these false representations in a letter on May 5, 2016 signed by Stephan W. Clark when they claimed that "the proposal never made sense to the Getty"; the GETTY had maintained confidentiality by discussing the proposed transaction "only with Mr. Aboutaam and his designees"; and claiming no "basis for [PLAINTIFFS'] request for compensation," among other representations. Again, at least

the representation regarding confidentiality and to whom the GETTY had communicated was false when made because the GETTY had directly communicated with LIVIO and the Torlonia family to acquire, exhibit, and/or obtain temporary export of the TORLONIA SCULPTURES.

143.    The GETTY's involvement in the TORLONIA SCULPTURES transaction was confirmed by Salvatore Morando of the Italian Ministry of Culture. Mr. Morando further confirmed that PLAINTIFFS were in contact with Prince Torlonia's family and their attorneys as early as May of 2012. He confirmed that PLAINTIFFS contacted the GETTY and put in place legal plans to return the TORLONIA SCULPTURES to public view.

144.    Mr. Morando recounted PLAINTIFFS' two years of legal efforts, contacts with museums, contacts with Italian officials, scientific studies, verifications, restoration studies, searches for exhibit spaces, and other collateral activities to accomplish the public display of the TORLONIA SCULPTURES. The result of that research and efforts was entitled the "MUSEUM" project. The MUSEUM project was proposed to the General Director for Archeology at the Ministry for Cultural Assets, Mr. Gino Famiglietti, in May of 2015.

145.    Mr. Morando expressed surprise that in March 2016, the office of the Ministry for Cultural Assets announced an agreement to publicize the TORLONIA SCULPTURES that greatly mirrored the MUSEUM project but was instead called the EXHIBIT project. The curator designated for that project was "Prof. Salvatore Settis, well-known Professor of Archeology" who was "the Director of the Getty Center for the History of Art and the Humanities in Los Angeles from 1994 to 1999."

- 30 -

146.    Mr. Morando confirmed PLAINTIFFS' suspicions that this new project is "based on an agreement with two large foreign museums" including the GETTY. "Obviously, in order to arrange such transactions, it would have been necessary to have had direct contacts with the managers of the two foreign venues and that such contacts were made between the end of 2014 and the start of 2015." These contacts were in violation of the NDNCA. Only in discovery did PLAINTIFFS learn the full detail of the repeated and unabashed violations of their rights.

147.    Mr. Morando confirmed "it appears evident that [PLAINTIFFS'] 'MUSEUM' project, with which [he is] very familiar, was literally plagiarized, copied, and renamed 'EXHIBIT.'"

148.    PLAINTIFFS also established a relationship between the GETTY and Maurizio Fiorilli, an Italian government lawyer whose previous experience with the GETTY included the aforementioned lawsuit in which the GETTY agreed to repatriate 40 looted art pieces. Through PLAINTIFFS, the GETTY was able to work with Fiorilli and other Italian authorities to effectuate a transaction regarding the TORLONIA SCULPTURES.

149.    Fiorilli thus had direct involvement in the GETTY's interest in and activities regarding the TORLONIA SCULPTURES. Fiorilli has confirmed that the GETTY violated the NDNCA, that representatives of the GETTY communicated repeatedly with the Prince's representatives without PLAINTIFFS' involvement, and that the project disclosed by the press is "identical" to that ultimately proposed by PLAINTIFFS to the GETTY and the Prince in order to bring the TORLONIA SCULPTURES into public view.

150.    PLAINTIFFS have never been compensated by DEFENDANTS or otherwise, for their investment of years of time, research, development, and efforts that directly resulted in the GETTY's ability to bring the TORLONIA SCULPTURES to the United States.

151.    Despite PLAINTIFFS' pre-suit demand, the GETTY denied that PLAINTIFFS are entitled to any relief, refused to share any communications between DEFENDANTS and the Torlonia family or its representatives relating to the TORLONIA SCULPTURES, and refused to return PLAINTIFFS' trade secrets and confidential information, including PLAINTIFFS' catalogue. Discovery has begun to expose the repeated and flagrant violations of the NDNCA and DEFENDANTS' legal and equitable duties to PLAINTIFFS.

