I9CPPHOO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

PHOENIX ANCIENT ART, S.A., ET
AL.,

                    Plaintiffs,

          v.                              17 CV 0241 (ER)

J. PAUL GETTY TRUST, ET AL.,

                    Defendants.

------------------------------x
                                          New York, N.Y.
                                          September 12, 2018
                                          2:32 p.m.

Before:

                    HON. EDGARDO RAMOS,

                                          District Judge

                         APPEARANCES

SHORE, CHAN, DePUMPO, LLP
     Attorneys for Plaintiffs
BY:  MICHAEL W. SHORE
     ANDREW HOWARD
          AND
HARRIS BEACH, PLLC
BY:  ELLIOT A. HALLAK


MUNGER, TOLLES & OLSON, LLP
     Attorneys for Defendants
BY:  MATTHEW A. MACDONALD
     STEPHANIE G. HERRERA (Present via telephone)


ALSO PRESENT:  HICHAM ABOUTAAM, Plaintiff

                    STEPHEN W. CLARK, VP, General Counsel, Secretary
                              The J. Paul Getty Trust

I9CPPHOO

```
 1          (In open court)
 2          THE COURT:  Good afternoon, everyone.  Please be
 3     seated.
 4          (Case called)
 5          MR. SHORE:  Michael Shore for Phoenix Ancient Art.
 6          MR. HOWARD:  Andrew Howard for plaintiffs.
 7          MR. HALLAK:  Elliott Hallak, Harris Beach, for
 8     plaintiffs as well.
 9          THE COURT:  And who is this gentlemen?
10          MR. SHORE:  This is our client, Mr. Aboutaam.
11          THE COURT:  Good afternoon.
12          MR. ABOUTAAM:  Good afternoon.
13          MR. MACDONALD:  Your Honor, Mat Macdonald from Munger
14     Tolles on behalf of Getty, and with me is Stephen Clark,
15     general counsel of Getty.
16          THE COURT:  Good afternoon to you all.
17          It seems as though discovery is proceeding swimmingly.
18     I have the parties' letters before me; so why don't we take
19     them in turn, starting with plaintiff's letter of June 14.
20     First issue being the stay, lifting the stay on depositions.
21     So Mr. Shore or Mr. Howard?
22          MR. SHORE:  Your Honor, thank you for hearing us
23     today, and I'm pleased to meet you.  This is my first time here
24     in your court.
25          THE COURT:  Welcome.
```

1          MR. SHORE:  Thank you very much.  I didn't realize I

2    was going to get stripped when I came in; so I appreciate the

3    security.

4          THE COURT:  Only Texans.

5          MR. SHORE:  I feel very safe.

6          Judge Ramos, this case was filed in January of 2017.

7    We don't even know what facts are in dispute because we don't

8    have an answer.  They have not denied a single averment in our

9    complaint; so we don't even know today what they deny and what

10   they don't deny.  We have a lot of attorney arguments they make

11   in their motions to dismiss, but there's no evidence.

12         So what needs to happen here, I believe and what I

13   would request the Court is to do, is to hold these, slash,

14   motions to dismiss in abeyance or even deny it without

15   prejudice, and send the parties back to actually conduct

16   discovery.  It's potentially a $70 million lawsuit.  I am

17   probably the only attorney here who have met the Torlonia

18   family, who had broke bread with them in the villa, who visited

19   them at their hunting lodge, who visited them at another one of

20   their villas, who negotiated -- tried to negotiate a separate

21   deal with them with a Chinese museum and finally gave up.

22         I wasn't a part of the negotiations of the

23   transactions in this deal, but I know the family.  I know how

24   much they desperately need cash.  Their bank failed the capital

25   stress test of the European Union Banking Authority.

1          THE COURT:  I'm sorry, what was that?

2          MR. SHORE:  The European Union Banking Authority.

3   They own a bank.  It failed a stress test by several tens of

4   millions of dollars.  They could not come up with the money.

5   They are desperate for money.  When we were negotiating with

6   them on behalf of the World Art Museum in China and the Chinese

7   Ministry of Culture to acquire the collection, we couldn't get

8   it done for various reasons.  But they got so desperate, they

9   dropped the price down to a third of what they were originally

10  asking if only the Chinese would pay them the money and not

11  require any approval from the Italian government to do the

12  deal.

13         So they are desperate for money.  They are -- like a

14  lot of noblemen in Europe or old noble families, they are

15  property rich and cash poor.  And their No. 1 cash -- or their

16  No. 1 asset they have that is worth anything is this

17  collection.  They are desperate to do a deal.

18         I know exactly what's going on here, and I think

19  probably your Honor does too.  There's an agreement to have an

20  agreement as soon as this lawsuit is over, and that's what we

21  need to get into the discovery on.  I need to take the

22  deposition of Mr. Potts.  I need to take the deposition of the

23  people who have actually been in contact with the family.

24         I've heard lots of discussions about, you know, there

25  was some sort of an agreement that we wouldn't take depositions

I9CPPHOO

in the case, and I'll be the first to tell you, maybe we
weren't quite as smart as we should have been as far as
understanding the lengths to which The Getty would go to avoid
allowing discovery to take place, real discovery, unfettered
discovery, deposition discovery.  Because what they did is they
filed a motion to dismiss.  We repled.  Parts of the motion to
dismiss were denied.  And now they file another motion to
dismiss, in violation of the agreement that they had that they
would not move to dismiss the contract claims until -- they
agreed they weren't going to do that.

So I think the gamesmanship and -- they've spent more
money trying to avoid giving simple discovery than I could ever
have contemplated they would spend on the entire lawsuit.  This
is a simple lawsuit.  They admit they circumvented the
non-circumvention agreement.  They admit it.  They talked to
the family.  They went behind the backs of my clients.  They
talked to the family.  They sent 30 trustees to Italy to meet
and see the collection.

I've been in the basement.  I've laid my hands on
these statutes.  I know what they are.  I've been there.
There's a deal to have a deal.  That's what's going on here,
and we need to have the depositions.  We need to take full
discovery, and then if they want to file a motion for summary
judgement on some kind of ground, more power to them.

But right now, what they're trying to do is they're

1      trying to win the case on a pleading issue, without giving full

2      discovery, and I think some of the other things that is readily

3      apparent at this point is they claim they aren't withholding

4      any documents.  Well, they're not withholding any documents

5      that they agreed to give us.  That may be true, but of course,

6      that's always true.  No one ever withholds the documents that

7      they agree to give us.

8              They're not searching personal computers.  They're not

9      giving us documents from their Italian lawyer, and the way this

10     works, there can be no deal without the approval of the Italian

11     Ministry of Culture.  It's a deal with the Italian Ministry of

12     Culture.  They've hired a lawyer to go negotiate the terms of

13     whatever they're going to do, and now they're trying to say

14     they don't have to give us any discovery from the person that

15     they're using to set up a deal with the Italian government

16     based upon a structure, I'm quite sure, that our clients

17     designed because I helped them design it.

18             THE COURT:  As I understand the defendant's position,

19     they're not giving you discovery with respect to that person

20     because that person is a lawyer, giving legal advice.

21             MR. SHORE:  I'm not sure what their role is, but he's

22     not a lawyer giving legal advice, but he is interacting with

23     the third party, the Italian government.  Those interactions

24     with the Italian government are not privileged.  Those are

25     interactions with a third party.  As a matter of fact, they're

I9CPPHOO

1    interactions with a government.