## COUNT 1 – Breach of Contract (GETTY)

152.    PLAINTIFFS incorporate herein the allegations in paragraphs 4-151.

153.    ELECTRUM, PHOENIX, and the GETTY entered into the NDNCA.

154.    ELECTRUM and PHOENIX provided something of value to the GETTY pursuant to the NDNCA. For example, ELECTRUM and PHOENIX exchanged knowledge regarding the TORLONIA SCULPTURES, the Torlonia family, relevant relationships, and Italian law for the GETTY's promises that it would keep all such information as confidential and not circumvent ELECTRUM and PHOENIX in violation of ELECTRUM and PHOENIX's rights to compensation on the potential transaction relating to the TORLONIA SCULPTURES.

155.    ELECTRUM and PHOENIX performed all of their obligations pursuant to the NDNCA and satisfied all preconditions to suit. For example, ELECTRUM and

PHOENIX provided the called-for knowledge regarding the TORLONIA SCULPTURES and the Torlonia family, provided the necessary introductions to members of Torlonia family, and had discussions with members of the Italian government necessary to effectuate a sale, temporary exportation, exhibition, and/or transfer of the TORLONIA SCULPTURES.

156.   The GETTY, however, breached its obligations under the NDNCA as detailed, by way of example in paragraphs 118, 120, 122, 128, and 138 above. For example, the GETTY failed to maintain the confidentiality of confidential information received from PLAINTIFFS pursuant to the NDNCA and used such information for purposes other than "evaluating the possible transaction." As a further example, the GETTY directly circumvented PLAINTIFFS and communicated with the Torlonia family to obtain rights to or to exhibit the TORLONIA SCULPTURES. As a further example, the GETTY refused to return ELECTRUM and PHOENIX's confidential information relating to its communications with the Torlonia family, including but not limited to their catalogue.

157.   PLAINTIFFS are entitled to compensation as the GETTY has secured rights to or to exhibit the TORLONIA SCULPTURES as a direct result of PLAINTIFFS' performance under the NDNCA, and PLAINTIFFS' efforts were instrumental in bringing about the benefits secured by the GETTY.

158.   As a result of the GETTY's breaches, ELECTRUM and PHOENIX have been damaged in an amount to be proven at trial.

### COUNT 2 – Breach of Third-Party Beneficiary Contract (GETTY)

159.   PLAINTIFFS incorporate herein the allegations in paragraphs 4-151.

160.   ELECTRUM, PHOENIX, and the GETTY entered into the NDNCA.

161.    The NDNCA was intended for REGULUS's benefit and the GETTY was fully aware that the parties intended the NDNCA was for REGULUS's benefit. ELECTRUM and PHOENIX intended to give REGULUS some of the benefits of the GETTY's promised performance under the NDNCA.

162.    REGULUS provided something of value to the GETTY pursuant to the NDNCA. For example, REGULUS provided important guidance and instruction regarding deal structures that would allow the GETTY to consummate a transaction with the Torlonia family and/or bring the TORLONIA SCULPTURES into public view. The GETTY further represented to REGULUS that it would treat information received from REGULUS under the NDNCA as confidential and not circumvent REGULUS.

163.    The benefits of the NDNCA to REGULUS were sufficiently immediate to indicate the assumption by the immediate parties to the NDNCA of a duty to compensate REGULUS if the benefits were lost.

164.    The GETTY, however, breached its obligations under the NDNCA as detailed hereinabove. For example, the GETTY failed to maintain the confidentiality of confidential information received from PLAINTIFFS pursuant to the NDNCA. As a further example, the GETTY used such information to enter into an agreement with the Torlonia family to obtain rights to or to exhibit the TORLONIA SCULPTURES without PLAINTIFFS' involvement.

165.    REGULUS is entitled to recovery, including but not limited to compensation for its confidential information and trade secrets, as the GETTY has secured rights to or to exhibit the TORLONIA SCULPTURES as a direct result of REGULUS's performance

under the NDNCA, and REGULUS's efforts were instrumental in bringing about the benefits secured by the GETTY.

166.    As a result of the GETTY's breaches, REGULUS has been damaged in an amount to be proven at trial.

## COUNT 3 – Intentional Interference with an Advantageous Business Relationship (All DEFENDANTS)

167.    PLAINTIFFS incorporate herein the allegations in paragraphs 4-151.

168.    PLAINTIFFS and the Torlonia family were in a business relationship that would have probably resulted in economic benefit to PLAINTIFFS.