2            And when you use a lawyer to go and do a negotiation

3    with a foreign government and then the Ministry of Culture to

4    try to come up with terms that you can get a collection

5    exported from the country that otherwise would be illegal to

6    do, that you can't hide behind the lawyer.

7            And they're doing the same thing with Mr. Clark.

8    Mr. Clark does all kinds of things.  I'm happy -- we'll pay for

9    it.  Let's have a discovery master appointed to look at every

10   single e-mail and every document that Mr. Clark has seen, and

11   let that discovery master decide whether he's acting as a

12   lawyer or whether or not he's acting as a business person.

13           But the law in this circuit is clear.  It's very

14   similar to the law in the Fifth Circuit that I'm more familiar

15   with.  The law is very clear.  Just because you pass something

16   by a lawyer, just because you put on a cc, just because you

17   have him do your bidding for you and a business discussion,

18   he's not some kind of consigliere here.  He is acting as a

19   businessperson, and that's what they use him for.

20           So I am happy to pay for the special master.  I'm

21   happy to waive attorney-client privilege completely for my

22   client if they'll do the same for theirs.  I'm happy to do

23   that.  I was always taught, by some really fine lawyers,

24   ethical lawyers, that the whole purpose of justice and advocacy

25   is everybody agrees to put all the facts on the table, and

I9CPPHOO

1    zealous advocacy comes in to argue what those facts mean.

2    Zealous advocacy should not be used to hide facts.  That's what

3    we've got here.  We've got the most zealous advocacy I've ever

4    seen in a case that's this old, not to let the facts come out.

5            So I want to take the depositions of the people I need

6    to take depositions of, the people who are interacting between

7    The Getty and the Torlonia.  If The Getty is helping the

8    Torlonia arrange for loans or financing to prop up their bank,

9    I way want to be able to get into that.

10           There's a wide-ranging, multi-tentacle relationship

11   between The Getty and the Torlonia family.  And I guarantee

12   you, I guarantee you -- and if I'm wrong, you can rain down

13   upon me your wrath -- this collection would already be at a

14   different museum, it would be at The Met, it would be at the

15   British Museum, it would be at the Louvre, it would be at

16   another museum if they didn't have a deal with The Getty to

17   have a deal because they need the money.

18           They are desperate for the money, and so there is a

19   deal.  There is a deal to have a deal, or something is going

20   on, and they're trying to hide it from us.  And all we want to

21   do is turn on the light.  Well, turn on the light and there

22   will be nothing there, or we'll turn on the light and the

23   cockroaches will scatter.

24           But this idea that they can continuously file serial

25   12(b)(6) motions, basically supported by nothing more than

1    attorney argument, to try to keep us from having our day in

2    court, it's wrong.  And, frankly, your time, I believe -- it's

3    up to you.  It's your time, but I think your time is being

4    abused by this process.  Let's just go do discovery.

5              THE COURT:  Let me ask you this.  What's happened

6    between the entry of the revised scheduling order and now that

7    would require the lifting of the stay that you agreed to?

8              MR. SHORE:  Well, for one thing, they violated their

9    agreement.  They said they would not -- the motion to dismiss

10   was denied, or you granted right to replead, and they agreed

11   that they would not -- that we could not take depositions until

12   they filed an answer to the contract claims, but they agreed

13   they would not attack the contract claims in a motion to

14   dismiss and they have.  So they violated their agreement.

15             I mean, they agreed that until all of our factual

16   allegations were not to be taken as true, that we would then

17   get depositions.  Well, what they've done is they have simply

18   filed another motion to dismiss on contract claims, which they

19   said they would not do, and this is a stall tactic.  This is

20   gamesmanship.  This is anything and everything but the truth.

21             Let's turn the light on.  They have cross-examination,

22   and I believe that one of our Supreme Court justices said, is

23   the No. 1 way to get to the truth.  It is the great truth

24   teller.  And they are desperate to avoid cross-examination.

25             I also know, by the way, Mr. Potts.  Mr. Potts used to

I9CPPHOO

1    be the head of a museum down in my neck of the woods.  I know

2    members of the board of trustees there.  I know what kind of

3    person Mr. Potts is.  I know the reasons why he left.

4    Mr. Potts is not a nice person.  The Getty is not a nice

5    museum.  The Torlonia family is not a nice family, and they

6    don't have any respect for this Court.  They don't have any

7    respect for law, and they will do anything and everything they

8    can, just like they did in Italy.  They filed with the courts

9    in Italy.  They've been sued by the Italian government more

10   than a dozen times.  This is a group of people who will do

11   anything and everything to avoid the lights being turned on.

12           THE COURT:  Who has been sued by the Italian

13   government, the Torlonia family or The Getty --

14           MR. SHORE:  The Torlonia family.  When it comes to

15   back dealing, they've been sued over tax issues.  They've been

16   sued over building permit issues.  They've been sued over a

17   multitude of things.  They've even been sued, according to what

18   they told me, they've even been sued for illegal hunting on

19   their own property out in the country.  This is not a nice

20   group of people, and they're not going to ever allow us to see

21   anything until the U.S. -- an Article III U.S. district judge

22   tells them they have to, and even then.

23           I am more than happy to pay for, myself, a discovery

24   master to go and to search The Getty and to search the personal

25   computers, all the e-mail accounts and everything else because

1    I don't trust Getty to tell their lawyers the truth, and I

2    don't trust their lawyers to press The Getty to do it.  This is

3    not -- this is a -- and I know these are serious accusations.

4    I stand behind them, and I guarantee you if we get into the

5    meat of this, you're going to see some things that will turn

6    your hair white.

7           THE COURT:  I mean, they are serious accusations and,

8    Mr. Shore, they're also based on an assumption that there's a

9    deal to do a deal, and I don't have any actual evidence before

10   me that that's the case.  And they're also based on your view

11   of the character of certain of the individuals that are

12   involved.

13          MR. SHORE:  The only way that I can give you evidence

14   is if you let me go get it.  And so when you're saying you

15   don't have any evidence before you, of course you don't because

16   they won't let us get it.  They won't let us take a deposition.

17   They told you before, in another hearing, that they ran the

18   search terms we'd asked them to run and got 25,000 hits.  They

19   produced 300 documents.  So where's the other 24,700 documents?

20          I have nothing -- the only thing I have from Mr. Potts

21   are calendar entries and other things -- or Clark.  They sent

22   30 members of their board of trustees to Italy, 30 people to

23   Italy to view the collection and meet with the Torlonia family.

24   Do you think they did that if they didn't have a deal?  Do you

25   think they would send 30 people over there?  Do you think that

I9CPPHOO

1    the Torlonia family would not have that collection under

2    contract with the British Museum or the Louvre or The Met or

3    one of the other major museums of the world if they didn't

4    already have a deal in their back pocket from The Getty?

5          THE COURT:  I, frankly, don't know the answer to that

6    because I don't know this industry.

7          MR. SHORE:  Right.  Well, I can tell you that if you

8    let me take -- if you open up discovery and let me take

9    depositions of everybody at The Getty that I want to take

10   depositions of, and I can't make a case, okay.  But give me my

11   chance.  Give me my chance to get past this stone wall,

12   obfuscation, obstruction and get to the heart of the matter.