169.    DEFENDANTS were aware of the relationship between PLAINTIFFS and the Torlonia family and were either introduced through PLAINTIFFS or had knowledge of that relationship through involvement with the GETTY.

170.    DEFENDANTS, however, intentionally and with malice cut PLAINTIFFS out of the continued relationship with the Torlonia family. By engaging in that conduct and by using improper or illegal means, DEFENDANTS intended to disrupt the relationship between the Torlonia family and PLAINTIFFS or knew that disruption of that relationship was certain or substantially certain to occur.

171.    DEFENDANTS' interference in PLAINTIFFS' relationship with the Torlonia family was independently unlawful and tortious in that (i) DEFENDANTS fraudulently induced PLAINTIFFS to enter into the NDNCA and to rely thereon by misrepresenting DEFENDANTS' intent and willingness to refrain from direct communication with the Torlonia family; (ii) DEFENDANTS defrauded PLAINTIFFS by representing that they would find a solution to compensate PLAINTIFFS for their work

regarding the TORLONIA SCULPTURES, including but not limited to a buyer's premium; (iii) DEFENDANTS fraudulently misled PLAINTIFFS and prevented them from seeking injunctive relief to prevent DEFENDANTS' tortious interference in their business relationship by making false representations about and fraudulent non-disclosures of DEFENDANTS' direct communications with the Torlonia family; and (iv) DEFENDANTS misappropriated PLAINTIFFS' skill, knowledge, labors, and goodwill, developed and/or expended over several years, as part of their disruption of PLAINTIFFS' relationship with the Torlonia family.

172.    Specifically, as detailed hereinbelow, DEFENDANTS had no intent to refrain from direct communication with the Torlonia family when they orally agreed to a non-disclosure and non-circumvention agreement and, in fact, attempted to avoid any contractual obligations for the same through drafting gamesmanship. Further, DEFENDANTS intentionally attempted to prevent PLAINTIFFS from seeking injunctive relief to prevent or limit the harm of DEFENDANTS' tortious interference by misrepresenting DEFENDANTS' interest in the TORLONIA SCULPTURES and their communications thereon and by fraudulently failing to disclose their direct communications with the Torlonia family. Moreover, DEFENDANTS were only able to interfere with PLAINTIFFS' relationship with the Torlonia family in the manner that they did—*i.e.*, depriving PLAINTIFFS of compensation for any deal involving the TORLONIA SCULPTURES—because they had misappropriated PLAINTIFFS' skills, knowledge, labors, and goodwill necessary to consummate such a deal. But for such misappropriation, DEFENDANTS could not have so interfered.

173.  As a result of DEFENDANTS' conduct, PLAINTIFFS' relationship with the Torlonia family was disrupted and PLAINTIFFS were harmed.

174.  DEFENDANTS' conduct was a substantial factor in harming the relationship between the Torlonia family and PLAINTIFFS.

175.  As a result, PLAINTIFFS seek recovery of damages from DEFENDANTS in an amount to be proven at trial.

## COUNT 4 – Fraud (ALL DEFENDANTS)

176.  PLAINTIFFS incorporate herein the allegations in paragraphs 4-151.

177.  DEFENDANTS fraudulently induced PLAINTIFFS to enter into the NDNCA by misrepresenting their willingness to respect PLAINTIFFS' exclusive relationship with the Torlonia family and to refrain from direct contact with the Torlonia family except through ELECTRUM.

178.  Specifically, prior to the execution of the NDNCA, POTTS orally represented to PLAINTIFFS that DEFENDANTS would not circumvent PLAINTIFFS and their exclusive relationship with the Torlonia family. That representation was false when made and/or made with reckless disregard to its truth or falsity as evidenced by the GETTY's attempt to avoid contractual obligations to refrain from direct contact with the Torlonia family except through ELECTRUM.

179.  In the drafting of the NDNCA, the GETTY attempted to surreptitiously remove language that prohibited them from circumventing PLAINTIFFS; whereas all of the GETTY's other changes to the draft of the NDNCA were clearly delineated in redline format, the GETTY's change to the non-circumvention language was intentionally

concealed because the GETTY never had any intent to refrain from direct contact with the Torlonia family except through ELECTRUM.