13         I know this family.  I know the Torlonia family.  I

14   know what they need.  I know what they want.  I even know what

15   their price was, and there's no way that there's not a deal.

16   And if you dismiss this case, or you don't give us our day in

17   court, within weeks there will be a press release announcing

18   The Getty Museum is going to -- or in cooperation with some

19   other museum but The Getty museum is going to have a big show.

20         My client worked three years, thousands of hours,

21   millions of dollars' worth of time, trouble and effort, and

22   they admit they circumvented him.  They admit they went behind

23   his back, and we know now, with what little discovery we got,

24   not only did they go behind his back, they lied to him about

25   it.  They denied doing it.

I9CPPHOO

| | |
|---|---|
| 1 | THE COURT:  They lied to whom?  I'm sorry. |
| 2 | MR. SHORE:  They lied to Mr. Aboutaam.  They went |
| 3 | behind his back and then to his face Mr. Potts looked him in |
| 4 | the eye and lied to him about what was going on and whether or |
| 5 | not they still had an interest.  That's in the record.  That's |
| 6 | not even denied by The Getty. |
| 7 | THE COURT:  Let me hear from Mr. MacDonald on this |
| 8 | group of issues. |
| 9 | MR. MACDONALD:  Good morning, your Honor -- or |
| 10 | afternoon, I'm sorry.  I'm a little confused about what time |
| 11 | zone I'm in. |
| 12 | Let me start by making a couple of sort of general |
| 13 | points, and then I think I may have a slightly different |
| 14 | proposal than the one Mr. Shore has in mind. |
| 15 | I think the first is sort of a foundational point, |
| 16 | which is I think Mr. Shore has the order of events in a lawsuit |
| 17 | in Federal Court backwards.  Which is, the way this works is |
| 18 | you file a valid pleading, and then you get to go take |
| 19 | discovery.  You don't get to take discovery to file a valid |
| 20 | pleading, and so we think the question that's before the Court |
| 21 | is whether there's a valid pleading.  We think there's not.  We |
| 22 | filed our reply last night.  That motion is fully briefed.  We |
| 23 | think that motion can be decided and dispose of the entire |
| 24 | case. |
| 25 | But let me now clear the air about a couple of things |

I9CPPHOO

1    that Mr. Shore said.  I think the idea that we are withholding

2    documents is absurd, and I don't think that there's any

3    evidence in the record to support that accusation.  We employed

4    a robust search protocol that I think was quite reasonable,

5    that plaintiffs had considerable input in, and that your Honor

6    blessed at a hearing in January of 2018.

7         When we reviewed those documents, we applied -- our

8    search criteria was, it was responsive if it said anything at

9    all about Torlonia, period, full stop.  We searched more than

10   20 custodians.  We applied 36 search terms, at least.  It

11   depends on how you count.  We reviewed 17,000 documents.  We

12   produced 2,600 documents.

13        Mr. Shore alluded to the fact that the second set of

14   searches we ran had a very low response rate.  The reason we

15   produced some smaller number of documents than the hits that we

16   described there were for the Court, are, No. 1, that the Court

17   narrowed the search that we were required to run; and No. 2,

18   the overwhelming majority of the documents that we reviewed in

19   that second search had nothing to do with this case.

20        They were about -- one of the search terms we applied

21   was the word "Phoenix."  And when I reviewed documents in the

22   Phoenix population, I saw a lot of e-mails with the word

23   Phoenix, Arizona, in the footnote.

24        The answer is on this document discovery that there is

25   simply nothing left to find.  I'm not saying we'll never find

I9CPPHOO

1    another document in this case ever, but the significant

2    documents have been found.

3          As to deposition discovery, we have repeatedly offered

4    to make witnesses available on the limited subject of whether

5    there is any deal.  We have done so in the hope that this case

6    could be over, and we have said very, very frequently, that we

7    are allowed to have people deposed on that.  We don't think --

8          THE COURT:  Including Mr. Clark?

9          MR. MACDONALD:  Mr. Clark?  I would allow Mr. Clark to

10   be deposed on that limited question.  Yes, sir.  I don't think

11   we've ever discussed exactly who because that proposal has

12   never gone anywhere because plaintiffs have said they want to

13   be able to ask about everything that ever had anything to do

14   with the case.

15         I think a targeted deposition is a much more sensible,

16   efficient way to get this resolved.  But we could have

17   Mr. Clark testify under oath that there's no deal, that there's

18   no deal to have a deal.  There's no documentary evidence in

19   this record to suggest that there's a deal to have a deal.

20         As for Mr. Calabi we have resisted running full

21   document searches on his documents because he's an Italian

22   lawyer who was retained to advise The Getty.  I have no idea,

23   your Honor, what the basis for the assertion that we retained

24   him to negotiate with the Italian government is.  I have no

25   idea what the basis is for the assertion that he is negotiating

I9CPPHOO

1    with the Italian government.  I have never heard that

2    allegation until we heard in a meet and confer or in a letter

3    we received from the plaintiffs.

4            THE COURT:  Well, are you in a position to make a

5    representation that Mr. Calabi didn't negotiate with the

6    Italian government?

7            MR. MACDONALD:  Yes.  I think I am.  I've asked him

8    whether he has negotiated with the Italian government, and I

9    understand from my client that he has not negotiated with the

10   Italian government.

11           THE COURT:  Okay.

12           MR. MACDONALD:  There's no deal being negotiated.

13           I think we have a very different view about what the

14   solution is.  There's a lot of discovery matters on your

15   Honor's plate this morning, a lot of disputes.  Our view is

16   that the appropriate thing to do is to hold all of these issues

17   in abeyance and resolve them after the motion to dismiss has

18   been decided.  That's the procedure that's laid out in Iqbal.

19   The doors of discovery don't get unlocked until the plaintiff

20   files a valid claim.

21           We think we filed a very strong motion.  We filed our

22   reply brief last night.  There is obvious judicial efficiency

23   rationales for that, and we don't have to resolve this.  The

24   parties can stop spending money on this case while that motion

25   is pending.

I9CPPHOO

1              Lastly, I think as to Mr. Shore's guarantee, I wonder

2     if Mr. Shore would guarantee --

3              THE COURT:  What's the guarantee?  I'm sorry.

4              MR. MACDONALD:  I'm sorry?

5              THE COURT:  Which guarantee?

6              MR. MACDONALD:  I heard Mr. Shore make a guarantee

7     that there would be evidence that would turn your Honor's hair

8     white if depositions were open.  I wonder if Mr. Shore would

9     back that guarantee if I were to offer our witnesses for a

10    limited deposition on the question of whether there is a deal

11    to have a deal or whether there's a deal, or what The Getty's

12    dealings with the Torlonia family is.  If he's wrong, whether

13    he would agree to pay our attorney's fees because I think that

14    guarantee will not -- he will not be able to back that

15    guarantee, your Honor.

16             THE COURT:  He offered to pay for a lot of things.  I

17    don't recall that he offered to pay your attorney fees.

18             MR. MACDONALD:  No, I was asking if he would offer to

19    pay our attorneys fees.