180.    DEFENDANTS misrepresented their willingness to refrain from direct contact with the Torlonia family except through ELECTRUM to induce PLAINTIFFS to enter into the NDNCA and facilitate a potential transaction for the TORLONIA SCULPTURES. Such fraudulent inducement has harmed PLAINTIFFS in that PLAINTIFFS would not have entered into the NDNCA and expended substantial time and effort on the GETTY's behalf if PLAINTIFFS had known that DEFENDANTS did not intend to refrain from direct contact with the Torlonia family except through ELECTRUM.

181.    Accordingly, PLAINTIFF is entitled to recover special damages, including but not limited to their out-of-pocket expenses expended on behalf of the GETTY in reliance on its false representations that DEFENDANTS would refrain from direct contact with the Torlonia family except through ELECTRUM.

182.    DEFENDANTS further defrauded PLAINTIFFS by representing that the GETTY would compensate PLAINTIFFS for their years' worth of knowledge, skill, labor, and good will as well as their relationships with the Torlonia family and members of the Italian government and their trade-secret deal structures and means for effectuating a transaction. Specifically, as discussed above, POTTS made multiple misrepresentations regarding the GETTY's intent to compensate PLAINTIFFS both in the spring of 2013 and during dinner in Rome on January 17, 2014.

183.    DEFENDANTS knew that these representations were false when made or made those representations recklessly and without regarding for their truth.

DEFENDANTS intended that PLAINTIFFS rely on their misrepresentations and PLAINTIFFS did actually reasonably rely on these misrepresentations.

184.   PLAINTIFFS were harmed by DEFENDANTS' misrepresentations and those misrepresentations were a substantial factor in causing PLAINTIFFS' harm, in an amount to be proven at trial.

185.   DEFENDANTS further concealed material facts from PLAINTIFFS to defraud and mislead PLAINTIFFS. Specifically, DEFENDANTS fraudulently concealed their breach of the NDNCA and misrepresented their interest in acquiring and/or exhibiting the TORLONIA SCULPTURES.

186.   By way of example, on August 24, 2015, POTTS sent an e-mail to Hicham, stating that he did not think the GETTY was prepared to revisit the opportunity to acquire and/or exhibit the TORLONIA SCULPTURES. Such statement was fraudulent in two respects: (1) at that time, the GETTY was interested in actively pursuing direct negotiations with the Torlonia family to acquire rights in, export, and/or exhibit the TORLONIA SCULTPURES; and (2) the GETTY fraudulently concealed the fact that it was in direct communications with the Torlonia family in breach of the NDNCA and derogation of PLAINTIFFS' rights.

187.   Similarly, on March 24, 2015, the GETTY's general counsel, Stephen W. Clark, represented to PLAINTIFFS that the GETTY was not interested in pursuing the proposed sale, transfer, temporary exportation, and/or exhibition of the TORLONIA SCULPTURES. However, within six months, the GETTY was meeting directly with the Torlonia family to gain access to the TORLONIA SCULPTURES.

188.    DEFENDANTS fraudulently misrepresented their interest in the TORLONIA SCULPTURES and concealed their breach of the NDNCA in order to cut PLAINTIFFS out of the deal with the Torlonia family, to avoid paying any compensation to PLAINTIFFS, to deprive PLAINTIFFS of their years' worth of time, money, and effort invested into preparing the TORLONIA SCULPTURES for sale, transfer, temporary exportation, and/or exhibition, and to prevent PLAINTIFFS from taking any actions, including but not limited to injunctive relief, to protect their rights.

189.    DEFENDANTS knew that PLAINTIFFS were ignorant of DEFENDANTS' direct communications with the Torlonia family and their representatives and that PLAINTIFFS could not find about such communications through ordinary intelligence, as demonstrated further by DEFENDANTS' refusal to provide those communications prior to this suit being filed. DEFENDANTS had a duty to disclose such communications in that their superior knowledge over PLAINTIFFS rendered their interactions with PLAINTIFFS in the absence of such disclosures inherently unfair. DEFENDANTS relied on their superior knowledge and PLAINTIFFS' ignorance to hide their malfeasance for as long as possible and to delay or prevent PLAINTIFFS' ability to enforce their legal and equitable rights.

190.    PLAINTIFFS reasonably relied on DEFENDANTS misrepresentations and concealments and neither pursued any further negotiations with the GETTY, the Torlonia family, or the Italian government, nor sought any injunctive relief against the GETTY to prevent its breach of the NDNCA and circumvention of PLAINTIFFS.