20             MR. SHORE:  May I give a brief response?

21             THE COURT:  Yes or no?

22             MR. SHORE:  I'll condition it, yes.

23             THE COURT:  Okay.

24             MR. SHORE:  Here's my brief response.  They have not

25    told us whether they searched their collection management

I9CPPHOO

database.  That's a database that has all the correspondence

related to the acquisition, and so we don't know that.

THE COURT:  Collection management database?

MR. SHORE:  There's something called the collection

management database.  It's disclosed in their 2016 acquisition

policy.  So I don't know that they've searched the collection

management database.  I want to be able to ask in a deposition.

I want to be able to ask in a deposition each witness what

private e-mail accounts do you have?  Have you communicated

with the Torlonia family through a private e-mail account?

Have all of those private e-mail accounts been searched by the

attorneys?  Have they been turned over?

I want to be able to ask about which account's the

attorney-client privilege.  They have objected and refused to

produce hundreds of documents that involve Mr. Clark, and

there's no basis for that privilege.  There's no basis for the

assertion of the privilege.  I want to be able to challenge it.

And here's the thing, your Honor, I know you were an

experienced lawyer before you took the bench.  If there's no

deal and there's no deal for a deal, why do they want a limited

deposition?  Why don't they not want me asking about where do

you store documents?  What was searched for?  Whose accounts

were searched?

All that stuff, they will say, oh, that has nothing to

do with the deal, whether deals exist.  I want to be able to

I9CPPHOO

probe what they looked for, where they looked for it.  I want

to probe whether there are any deals with the Torlonia bank,

whether they've helped the Torlonia bank gain capital to meet

their undercapitalization requirements.  There's a lot of ways

that a sneaky, underhanded person can do this and could have a

deal to set up a deal.

And I'm a smart guy.  They're very smart people, and

if they -- the only reason why they want to a limited

deposition, which there's nothing in the Federal Rules of Civil

Procedure that allows this.  In the Federal Rules of Civil

Procedure, I take a deposition, they can object to form and

they can object to privilege.  They can't object to the scope

of the deposition, and for somebody who is getting up the

self-righteous anger and saying there is no deal, there is no

deal to have a deal, you know, you haven't done anything, why

not allow a real deposition?

Why not allow me to figure out what they've looked

for, where they've looked, what other people may have contacted

the Torlonia, what other business deals around the Torlonia

family could be going on.  That's what they're afraid of,

because the Torlonia family is smart.  These people are smart.

They know how to game the system.  They know how to game the

system of antiquities importation and exportation.  They know

how to game the system period.

What he said was that this lawyer, this Italian

1    lawyer, hasn't negotiated with the Italian government.  Has he

2    communicated with the Italian government?  Has he passed on

3    communications for them to the Italian government?  Anything

4    this lawyer has communicated to the Italian government, I

5    should get.  If he communicated to the Italian government on

6    behalf or if he communicated with a member of the Ministry of

7    Culture on that, or if he communicated with the Torlonia family

8    on their behalf.

9            So they're playing games here.  They're playing words

10   games.  They're playing semantic games here.  So the way to get

11   to the heart of this is let me depose these guys, and all of

12   this is going to be stripped away.  Ultimately, I don't think

13   their lawyer is going to let them perjure themselves, and I

14   don't think Mr. Clark is going to perjure himself.  I think

15   he's going to be forced to tell the truth, but they admitted

16   they circumvented my client.  They admitted they violated the

17   agreement, and the idea --

18           THE COURT:  Can I just ask, Mr. Macdonald -- I've

19   given you your opportunity, Mr. Shore -- have you admitted that

20   you circumvented the non-circumvention agreement?

21           MR. MACDONALD:  No.  We have admitted -- we have

22   truthfully said, which we have never attempted to deny that The

23   Getty talked to the Torlonia family about a non-profit

24   exhibition.  We deny that they ever discussed an acquisition,

25   and we do not agree that talking about a non-profit exhibition

I9CPPHOO

is a breach of a non-circumvention agreement.

MR. SHORE:  But see, there we go.  There's the gamesmanship.  They're trying to say that the transaction has to be a sale.  The agreement says they can't talk with the Torlonia family about any transaction.  An exhibition is a transaction.  A non-profit -- The Getty is a non-profit. Great.  That doesn't mean it's not profitable to the Torlonia family.  It just means it's not profitable to The Getty.

This is exactly the kind of stuff, this gamesmanship, this wordsmithing, this little sneaky underhanded way that they represent things.  They talked to the Torlonia family.  They negotiated with them.  They sent 30 trustees to Italy to meet with them.  They hired a lawyer in Italy to help do this transaction.  All of this is in violation of the non-circumvention agreement, unless you take their interpretation of the agreement at the threshold level and say a transaction is only a sale.  That's preposterous.  They are self-granting themselves summary judgement is what they're trying to do.

THE COURT:  Mr. Macdonald, Mr. Shore has indicated on a number of occasions that you violated some sort of agreement to not move to dismiss.

MR. MACDONALD:  Yes.

THE COURT:  What's that?

MR. MACDONALD:  I think we, in the negotiation of the

I9CPPHOO

1   stay, there was no discussion of what the contents of our

2   motion would be -- of our motion to dismiss would be.  They

3   asked -- they called me up.  They asked me for an extension of

4   the discovery schedule.  The discovery schedule had --

5   previously negotiated discovery schedule was getting short.

6   They wanted to extend it by some lengthy period of time.

7          I was concerned that discovery would expand to fill

8   the available time, and so the only condition I asked for, in

9   agreeing to give them more time to take discovery, was that

10  there be a stay of depositions while my motion to dismiss was

11  pending.  I told them I was going to file a motion to dismiss.

12  We never once discussed what that motion would entail, and we

13  agreed that it made a lot more sense for the case, the

14  discovery to proceed after we actually answered so we know

15  what's in dispute.

16          I believe what they are referring to is a line in my

17  initial motion to dismiss, which simply said that we were not,

18  at that time, moving to dismiss that particular pleading on

19  contract grounds.  We never have made any representation about

20  what we would do in response to an amended pleading, and I have

21  never been asked what I would do in response to an amended

22  pleading.

23          THE COURT:  So let me ask, when was this amended

24  scheduling order entered into on those conditions?

25          MR. MACDONALD:  Approximately May, your Honor.

I9CPPHOO

1           THE COURT:  Of what year?

2           MR. MACDONALD:  Of this year.

3           THE COURT:  Of this year?

4           MR. MACDONALD:  Yes.

5           THE COURT:  So that was how many months ago?

6           MR. MACDONALD:  Four months ago.

7           THE COURT:  So let me ask you the same question that I

8    asked Mr. Shore.  What has happened between then and now that

9    would require the stay of depositions to be lifted?

10          MR. MACDONALD:  Our position would be that nothing

11   requires it to be lifted, and in fact, it's our view that the

12   stay should be extended to all discovery.

13          THE COURT:  Go ahead.

14          MR. SHORE:  Your Honor, in our letter of June 14th, we

15   actually cite -- what he said was, they would not challenge our

16   contract claims at all until the appropriate time, quote, "When

17   the Court is not required to accept plaintiff's allegations as

18   true."  In a 12(b)(6) motion, you're required to accept our

19   allegations as true.

20          So they said they were not going to attack our

21   contract claim until after motions to dismiss had been decided.