191.    PLAINTIFFS have been damaged by DEFENDANTS' fraudulent misrepresentations and concealments, including being prevented from swiftly enforcing all legal and equitable rights against the GETTY, as well as other damages.

192.    As a result, Plaintiffs seek recover of damages from DEFENDANTS in an amount to be proven at trial.

## COUNT 5 – Unjust Enrichment (All DEFENDANTS)

193.    PLAINTIFFS incorporate herein the allegations in paragraphs 4-151.

194.    DEFENDANTS received benefits from PLAINTIFFS and were unjustly enriched by DEFENDANTS' misappropriation of the value of PLAINTIFFS' skills, labors, expertise, experience, goodwill and relationships, knowledge of and ability to navigate Italian politics, and efforts expended for DEFENDANTS' benefit.

195.    As a result of their misappropriation, DEFENDANTS received a benefit by virtue of the potential transaction relating to the TORLONIA SCULPTURES for which PLAINTIFFS hereby sue.

196.    DEFENDANTS should not be entitled to retain the benefits they received from PLAINTIFFS without compensating PLAINTIFFS for the value of the benefits which DEFENDANTS received from PLAINTIFFS. Equity and good conscience require DEFENDANTS to compensate PLAINTIFFS for the value of the benefits DEFENDANTS received from PLAINTIFFS in an amount to be proven at trial.

## COUNT 6 – Unfair Competition (ALL DEFENDANTS)

197.    PLAINTIFFS incorporate herein the allegations in paragraphs 4-151.

198.    In addition to misappropriating PLAINTIFFS' confidential information and trade secrets in breach of the NDNCA, DEFENDANTS have misappropriated

PLAINTIFFS' labors, skills, expenditures, and goodwill in relation to efforts to prepare and make available the TORLONIA SCULPTURES for sale, transfer, temporary exportation, and/or exhibition.

199.    By way of example, PLAINTIFFS developed substantial knowledge and skill in navigating Italian law on antiquities and their sale, de-notification, and/or exportation. PLAINTIFFS also built valuable goodwill with key Italian officials and expended considerable labor and effort to make an international sale, transfer, temporary exportation, and/or exhibition of the TORLONIA SCULPTURES legally and economically viable. As described more fully above, PLAINTIFFS' labors to effectuate a public display of the TORLONIA SCULPTURES included at least two years of legal efforts, contacts with museums, contacts with Italian officials, scientific studies, verifications, restoration studies, searches for exhibit spaces and other collateral activities.

200.    DEFENDANTS, in combination with others, misappropriated such skill, goodwill, and labor to obtain their benefit and deprive PLAINTIFFS of the value thereof. Such misappropriation is demonstrated by Mr. Morando's confirmation that PLAINTIFFS' "MUSEUM" project, which was developed through and depended upon the skill, labor, and goodwill that PLAINTIFFS expended and/or developed over more than two years, was literally plagiarized, copied, and renamed the "EXHIBIT" project, in which the GETTY is directly involved. DEFENDANTS have misappropriated PLAINTIFFS' skill, labor, and/or goodwill and/or the benefits thereof to gain access to the TORLONIA SCULPTURES without compensating PLAINTIFFS.

201.    DEFENDANTS' bad faith in such misappropriation is manifest in DEFENDANTS' fraudulent inducements, misrepresentations, and/or fraudulent

nondisclosures regarding PLAINTIFFS' compensation for their efforts and in

DEFENDANTS' malicious efforts to avoid compensating PLAINTIFFS and to deprive

PLAINTIFFS of compensation. As detailed above, DEFENDANTS fraudulently induced

PLAINTIFFS to enter into the NDNCA to gain access to and the benefit of PLAINTIFFS'

skill, labor, goodwill, and contacts but never intended to refrain from circumventing

PLAINTIFFS' relationship and business opportunity with the Torlonia family.

DEFENDANTS further defrauded PLAINTIFFS by representing that the GETTY would

compensate PLAINTIFFS for their years' worth of knowledge, skill, labor, and good will as

well as their relationships with the Torlonia family and members of the Italian government

and their trade-secret deal structures and means for effectuating a transaction. Specifically,

as discussed above, POTTS made multiple misrepresentations regarding the GETTY's

intent to compensate PLAINTIFFS both in the spring of 2013 and during dinner in Rome

on January 17, 2014. DEFENDANTS similarly feigned interest in a deal involving both the

TORLONIA SCULPTURES and PLAINTIFFS in order to gain access to and the benefit

of PLAINTIFFS' skill, labors, and goodwill. DEFENDANTS swiftly went from engaging

in negotiations involving compensation for PLAINTIFFS, including discussions of a

possible 22% commission payable by DEFENDANTS, to actively and maliciously cutting

PLAINTIFFS out of the deal to deprive them of the benefits of their labor, skill, and

goodwill.