22   Then they reneged on that, and they filed a motion to dismiss

23   the contract claim.  That's in the first full paragraph of our

24   June 10 letter.  This is gamesmanship of the worst kind.  Let's

25   turn on the light.  Let's see what's there.

I9CPPHOO

```
1              THE COURT:  The June 14th letter, you said?

2              MR. SHORE:  The June 14th, 2018, letter, and the quote

3       is from docket 37 at one and also docket 58, where the

4       representation that they would not change the plaintiff's

5       contract claims until "the appropriate time when the Court is

6       not required to accept plaintiff's allegations as true."

7       That's their words, and so now what they've done to try to -- I

8       know what happened.

9              They got word, you need to get this case dismissed.

10      We got to get rid of this thing.  We have an exhibition we

11      want.  The Torlonias want their money.  They want to do this

12      deal.  We can't do this deal with this lawsuit pending.  We've

13      got to get this thing dismissed.  So now they've moved to

14      dismiss the contract claim.

15             They said they were not going to move to dismiss.

16      They may want to move it on summary judgement.  That's fine.

17      But summary judgement should come after adequate discovery,

18      fair discovery.  This is three years' worth of millions of

19      dollars of time, effort and money that they have stolen.

20      Stolen.  There's no nice word for it.

21             THE COURT:  Mr. Macdonald?

22             MR. MACDONALD:  Yeah, your Honor.  I'm looking at

23      plaintiff's June 14th letter.

24             THE COURT:  Yes.

25             MR. MACDONALD:  And that confirms for me that the
```

I9CPPHOO

1    quote, what they are quoting is a statement at the beginning of

2    our initial motion to dismiss, which means the obvious, which

3    was that we were not dismissing that pleading because, in our

4    view, we couldn't win a motion to dismiss a contract claim on

5    the 12(b)(6) motion.  They changed the pleadings.  They've

6    changed the allegations, and we've concluded now that, on the

7    amended pleading, they have not plausibly alleged they have any

8    contract here.

9            THE COURT:  So that quote predates the Court's ruling

10   on the initial motion to dismiss?

11           MR. MACDONALD:  Yes, your Honor.  It was on the very

12   first page, or maybe the second page, of our initial motion to

13   dismiss that we filed 2017 sometime.  It was never discussed in

14   connection with the stay at all.

15           MR. SHORE:  Now we've gone in the rabbit hole.

16   They're saying that they realized they couldn't get the

17   original contract claim dismissed?  The new contract claim has

18   the same allegations in more detail.  So, and I invite you to

19   compare the two.  That is -- we are deep in the rabbit hole at

20   this point.  There is no way that they can say that the

21   contract claims changed.

22           We have always said that a transaction includes more

23   than a contract.  That, and, obviously, the word transaction

24   obviously means an exhibition, a gift, whatever you want to

25   call it is a transaction.  A donation is a transaction.  So,

I9CPPHOO

1  again, this -- and I know I'm repeating myself, and I

2  apologize.

3          I'm a little bit perplexed at this entire process

4  right now.  Just let us turn on the light.  Let me take some

5  depositions, and let me get to the truth.  Let me show you what

6  they really looked for and what they didn't look for.  Let me

7  show you how they have massively narrowed the request to mean

8  something that doesn't reveal anything.  This is obstruction at

9  its height.

10         Now, they're smart.  These are brilliant lawyers, and

11  they're very smart, but I'm pretty smart, too, and I know

12  what's going on.  And what I would like to do is be able to

13  enlighten you, after taking some depositions, to show you

14  exactly what they have done and exactly what they plan to do.

15  And again --

16         THE COURT:  Let me ask you this, Mr. Shore, because

17  part of what I'm trying to do is I'm trying to put this time

18  line together as to -- because you're making a lot of

19  allegations and you're making a lot of accusations about

20  wrongdoing not only on the part of The Getty Museums and

21  others, but on the part of counsel.

22         And I'll ask you straight out.  If, in fact, that

23  quote that you put in your letter predates the Court's opinion

24  in the initial motion to dismiss and, in fact, the

25  communications between counsel leading to the agreement to stay

1    depositions is as Mr. Macdonald represented, and I'll give you

2    an opportunity to respond to that, which is to say that he made

3    no assertions that they would not move to dismiss the contract

4    claims, then why isn't this quote out of context in an effort

5    to mislead the Court?

6            MR. SHORE:  It's not out of context.  The context is

7    this was part of the discussion which was later brought forward

8    in their motion, but the discussion was:  What are we going to

9    do about discovery?  When are we going to start taking

10   depositions?  And we wanted to take depositions after an answer

11   was filed because we want to know what facts are at issue.  We

12   still don't know.

13           They don't deny anything.  So we don't have an answer

14   about what's denied and what's not denied.  So we agreed, let's

15   file your original rule 12 motion an they said we're not going

16   to file on the contract claims because he just said, we can't

17   win, we couldn't win a 12(b)(6) in the contract claims.

18           So the way this was set up was we would wait and do

19   depositions until after there was an answer filed, which was

20   after you ruled on their first motion to dismiss.  The first

21   motion to dismiss.  And they would have to file an answer.

22   Then we'd know what facts were in dispute, and then we would

23   take depositions.

24           And they did not originally move, and they told us

25   they were not going to originally move, on the contract claims.

I9CPPHOO

1    So that's the context.  You're not going to move on the

2    contract claims.  We want to wait and take depositions until

3    after an answer is filed so we know what facts are in dispute,

4    and also, since they're not moving on the contract claims,

5    whether or not the Court dismisses some of these other claims,

6    then we'll also know whether or not we need to take depositions

7    on those or not.

8            THE COURT:  And that was the state of play when?

9            MR. SHORE:  Before they filed their first motion to

10   dismiss.  I'm sorry.

11           MR. HOWARD:  And I'm sorry.  To interject for a

12   moment, I was involved in these negotiations.  Because the

13   ruling on the first motion to dismiss came out close to the end

14   of the discovery period, I reached out to Mr. Macdonald.  He

15   represented twice on the record to the Court that they weren't

16   going to move on contract under rule 12(b)(6).

17           THE COURT:  When?

18           MR. HOWARD:  This was after the ruling on the first

19   motion to dismiss.  Okay.  So admittedly, in his first motion

20   to dismiss, he said we're not moving on contract because we

21   have to accept plaintiff's allegations as true.  With that

22   representation on the record, I felt assured that we were going

23   to get an answer at some point in time.

24           It befuddles me to this day that we have walked back a

25   representation to the Court on the record twice.  So at that

I9CPPHOO

point, with our understanding that the case would be going

forward at least as to some claims, it made sense to do

depositions once, as opposed to once pre-answer and once

post-answer.

            And your Honor asked earlier:  What has changed?

Well, what has changed is that they filed a motion to dismiss

that is really a poorly cloaked motion for summary judgement

that throughout repeatedly relies on attorney argument that

extensive discovery has been taken.  And that's one of the

reasons we're here today is because what they're really doing

is making a motion for summary judgement under 12(b)(6) and

trying to prohibit us from getting discovery while, at the same

time, claiming we've gotten enough.

            THE COURT:  Claiming?

            MR. HOWARD:  We've gotten enough.  Well, extensive

discovery.