  202. Throughout the course of their interactions with PLAINTIFFS,

DEFENDANTS knew that PLAINTIFFS expected to receive compensation for their efforts

to effectuate a sale, transfer, temporary exportation, and/or exhibition of the TORLONIA

SCULTPURES, and DEFENDANTS actively engaged in negotiations involving

compensation for PLAINTIFFS, including but not limited to commissions to be paid by DEFENDANTS. At no point did DEFENDANTS ever indicate that they were not willing to compensate PLAINTIFFS or that they believed PLAINTIFFS were not entitled to compensation for their skill, labors, and/or goodwill in relation to a potential sale, transfer, temporary exportation, and/or exhibition of the TORLONIA SCULPTURES. Had DEFENDANTS declined to engage in negotiations involving compensation for PLAINTIFFS and/or disclosed a belief that PLAINTIFFS were not entitled to compensation, PLAINTIFFS would not have expended substantial time and effort attempting effect a sale, transfer, temporary exportation, and/or exhibition of the TORLONIA SCULPTURES involving DEFENDANTS, and DEFENDANTS would not have been able to misappropriate PLAINTIFFS' labor, skill, and/or goodwill.

203.    DEFENDANTS' misappropriation caused PLAINTIFFS to be harmed and afforded DEFENDANTS an unfair competitive advantage—specifically, PLAINTIFFS were deprived of the benefit of skills, labor, and/or goodwill developed and/or expended over several years while DEFENDANTS obtained such benefits without having to make any such expenditure or investment of time and effort.

204.    By reason of the foregoing, DEFENDANTS have engaged in unfair competition with PLAINTIFFS causing PLAINTIFFS to suffer damages in an amount to be proven at trial.

## **JURY DEMAND**

PLAINTIFFS demand a trial by a jury on all issue so triable.

**PRAYER FOR RELIEF**

WHEREFORE, PLAINTIFFS respectfully request that judgment be entered in their favor and against DEFENDANTS and specifically request that the Court grant the following relief:

A.  Actual damages in the amount of no less than $77,000,000;

B.  Compensation for the value of Plaintiffs' skills, labors, expertise, experience, goodwill and relationships, knowledge of and ability to navigate Italian politics, and efforts expended for DEFENDANTS' benefit;

C.  Special, exemplary, and/or punitive damages;

D.  Restitution;

E.  Attorneys' fees, expenses, and costs;

F.  Pre- and post-judgment interest, jointly and severally, against DEFENDANTS; and

G.  Such other further relief as the Court may deem just and proper, in law or in equity.

Dated: April 20, 2018                    Respectfully submitted,

                                         */s/ Andrew M. Howard*
                                         Elliot A. Hallak (EAH-5479)
                                         ehallak@harrisbeach.com
                                         HARRIS BEACH PLLC
                                         677 Broadway, Suite 1101
                                         Albany, New York 12207
                                         Phone: (518) 427-9700
                                         Fax: (518) 427-0235

                                         Michael W. Shore
                                         mshore@shorechan.com*
                                         Alfonso Garcia Chan
                                         achan@shorechan.com*
                                         Andrew M. Howard
                                         ahoward@shorechan.com*
                                         Samuel E. Joyner
                                         sjoyner@shorechan.com**
                                         Paul T. Beeler
                                         pbeeler@shorechan.com*
                                         SHORE CHAN DEPUMPO LLP
                                         901 Main Street, Suite 3300
                                         Dallas, TX 75202
                                         Telephone: (214) 593-9110
                                         Facsimile: (214) 593-9111

                                         **pro hac vice* motions granted
                                         ****pro hac vice* motion to be filed
                                         Attorneys for Plaintiffs
                                         **PHOENIX ANCIENT ART, S.A., PETRARCH LLC
                                         a/k/a ELECTRUM, and REGULUS
                                         INTERNATIONAL CAPITAL CORP.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system on April 20, 2018.


*/s/  Andrew M. Howard*_____
Andrew M. Howard