            MR. SHORE:  And to back up to the other point, that's

the correct timeline.  The other point is every answer to

discovery that they give is their interpretation of the

question in a way that is as narrow as possible.  It's

everything they do is to hide and obstruct, and that's why I

need the deposition, and that's why I need the depositions of

Mr. Clark --

            THE COURT:  Let me ask.  Did I have a pre-motion

conference with respect to the filing of the second motion to

I9CPPHOO

1    dismiss?

2              MR. HOWARD:  Yes, your Honor.

3              THE COURT:  Was all this discussed?

4              MR. HOWARD:  Some of it was, yes.  We mentioned the

5    fact that we were surprised they were moving on contract, given

6    they previously represented they were not, but the issues of

7    whether or not depositions would go forward was not ripe at

8    that time.

9              MR. MACDONALD:  May I be heard for a moment, your

10   Honor?

11             THE COURT:  Yes, please.

12             MR. MACDONALD:  Your Honor, this precise argument was

13   used as a basis to oppose our request to file a motion for

14   summary judgment -- or, excuse me, under 12(b)(6), that we had

15   previously represented we would not, but the Court granted us

16   leave.  And the motion that we filed with the Court was the

17   same motion that was described in our pre-conference letter.

18             THE COURT:  Okay.  I'm not going to lift the stay on

19   depositions.

20             Next.  What about the --

21             MR. HOWARD:  So we have some issues with respect to

22   documents and privilege, and we have two letters and as a

23   matter of moving things along quickly, I can kind of sum the

24   issues into discovery issues and privilege issues.

25             THE COURT:  Very well.

I9CPPHOO

1          MR. HOWARD:  Some of the discovery document issues has

2     already been touched upon.  One of those is the fact that we

3     had 25,000 search terms that resulted in 300 documents.

4     Another is the fact that we issued our second request for

5     production.  They refused to answer, or produce any documents

6     in response to 35 out of 41 of those RFPs, and produced only 15

7     documents.

8          And one of the reasons we've been asking for these

9     depositions is to understand truly what's being done to

10    identify custodians, sources of information, and have that

11    information produced.  And Mr. Shore represented or mentioned

12    previously, we just learned, through the acquisition policy

13    they noticed in one of their responsive letters, that they

14    claim all, "ongoing activities, such as exhibitions, loans,

15    research and correspondence with donors, artists and scholars

16    should be recorded in the museum's collection management

17    database, TMS.  Any original paper file should also be

18    retained.  Each curatorial department maintains organized

19    records on exhibitions, loans and works of arts for possible

20    purchase or gift."

21         All that Mr. Macdonald has ever talked about are

22    producing documents from individual custodians, not from any of

23    these sources.  And what we see through these letters is that

24    we're not withholding information.  Well, that's true because

25    they're not getting the information.  They're intentionally not

I9CPPHOO

1      looking at the particular source of information.

2              And we tried to get around this by proposing

3      additional search terms, and they said no, no more search

4      terms.  You don't get anything unless we agree that there are

5      some total limit on the search terms.  Well, that's contrary to

6      what they did to me.  They recently -- we conferred back and

7      forth, and when I told them I'd produced everything, I said,

8      but in you want, you can issue more search terms.  They sent me

9      80 new search terms just last month, on the 21st.  You know,

10     we'll agree and search.  Discovery is an iterative process, and

11     we'd like them to participate in that as well, as opposed to

12     trying to dispose of the case on this incomplete record.

13             THE COURT:  So let's try to separate these issues

14     because, on the one hand, there's the issue of, as I understand

15     it, they have made a search using terms that were agreed upon.

16     There were certain number of hits, and they say that they

17     turned over the hits that were relevant to this case and have

18     not turned over hits that were not relevant to this case.

19             MR. HOWARD:  What they said is they turned over hits

20     that say Torlonia.  I don't know that that's relevant to this

21     case, and that's one of the problems with using search terms

22     and why we're trying to get at the actual source of --

23             THE COURT:  Isn't that how discovery is handled every

24     day in every case?

25             MR. HOWARD:  Search terms are one methodology of

I9CPPHOO

1    obtaining documents, but when there are discrete categories of

2    information or discrete sources of information, like databases

3    that are presumably organized by the artworks at issue, or if

4    there are discrete categories of information, like

5    communications with the Ministry that we request here, or even

6    internal communications relating to the Italian government,

7    which we've also requested in those letters, those can be

8    identified separately.

9              THE COURT:  When did you learn about this collection

10   management database?

11             MR. HOWARD:  I learned of it when they cited their

12   most recent acquisition policy in response -- in their second

13   responsive letter.

14             THE COURT:  And what was the agreement as to what

15   would be searched?  Because I assume that there was an

16   agreement about what custodians, et cetera.

17             MR. HOWARD:  There wasn't.  We came to your court in

18   January of this year and talked about it, and your Honor denied

19   a number of my search terms, that I can't recall off the top of

20   my head, as well as a number of different custodians, including

21   each of The Getty trustees, whom we learned all visited the

22   Torlonia collection and the Torlonia family in Italy.  So there

23   wasn't an agreed set of search terms.  It was an order that set

24   the custodians and search terms.

25             THE COURT:  Okay.  And you learned about this database

I9CPPHOO

1    when?

2              MR. HOWARD:  Just reading -- they said, hey, look, our

3    acquisition policy is available online, cited me a web page.  I

4    looked it up on my way here.

5              MR. SHORE:  Here's the disconnect again.  30 people

6    went to Italy, 30 members of their trustees and we don't even

7    have the e-mails between them and among those 30 people who

8    went on the trip about what happened on the trip, who they

9    talked to, what they thought, what they did, and I mean that,

10   nothing.

11             I mean, we've given everything.  We are an open book.

12   I'm willing to waive attorney-client privilege, if they'll do

13   it.  I just want the light on.  I don't understand why, and I'm

14   really -- and I'm struggling.  I practice all over the country,

15   probably 30 federal districts.  I've never seen anything like

16   this with these guys.

17             THE COURT:  Let me ask Mr. Macdonald.  Mr. Macdonald,

18   what about this collection management database?

19             MR. MACDONALD:  Your Honor, we're happy to search it.

20   It's never been mentioned to me before until now that I should

21   search the collection management database.  I'll be candid.

22   The reason I didn't search the collection management database

23   is that based on the investigation that I did, I didn't think

24   there would be any responsive documents.  But we're happy to

25   search the collection management database.

I9CPPHOO

1          MR. HOWARD:  We don't know what sources of information
2     there are.  We've been told they would get information from
3     custodians.  It took our independent research to identify this
4     separate source.  I don't mean to revisit the issue of
5     depositions, but at some point in time, I would like to issue a
6     30(b)(6) deposition that seeks the person with the most
7     knowledge of how records are kept at The Getty so I can really
8     get to the bottom of what sources are kept, how they're kept,
9     what type of databases they have, what kind of internal
10    slack-like messaging services they use to communicate with each
11    other because that's the way to get past pure attorney argument
12    on the issue of burdensomeness or responsiveness.
13          THE COURT:  Mr. Macdonald?
14          MR. MACDONALD:  Sure.  Let me -- I think, let me start
15    this discussion with a completely different approach that I
16    previewed before, which is that what sounds like what is on
17    offer from plaintiffs is a lot of very burdensome and very
18    expensive discovery and a lot of decisions for the Court to
19    make about privilege.  There may be extensive investigation of
20    every kind of communication system, 30(b)(6) depositions.
21          There's, apparently, a lack of trust in the work that
22    I do when I investigate and do document discovery.  I would
23    submit, your Honor, that this is a case that calls out for a
24    stay of discovery while our motion is pending, all discovery,
25    not just deposition discovery.

I9CPPHOO

1              There's well-established case law in this circuit that

2         a plaintiff is not entitled to discovery while they file a

3         valid motion to dismiss -- excuse me, while they file a valid

4         pleading.  So there's no unfairness in saying to the plaintiffs

5         that they've gotten a lot of discovery and they're not entitled

6         to more.  I think they've gotten an unusual amount of discovery

7         before they file a valid pleading.

8              This clearly meets the balancing test that this

9         circuit follows.  There's a substantial argument for the motion

10        to dismiss.  I think the motion to dismiss argument is very

11        strong and very likely to dispose of the case, since I don't

12        think there are well-pleaded allegations that The Getty has a

13        deal, and I think there's a reason for that.

14             And I think the burden that this discovery has already

15        put on The Getty and the burden going forward justifies a stay.

16        If the complaint survives a motion to dismiss, we can have this

17        discussion in the future.  So that would be my proposal going

18        forward, and a way to sort of short circuit this discussion and

19        put it off in case it's necessary because, in my view, your

20        Honor, it's not going to be necessary.

21             THE COURT:  Let me ask you this, Mr. Macdonald,

22        because again, I'm trying to see this in the following way.  To

23        the extent that you've made searches and you've determined that

24        there are no responsive documents, that's one thing.  But what

25        representations have been made to plaintiffs about the sources

I9CPPHOO

1    that have been -- the file cabinets, if you will, that have

2    been searched?

3         MR. MACDONALD:  I don't know how specific we have ever

4    gotten in those discussions.  We did what I think was a very

5    standard and customary investigation, talked to custodians

6    about where they kept documents, where we might find custodial

7    documents.  We've produced very substantial paper files.  We

8    have produced personal e-mails from Tim Potts' personal e-mail.

9    We searched --

10        THE COURT:  And who's Cox?

11        MR. MACDONALD:  Dr. Potts.  Dr. Potts is the director

12   of the museum.

13        THE COURT:  Okay.

14        MR. MACDONALD:  He's the head honcho at The Getty

15   Museum.

16        THE COURT:  Okay.

17        MR. MACDONALD:  We believe searched his text messages

18   as well.  We did not do that for every single custodian, but

19   we've been very clear with them what e-mails we searched and

20   which e-mails we haven't.  And this is the first time I'm

21   hearing specific complaints about the way we did that search.

22        I mean, this dispute about current document production

23   began with plaintiff's second set of RFPs, which asked for

24   Torlonia-related documents in a million different ways, and our

25   response, your Honor, was to say we've already produced the

I9CPPHOO

1    Torlonia-related documents.

2            We've already searched for those.  You know the search

3    protocol we ran.  You know the files that we searched.  You

4    know whose e-mails we searched.  There was no request to go --

5    at that time, to go out and look at a different source.

6            They want to talk about a source.  I'm happy to engage

7    in a negotiation about sources.  I do think it's fair to ask,

8    however, that we get some closure on this issue so that I'm not

9    being subjected to serial discovery.

10           MR. SHORE:  Your Honor, it makes no sense.  The amount

11   of time they have wasted on fighting discovery, if there is no

12   deal, there never was a deal, there's not going to be a deal,

13   the time they spent fighting discovery, this could have been

14   all done and over.  This makes no sense.

15           Now, if the Court, and I think their motion to dismiss

16   is borderline frivolous based upon your Honor's own decisions

17   that we cite, and your Honor's decisions that's cited about

18   what's required to plead a contract.  It's a frivolous motion.

19   They know it.  It's a hail Mary in the snow, which it's not --

20   I'm a Dallas Cowboy/Minnesota Viking analogy.

21           But if the Court's going to overrule this motion or

22   deny this motion in relatively short order, then this is all

23   for nothing because then we'll start full bore discovery on

24   every issue, and all this won't matter.  But I should at least

25   get a deposition, and I know you said no, but I should at least

I9CPPHOO

1   get a deposition on what they've done to search.  Let me go in

2   and find out --

3            THE COURT:  Well, would you be satisfied with the

4   lawyer's proffers as to what it is they've done?

5            MR. SHORE:  No, I would not and here's why.

6            THE COURT:  Why not?

7            MR. SHORE:  Because I think what they've done is they

8   called The Getty and said, hey, go look for this stuff, and

9   they have the custodians do the search, and they have The Getty

10  do the search.  The Getty has already admitted they lied to us

11  repeatedly.

12           MR. MACDONALD:  That, I want to respond to that.  That

13  is not true, your Honor.

14           MR. SHORE:  And so --

15           THE COURT:  Mr. Shore, you keep saying they've

16  admitted stuff, but you know, when I hear it, that doesn't

17  sound like something they would admit to if they're still in

18  this case.

19           MR. SHORE:  Well, again, this is with the whole

20  definition of transaction.  They admitted they went behind the

21  backs of my clients and contacted the Torlonia family.  They

22  admitted they went to Italy with 30 people and didn't tell my

23  client about it and viewed the collection and talked to the

24  Torlonia family.  They admit they hired an Italian lawyer to

25  consult with them on how to acquire the collection and legally

I9CPPHOO

 1    get it out of Italy.

 2              They did all that without telling my client, and their

 3    whole thing is, we went behind your back and we did this, and

 4    at the time that they were doing all this stuff behind their

 5    back, Mr. Potts looks my client in the eye in New York City and

 6    said, we don't have any interest in this collection.  That's

 7    part of the fraud claim.

 8              THE COURT:  That's part of the?

 9              MR. SHORE:  That's part of the fraud claim.

10              THE COURT:  Okay.

11              MR. SHORE:  That they actively concealed their

12    circumvention.  Now, their whole thing is, well, it's okay for

13    us to do that because we weren't talking about a purchase.  We

14    were talking about exhibition, or we're talking about a loan or

15    we were talking about something else.  But whatever these

16    things were that they were talking about, they're a transaction

17    under the agreement.

18              So everything that they tell you that they are denying

19    that they did anything wrong is based upon an interpretation of

20    the agreement that a transaction only involves a sale and

21    nothing else.  That's the disconnect.

22              So, you know, if your Honor is -- I think the 12(b)(6)

23    should be converted to a summary judgement and held in abeyance

24    until discovery is finished, actual, real discovery.  If the

25    Court wants to go ahead and deny it, which I think it should,

I9CPPHOO

1    please deny it soon so we can start taking depositions and

2    getting this case prepared.

3         I don't want to come back here and bother you with

4    this again and again.  I don't want to argue with them over

5    whether or not I get a deposition on this subject, limited or

6    not limited.  Let's get this case going, and stop the serial

7    12(b)(6) motions.

8         THE COURT:  Let me ask you this, then because these

9    letter request leave to make a motion to compel.  Do you want

10   to make the motion?

11        MR. SHORE:  Yes, but I mean, I think the response to

12   the motion is going to be -- I think the response to our motion

13   to compel is we going to be we shouldn't get any discovery

14   until the 12(b)(6) motion is decided, and if that's going to be

15   their response, if that's their response, and I think that is

16   going to be their response, let's deny their 12(b)(6) motion

17   and let us go do discovery and we'll see you for trial.

18        But right now, this is just going to be another --

19   it's going to be a 12(b)(6) after 12(b)(6), delay after delay,

20   block, obstruct, obstruct, obstruct.  And yes, I mean, let me

21   file my motions to compel.  Let me take depositions.  Let's

22   have a lawsuit.

23        THE COURT:  Mr. Macdonald?

24        MR. MACDONALD:  I mean, I think we should not have

25   discovery right now would be part A of my opposition to the

I9CPPHOO

1    motion to compel, but I certainly think we would respond on the

2    merits.  I think the discovery that we have -- for the searches

3    for documents that were done in this case have been quite

4    reasonable, and I think they're defensible, and eminently so.

5    And I think they were done in an ordinary way.

6            I would like to say, and I don't think I actually have

7    a response to my question to Mr. Shore about whether or not he

8    would agree to pay our attorney fees for the case if he turns

9    out to be wrong, and there's no deal.  And I would offer

10   depositions of some reasonable number of Getty executives to

11   testify on the question of whether there's a deal, and if

12   there's no deal, then move for summary judgement, case over and

13   we get our fees.  I'd make that bargain.

14           THE COURT:  Who would you propose to have deposed on

15   the question of whether or not there was a deal?

16           MR. MACDONALD:  I'd like to consult with my client

17   briefly before I answer that question.  Is that acceptable,

18   your Honor?

19           THE COURT:  Sure.

20           (Pause)

21           MR. MACDONALD:  I would propose, as part of my offer

22   to Mr. Shore, in exchange for a promise of attorney fees, to

23   put up Mr. Clark, who is The Getty's general counsel;

24   Dr. Potts, who is the head of the museum; Dr. Cuno, who is the

25   head of the entire Getty Trust, so the entity that sits above

I9CPPHOO

1  and manages the Museum; and Dr. Jeffrey Spier, who is the

2  director of the antiquities department, head antiquities

3  curator?  Senior curator of antiquities.  He's the head honcho

4  of the antiquities department.

5         THE COURT:  Okay.  So this is what I will do,

6  Mr. Shore.  I will reverse myself to the extent that I will

7  allow you to take a deposition of those four individuals on the

8  limited question as to whether or not there was a deal.  If you

9  choose to take those depositions, but I'll leave that up to

10  you.  Otherwise, I will not lift the stay.

11         Other than that, I'm just going to have you folks go

12  ahead and brief this, and I can determine it on the papers.

13  But it would be helpful to the Court, Mr. Macdonald, to know

14  what it was that counsel has done, the defendants have done, by

15  way of ensuring that all relevant documents have been located.

16         So how much time do you want to make your motion,

17  Mr. Shore?

18         MR. SHORE:  30 days?

19         THE COURT:  30 days.  30 days to respond.  Two weeks

20  to reply.

21         MR. SHORE:  May I ask for one clarification on our

22  deal depo?

23         THE COURT:  You don't have to pay their attorneys'

24  fees.

25         MR. SHORE:  No, no.

I9CPPHOO

1          MR. HOWARD:  That's an important clarification.

2          MR. SHORE:  No, my clarification is deal, any contacts

3    between those people and the Torlonia family about any type of

4    transaction at all, exhibition, donation, sale, lease, payments

5    to any other Torlonia entity that would be consideration for

6    doing it, like support for the bank or anything like that, just

7    any transactions of any type or kind -- transactions as defined

8    in the agreement -- transaction of any type or kind between the

9    Torlonia family and The Getty.

10         THE COURT:  Mr. Macdonald?

11         MR. MACDONALD:  Without agreeing to the definition of

12   transaction that counsel just used, we will interpret deal very

13   broadly.  They'll be free to inquire about The Getty's

14   relationship with the Torlonia family from -- I would request a

15   couple of, I think, limitations in exchange for that, your

16   Honor.  And I would submit a couple of possibilities.

17         THE COURT:  Okay.

18         MR. MACDONALD:  One, I think we should have reasonable

19   time limits on these depositions.  These are very important

20   people with very busy jobs.  I would propose two hours, and we

21   do them all in one day.

22         THE COURT:  We'll go with half-day each.

23         MR. MACDONALD:  Half-day each.  Very good.  Second --

24         MR. SHORE:  Just --

25         MR. MACDONALD:  I'd like to request leave to move for

I9CPPHOO

1    summary judgement, and I'd like to reserve all of my remedies

2    under Rule 11 and otherwise, if the testimony turns out to be

3    wrong.

4                THE COURT:  I'm sorry, you lost me.

5                MR. MACDONALD:  I'm sorry.  Let me rephrase it this

6    way.  I think if I put up witnesses, it would be reasonable for

7    me to submit a motion -- to get leave to file a motion for

8    summary judgment on this case the minute those depositions are

9    complete.

10               MR. SHORE:  Your Honor, if he gives me seven full

11   hours of normal time for each of these witnesses, I'll let him

12   file a motion for summary judgement.  But half a day, that just

13   gives them the ability to play delay games and play games.

14               THE COURT:  And if they do that, you can come back to

15   me and I'll give you another half day.

16               MR. SHORE:  Do you really want to have another hearing

17   on that?

18               THE COURT:  Well, I want to get this thing resolved,

19   and it seems like we're arguing about minutia that adults

20   should be able to figure out on their own.

21               MR. SHORE:  I agree with your.  I mean, just let me

22   take the deposition just according to the -- I'm not going to

23   waste their time.

24               THE COURT:  If you were going to be deposing them on

25   the entire case, you would have a day.  This is a limited

I9CPPHOO

1    deposition.  Half day, and if you need to come back, I will

2    hear you.

3              MR. SHORE:  Can we call that four hours?

4              THE COURT:  Yes, four hours.  That's my definition of

5    half day.

6              MR. SHORE:  Okay.

7              THE COURT:  Okay.

8              MR. HOWARD:  Your Honor, do you want to hear argument

9    on the privilege issues, or are we just going to brief it all?

10              THE COURT:  Brief it all.

11              MR. HOWARD:  Okay.

12              MR. SHORE:  And we'd be happy to have a special

13    master, and I'll pay for it.

14              THE COURT:  Then agree on a special master.

15              MR. SHORE:  They'll submit all their privileged

16    documents, we'll submit all our privileged documents and let

17    the special master decide.  I'll pay for it.

18              THE COURT:  I'm happy to consider that.  Put that in

19    your motion because I don't want to look at all those

20    documents.  Okay?  So we have the dates for the motion?

21              THE DEPUTY CLERK:  The motion is due October 12th,

22    2018.  The opposition is due November 12th, 2018, and the reply

23    is due November 30, 2018.

24              THE COURT:  And I take it, Mr. Shore, that you are

25    going to be taking those depositions?

I9CPPHOO

1          MR. SHORE:  I will be taking those depositions.

2          THE COURT:  Very well.  Obviously, no one's rights

3     are -- you have whatever rights you had when you came in here.

4     So you can make whatever motions you want that are appropriate.

5     Okay?

6          MR. SHORE:  Thank you, your Honor.

7          MR. MACDONALD:  Thank you, your Honor.

8          THE COURT:  Thank you, folks.

9          (Adjourned)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25